## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO.: 14-80900-CIV-ROSENBERG-BRANNON

CREATIVE AMERICAN EDUCATION, LLC,
a Colorado Limited Liability Company,

      Plaintiff,

v.

THE LEARNING EXPERIENCE SYSTEMS,
LLC, a Delaware Limited Liability Company,
ANTHONY KORDA, an individual, ANTHONY
KORDA D/B/A KORDA, ZITT & ASSOCIATES,
and THE LAW OFFICES OF ANTHONY KORDA,
LLC, D/B/A KORDA, ZITT & ASSOCIATES, a
Florida Limited Liability Company,

      Defendants.
_____/

THE LEARNING EXPERIENCE SYSTEMS, LLC,
A Delaware Limited Liability Company and
TLE AT PARKER, LLC, a Delaware Limited Liability
Company, and TLE AT AURORA, LLC, a Delaware
Limited Liability Company,

      Counter-plaintiffs,

v.

CREATIVE AMERICAN EDUCATION, LLC, a
Colorado Limited Liability Company, and
BERNARD LOGANATHAN, an individual, and
BEEVE SHAIK ALUDEEN-LOGANATHAN a/k/a
KATIJAH SHAIK ALUDEEN, an individual

      Counter-defendants,
_____/

BERNARD LOGANATHAN, an individual, and
KATIJAH  BEEVE BINTE SHAIK ALAUDEEN,
an individual,

      Counterclaim plaintiffs,

**AMENDED COMPLAINT
AND COUNTERCLAIM**

v.

THE LEARNING EXPERIENCE SYSTEMS,
LLC, a Delaware Limited Liability Company,
ANTHONY KORDA, an individual, ANTHONY
KORDA D/B/A KORDA, ZITT & ASSOCIATES,
and THE LAW OFFICES OF ANTHONY KORDA,
LLC, D/B/A KORDA, ZITT & ASSOCIATES, a
 Florida Limited Liability Company,

      Counterclaim defendants

      Plaintiff and counterclaim plaintiff, Creative American Education, LLC ("Creative American") and counterclaim plaintiffs Bernard Loganathan ("Mr. Loganathan") and Katijah Beeve Binte Shaik Alaudeen ("Ms. Alaudeen") (collectively, the "Loganathans"), by their attorneys, Hirzel & Dreyfuss, P.A., and Einbinder & Dunn, LLP, for their amended complaint and counterclaim in the above-entitled action, allege as follows:

## Jurisdiction and Venue

      1.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as more fully detailed below.

      2.    Jurisdiction is also proper, pursuant to 28 U.S.C. §1331, with respect to the claims of Creative American against defendant The Learning Experience Systems, LLC ("TLE") under the Securities Act of 1933, *15 U.S.C.A. §77(b)*, the Securities Act of 1934, *15 U.S.C.A. §78(c)*.

      3.    Venue is proper in this district pursuant to the agreements between Creative American and TLE. Venue is proper as to defendants Anthony Korda, individually, Anthony Korda d/b/a Korda, Zitt and Associates (together "Korda") and The Law Offices of Anthony Korda, LLC d/b/a Korda, Zitt and Associates ("Korda LLC" and, together with Korda, the "Korda Parties"), pursuant to 28 U.S.C. § 1391 (b)(1) and (2), as Korda does business and, upon

information and belief, resides, in the Southern District of Florida; Korda LLC is subject to jurisdiction in the Southern District of Florida; and because the acts or omissions which give rise to the claims against the Korda Parties occurred in the Southern District of Florida.

4.      The amount in controversy on each of the counts set forth below exceeds the sum of $75,000 exclusive of interest and costs.

## The Nature of the Action

5.      This action alleges that TLE defrauded Creative American into entering into a series of agreements relating to Creative American's acquisition of two TLE franchised child care centers, and the management of those centers by TLE. Creative American's principal, Ms. Alaudeen, and her husband, Mr. Loganathan wanted to immigrate to the United States. TLE exploited this and defrauded Creative American by representing that it could get the Loganathans a "fast track" to a green card through an immigration investment program, and by representing that TLE had significant experience in such investment programs. Creative American invested and lost over $2.5 million, money originally invested in Creative American by the Loganathans, from the acquisition of two TLE franchised child care centers, which TLE grossly and intentionally mismanaged. As part of its fraudulent scheme, TLE also referred the Loganathans to the Korda Parties, who would give the Loganathans "independent" legal advice. In fact, the Korda Parties failed to give even the most basic advice regarding the immigration issues which were so clearly the purpose of Creative American's and the Loganathans' investment. Thus, Creative American claims here that: TLE fraudulently induced it to enter into multiple agreements, violated Florida's Deceptive and Unfair Trade Practices Act, breached the agreements between the parties, violated the covenants of good faith and fair dealing implicit in those agreements, and also breached its fiduciary duties and violated its obligations as Creative American's attorney in fact pursuant to a

management agreement and two powers of attorney. Creative American and the Loganathans claim that the Korda Parties, committed attorney malpractice, breached their fiduciary duties and breached their agreements with Creative American and the Loganathans. As a result, Creative American and the Loganathans have suffered and seeks to recover at least $2.5 million in damages.

## The Parties

6.      Creative American is a Colorado limited liability company, with a principal place of business in Colorado.

7.      Ms. Alaudeen, is the sole member of Creative American. Ms. Alaudeen is a foreign citizen, is currently a resident of Colorado, and is domiciled in Colorado under an E2 visa.

8.      Mr. Loganathan, is a foreign citizen who is currently a resident of Colorado, and is domiciled in Colorado under an E2 visa.

9.      Defendant, counter-plaintiff and counterclaim defendant TLE is a Delaware limited liability company. Its principal address is 4855 Technology Way, STE 700, Boca Raton, Florida, 33756. It is wholly owned by its parent company, The Learning Experience Holding Corp., which is a Delaware Corporation, with the same principal address in Boca Raton, Florida.

10.      Upon information and belief, defendant and counterclaim defendant Anthony Korda is a resident of Florida. Upon information and belief, during the period until December 31, 2013, Anthony Korda did business under the name "Korda, Zitt and Associates."

11.      Upon information and belief, defendant and counterclaim defendant, Korda LLC is a Florida limited liability company ("LLC") which, no later than July 2014, has been doing business as Korda Zitt & Associates. Upon information and belief, Korda LLC's principal place of business is in Florida and Anthony Korda is its sole member.

## <u>Facts</u>

12.    TLE is a franchisor of childcare centers established by the Weissman family, which, according to TLE's web site, is known in the childcare business for developing the Tutor Time franchise, which became the largest franchise childcare operation in the world and the fourth largest for-profit child care company in the United States. According to TLE's web site, the Weissman family sold Tutor Time in or about 2000, and created TLE, which, TLE claims, is the now fastest growing childcare franchisor in the United States, with more than 200 locations across the country.

13.    Creative American became a TLE franchisee in 2011 when it acquired two TLE franchise centers in Colorado. Creative American was formed by Ms. Alaudeen who, with her husband, Mr. Loganathan, ran a child care center in Singapore and wished to become United States citizens by investing in a similar business here.

14.    The Loganathans, as citizens of Singapore, wished to immigrate to the United States with their three children, under the fifth employment based preference immigrant visa category (the "EB-5" program, referenced above). Foreign investors who wish to become permanent residents of the United States can do so under the EB-5 program, which requires the immigrant to invest money into a business in the United States that will create at least ten full-time jobs for United States citizens. After researching child care franchises, The Loganathans selected TLE because of the statements on its web site, set forth in greater detail below, regarding its significant knowledge of and experience with the EB-5 program, and its representation that visa applications associated with investments in TLE would receive expedited treatment from the United States Citizenship and Immigration Services (USCIS).

15.    In or about June 2011, the Loganathans contacted TLE to request information about investing in a TLE franchise pursuant to the EB-5 program. They were

immediately contacted via e-mail by Barry Collins, a TLE franchise consultant who stated that TLE was the fastest growing child care company in the country and that its "[f]ranchisees are experiencing unprecedented growth and profits."

16.     Collins directed the Loganathans to review TLE's web site again for information about investing in TLE for an EB-5 visa. TLE's web site states that TLE's EB-5 applicants receive a "fast track processing route to a Green Card," and that its EB-5 program provides "a reliable path for foreign nationals and their immediate families to invest in the United States and gain permanent green card status to live, work or retire anywhere within the country." TLE's web site also stated one of the basic requirements for an EB-5 visa is a $1 million investment, which would be returned in full if the visa application was denied for any reason. TLE's web site stated that TLE could recommend an "independent attorney" to assist with EB-5 applications.

17.     TLE's web site promised extensive initial training, unparalleled ongoing training and support, and guidance from TLE staff who are experts in the field, stating that providing these services "has given [TLE] a hard-earned and well-deserved reputation as not only one of the best child care franchisors, but one of the best franchisors, period." The web site also stated that TLE promotes cultural diversity, is an equal opportunity, and affirmative action employer.

18.     TLE claimed, on its web site, to have "innovated and developed the premier child care product available on the market today," stating that "[f]rom the ground up, our facilities and services have set the standard in our industry. We are [often] imitated, but never duplicated." TLE's web site claimed to have been able to set such a standard "through the vast experience of our founders and executive officers[, who] have been in the child care business for more than

quarter century," stating that its officers and founders have "built, operated and franchised more than 2.5 million square feet of child care space in the majority of the U.S. and in four other countries."  The web site further stated that TLE's management's "nearly three decades of child care expertise, experience and knowledge" would be bestowed upon its franchisees to make their journey as a child care operator "a successful and lucrative venture," asserting that "with TLE, you're in business for yourself, but not by yourself."

19.     On June 30, 2011, Collins sent the Loganathans a Franchise Application and a Financial Fact Sheet. The fact sheet stated that the cost to run a 10,200 square foot TLE center was approximately $500,000, which included $150,000 in operating funds, which would be sufficient to operate the centers for a year. On July 5, 2011, Collins sent the Loganathans an e-mail which stated that a leased center would cost between $450,000 and $500,000 to acquire, so to qualify for TLE's EB-5 program, the Loganathans would have to invest in two centers.

20.     In or about July 2011, Collins sent the Loganathans a Franchise Disclosure Document ("FDD") to review. The purpose of the FDD is to provide Federal Trade Commission required information concerning investment in a franchise.

21.     Item 7 of the FDD outlines the estimated initial investment franchisees can expect to make, including estimates for rent, security deposits, insurance deposits, state and local licenses, employee salaries and operating funds. Item 7 of the FDD supported Collins' statements to the Loganathans – including that they could open up a TLE franchise for $500,000, which included a $60,000 franchise fee and $150,000 in operating expenses.

**TLE refers the Loganathans to a hand-picked immigration attorney**

22.     Shortly after providing the FDD, Collins sent the Loganathans contact information for the Korda Parties, to help with their EB-5 application. Upon providing the Korda

Parties' information, Collins advised the Loganathans to keep him copied on any legal correspondence. It appears that Korda was anything but the "independent attorney" described on TLE's web site, and was actually more invested in TLE's success than in the Loganathans' interests.

23.     After receiving Collins' referral, the Loganathans immediately e-mailed Korda, and copied Collins on the e-mail, stating that they were referred by TLE and needed advice regarding an application for an EB-5 visa. The Loganathans stated in their initial e-mail that they were planning to purchase two TLE centers "at a total investment of [$1] million," would be employing 10 citizens or more, and that they understood this would entitle them to apply for an EB-5 visa. The Loganathans requested that Korda advise them if he would be able to aid them in their EB-5 application, and, if so, asked when they could commence the application. Korda responded, on July 16, 2011, stating that he would be "delighted to assist with the preparation and filing" of the Loganathans' EB-5 application and agreeing to represent the Loganathans. The July 16, 2011 e-mail also contained a description of fees and the services Korda agreed to provide to the Loganathans, including "liaising with TLE" to obtain all relevant documents and filing the I-526. Korda also began advising the Loganathans in the July 16, 2011 e-mail, pursuant to the agreement above, stating that the Loganathans' application could be filed "as soon as the funds have been invested" and that the funds should go "directly to the project." The July 16, 2011 agreement is annexed hereto as <u>Exhibit 1. In this case, "d</u>irectly to the project" meant to a bank account, set up in Creative American's name but wholly controlled by TLE, as detailed below.

24.     The Loganathans replied, via e-mail, on July 17, 2011, forwarding a list of questions to Korda regarding the application process. At that time, the Loganathans believed that they were represented by the Korda Parties with respect to all transactions with and investments

8

in TLE related to their EB-5 application, including with respect to setting up all necessary legal entities required to complete their application and complete their investment. The Loganathans have been continuously represented by the Korda Parties since that time until approximately July 2014. The Loganathans specifically asked Korda whether they would be able to reside legally in the U.S. while their application was being submitted. Korda responded that same day, via e-mail, stating that the Loganathans could enter the U.S. on a temporary visa and submit their I-526 application, which would start the EB-5 process. The Loganathans also asked Korda whether they could apply for the I-526 after the first installment payment they planned to make to TLE. Korda responded that the Loganathans would have to make a full $1 million investment before they could file for the I-526.

25.     Korda did not advise the Loganathans, in the July 17, 2011 e-mail exchange, or otherwise, to consider investing in a franchise located in a Rural Area or a Targeted Employment Area (TEA), where the required investment would only be $500,000, nor did he advise the Loganathans that well over 90% of EB-5 applicants invest this lower amount. Korda also did not advise the Loganathans that many franchise systems in the United States with EB-5 programs provide franchise locations in qualifying areas, and that the Loganathans should consider researching alternative options. Korda did not even advise the Loganathans to determine whether the proposed TLE locations qualified for the lower investment threshold – something immigration attorneys can do via a census search. Korda was aware that the Loganathans were considering alternative locations for their franchise – the Loganathans forwarded Korda e-mail correspondence with Collins discussing the cost variables between centers in Florida, Texas, Seattle and Colorado, yet Korda did not at any time advise the Loganathans that their investment costs could be cut in half by choosing a TEA location, or check to see if any of the TLE locations the Loganathans were

considering were TEA locations. The Loganathans would not have invested $1 million with TLE had they known that only $500,000 was necessary to get a green card through the EB-5 program.

26.     Collins remained involved in the Loganathans' correspondence with Korda, often conveying legal information to the Loganathans. For example, on July 23, 2011, Collins e-mailed the Loganathans stating "You will form an entity in the U.S. such as [a limited liability company] and deposit the $1 [million] in the operating account. You will then write checks out of that account as needed… [A]ccording to Anthony Korda, the [f]ull $1 [million] needs to be in the account to start the [EB-5 application] process." The Loganathans forwarded this e-mail to Korda, but at no time did Korda object to Collins' characterization of his legal advice. The operating account that Collins was referring to was a bank account, set up by TLE in the name of the Loganathans' LLC, over which TLE had full control.

27.     Also on July 23, 2011, the Loganathans e-mailed Korda, referring to Collins' e-mail, above, and stating that they had been told to deposit "the required" $1 million into a LLC "that we set up on our own so that we can commence with our [I-526] application." The Loganathans asked Korda whether they could commence the I-526 petition after the $1 million was deposited into a LLC's bank account "set up to do business with TLE." Thus, Korda knew or should have known that the Loganathans intended to invest their money into the above-referenced account in Creative American's name over which TLE would have complete access and control. The Loganathans stated their understanding that "technically, the funds [would not be] invested into the business at the [onset], rather they will be distributed [periodically] during the course of the business." The Loganathans asked whether this was sufficient to satisfy the EB-5 investment requirement. In response that same day, Korda advised the Loganathans that the funds would have to be "fully committed" to the project before they could file their I-526 petition. At no time during

the July 23, 2011 e-mail exchange did Korda advise the Loganathans that, in fact, nearly all EB-5 applicants invest their money into an escrow account before they file their I-526 petition, so that their money can be refunded if the I-526 petition is rejected. Korda did not inquire at all as to what access or control TLE would have over the Loganathans' investment, and did not, at any time, advise the Loganathans to limit TLE's access to their money. Moreover, during the July 23, 2011 e-mail exchange, the Loganathans asked Korda specific questions about setting up a LLC. The Loganathans wanted to know whether they could deposit their EB-5 investment money into a bank account owned by a Texas LLC they had already created. In response, Korda advised the Loganathans to create a separate LLC (which later became Creative American) and stated that he could arrange to set up the LLC for them. Later that same day the Loganathans asked Korda whether they should set up two LLCs – one for each center. On July 25, 2011, Korda replied, and advised the Loganathans to set up a single LLC, and further advised them to set the LLC up in the state where the business would be located.

28.     On July 25, 2011, the Loganathans again asked Korda whether the entire $1 million had to be invested into a business account (which they had referred to in their July 23, 2011 e-mail as being "set up to do business with TLE" and over which they intended to give TLE complete access and total control) for their LLC prior to filing their I-526 petition. Again, Korda responded by stating that their I-526 petition could only be filed once the funds were "committed to the project." Korda stated that an escrow account was "acceptable" but failed to advise the Loganathans that, in fact, an escrow is the industry standard, and is essential to ensure that the investment is refundable. On July 28, the Loganathans e-mailed Korda and stated that "Collins from TLE [had advised them] that it would be okay [for the Loganathans] to transfer the funds to the TLE account which would constitute [their] investment of [$1 million] for [the I-526 petition]."

11

29. Based on the July 2011 e-mails, among other things, Korda was fully aware that the Loganathans intended to make an investment into a LLC account in Creative American's name that TLE would have the ability to withdraw from and use to fund the build out of the centers.

30. On August 17, 2011, the Loganathans e-mailed Korda stating that they were employing a company to help them prepare the necessary paperwork to create their LLC, as Korda had advised, and that they would keep Korda appraised of new developments. Thus, Korda was also fully aware that the Loganathans were creating a new LLC, based on his advice, and that any amounts invested by the Loganathans, would flow through the LLC's bank account. Accordingly, any investments whatsoever made to TLE would be made by both the Loganathans and Creative American. At this time, the Loganathans believed that the Korda Parties represented them both individually, represented Ms. Alaudeen as a principal of Creative American and Mr. Loganathan as an investor in Creative American and that the Korda Parties also represented Creative American. The Korda Parties have continuously represented the Loganathans, individually, Ms. Alaudeen as a principal of Creative American, Mr. Loganathan as an investor in Creative American, and Creative American, from that time up until approximately July 2014.

31. Thus, believing themselves to be represented by counsel, and in accordance with the advice received from counsel, the Loganathans invested $180,000 on September 19, 2011 into a bank account, in Creative American's name, which was set up and fully controlled by TLE and from which TLE could withdraw money in its sole discretion.

32. In September 2011, Korda still had not compiled the necessary paperwork to file the I-526 petition. The Loganathans asked Korda if they could enter the country earlier, so that they could look after their investment. Korda advised the Loganathans to apply for a temporary B1/B2 visa. However, instead of completing the application for them, Korda advised the

Loganathans to do it on their own. They did, and scheduled an interview for November 2011. Upon arriving at their interview, however, the Loganathans were immediately told that their application was missing critical information and was rejected. Thus, in November 2011, the Loganathans did not have an alternative visa to enter the country, and Korda had not yet filed their I-526 petition. At that time, the Loganathans were forced to enter into a management agreement, as detailed below.

33.     During this same time, in December 2011, Korda sent various e-mails to both the Loganathans and TLE regarding the formation of Creative American. Korda and Richard Weissman, TLE's chief executive officer, e-mailed directly with respect to whether the Loganathans should set up one or two LLCs. In connection with this correspondence, Korda was forwarded and/or copied on a series of e-mails between TLE and the Loganathans regarding Creative American's bank account and whether a second LLC should be formed. Korda e-mailed Weissman directly three times - twice on December 7, 2011, and again on December 8, 2011, to state that only a single LLC should be set up, and to explain how Creative American's formation should be handled to accommodate the Loganathans' I-526 petition. In the December 7, 2011 e-mail, Korda explained to Weissman that the problem with the approach Weissman had suggested – forming a holding company for two LLCs – would be that the Loganathans would be unable to prove that the required number of jobs were directly created as a result of their investment.

34.     Korda also sent several e-mails to Mick Rosetti, the Loganathans' personal attorney who was assisting the Loganathans in setting up Creative American and filing the necessary tax documents. On December 9, 2011, Korda e-mailed Rosetti to state that "[p]rior to filing the I-526 we will have to show that [the Loganathans] ha[ve] invested in [Creative American] and that [they] are involved in the management [of the TLE centers]." Upon

information and belief, Korda communicated with Rosetti on other occasions to advise on various aspects of Creative American's formation, including who its members and officers should be.

35.     In or about December 2011, the Loganathans requested that Korda send them a retainer agreement. Mr. Loganathan executed a retainer agreement with Korda on December 22, 2011, a copy of which is annexed hereto as <u>Exhibit 2</u>. On December 23, 2011, Korda told Mr. Loganathan that all checks regarding the Korda Parties' representation should be made out to "Law Offices of Anthony Korda."

36.     In January 2012, the Loganathans sent Korda a draft of the management agreement and asked him to review it. Korda never reviewed the agreement, and never advised the Loganathans that they should have another attorney review the document. The Loganathans believed that Korda had reviewed the agreement and did not have any questions or concerns and so, three days later, executed the agreement. Korda also did not tell the Loganathans that they were required to show, for the purposes of their I-526 petition, that they were involved in the management of the TLE centers, as he stated in his December 9, 2011 e-mail to Rosetti. Korda did not, at any time, advise the Loganathans that entering into a Management Agreement which gave TLE total control over the management of the centers would, in fact, make it more difficult or even impossible to file their I-526.

37.     From January 2012 until June 2012, Korda continued to tell the Loganathans that he was compiling information necessary for their I-526 petition. However, by June 2012, the Loganathans had invested $1 million, but Korda still had not filed the I-526 petition or even compiled the necessary documentation from TLE. In fact, to this day, the Loganathans I-526 petition has not been filed. The Loganathans' centers opened in September 2012 and January 2013, and were being managed by TLE, at a significant additional cost to the Loganathans. In

January 2013, the Loganathans again inquired of Korda whether they could apply for a temporary visa. Korda finally filed an application for an E2 visa in or about March 2013. The Loganathans did not arrive in the United States until June 2013 – nine months after their first center had become operational and nearly two years since their retention of Korda and their subsequent initial investment in TLE. By June 2013, TLE had spent over $1 million of the Loganathans' and Creative American's money.

**The Initial Investment**

38.     In August 2011, the Loganathans sent a list of questions to Collins. Specifically, the Loganathans inquired about the initial investment amount, whether the operating capital was included in the total investment amount needed to open the center, whether TLE would refund their investment if their visas were not approved, and whether TLE would supply them with a memorandum regarding Colorado's state and local rules and regulations applicable to child care centers. On August 2, 2011, Collins replied, stating that the $150,000 required in operating capital was included in the $500,000 needed to open each center, and that their investment would be refunded if their visa was not approved. Collins stated "since the centers will be open and operating prior to visa approval, should you not be approved, TLE would sell the businesses and return your money in full." Further, Collins assured the Loganathans that TLE would provide them with all of the applicable state rules and regulations.

39.     As noted above, on September 19, 2011, based on TLE's agreement to refund their money, and Korda's failure to advise them or Creative American to invest their money into an escrow account or to otherwise enter into a written agreement to ensure that TLE would honor its promise to refund their money, the Loganathans made their first investment of

$180,000.00. The money was invested into a bank account in Creative American's name that TLE set up, had complete control over and would use to fund the build out of their centers.

**The Franchise Agreement**

40.     On September 19, 2011, the Loganathans, in trust for Creative American, entered into two identical franchise agreements (the "Franchise Agreements") with TLE, to open franchise locations in Parker, Colorado and Aurora, Colorado (the "Parker Center" and the "Aurora Center"), and on November 18, 2011, made a second payment to TLE of $150,000.00. The Franchise Agreements are annexed hereto as Exhibits 3 and 4. Simultaneously with executing the Franchise Agreements, the Loganathans each individually executed two identical documents titled "Personal Guaranty and Subordination Agreement" (the "Guarantys"). The Guarantys are attached to the Franchise Agreements as "Attachment 4." See Exhibits 3 and 4, Attachment 4.

41.     Among other things, the Franchise Agreements provided that Creative American would have 30 days from the receipt of a written notice to cure any alleged default prior to termination by TLE, and that in the event of any legal action to enforce the terms and conditions of the Franchise Agreement, then "the prevailing party will be entitled to recover reasonable compensation for preparation, investigation and other costs and reasonable attorneys' fees…"

**The Loganathans are forced to sign a management agreement**

42.     As stated above, in November 2011, after they had already invested $330,000.00, the Loganathans' B1/B2 visa application was rejected, and on November 24, 2011, the Loganathans advised TLE that their arrival to the United States would be delayed.

43.     In response, Weissman e-mailed the Loganathans on November 28, 2011, stating that "[a]s a $1 million investor you are granted a green card to citizenship under the EB5 program in the USA." Weissman further stated that TLE would agree to manage the Loganathans'

16

centers and described the terms of such an arrangement, including a 4% management fee. In addition to the 4% fee, TLE required that the Loganathans advance their entire $1 million investment, including all operating capital, up front. At that time, the Loganathans' had already invested $330,000 in the two centers, and had no choice but to enter into a management agreement with TLE. Weissman wrote that TLE would "hire the staff[,] manage the day to day, prepare financial[] statements monthly to forward to you, and take on the responsibility of operations of your center." On November 30, 2011, Weissman sent the Loganathans a further breakdown of the management fee, stating that the fee would stop after the Loganathans were "100% trained" and had assumed management full-time at the centers, at which point the Loganathans would co-manage the centers with TLE for six months. Weissman stated that TLE currently managed "multiple centers for franchisees" and reassured the Loganathans that "this [was] not new to [TLE]. [TLE will] basically do everything for your entities…"

44.     Based on all of the assurances from the various e-mails from Collins, the assurances of Weissman, and the effusive descriptions of TLE's experience and innovation in the industry, as described above, the Loganathans agreed to make a third payment to TLE and to enter into a management agreement. Thus, on December 15, 2011, the Loganathans deposited $305,787.50 into their centers' operating accounts - bringing their total investment up to $635,787.50.

45.     On January 23, 2012, Mrs. Alaudeen and Creative American executed the Exclusive Center Management Agreement (the "Management Agreement"), pursuant to which TLE assumed authority over the management and operations of the centers. The Management Agreement is annexed hereto as Exhibit 5. Simultaneously with executing the Management Agreement, Mrs. Alaudeen, believing herself to be represented by the Korda Parties, assigned each

of the Franchise Agreements to Creative American, who she also believed to be represented by the Korda Parties. Both assignments were countersigned by TLE. Because the Loganathans could not come into the country to manage their investment of hundreds of thousands of dollars, The Management Agreement required them to give TLE a power of attorney to operate every aspect of the business on their behalf. Thus, the Management Agreement gave TLE power of attorney pursuant to paragraph 2(a), which states that Creative American "hereby grants absolute power of attorney … appointing [TLE] as its attorney-in-fact to act in its place and stead on all matters pertaining to the [c]enters." In addition, TLE required Creative American to execute two separate powers of attorney (the "Powers of Attorney") for each of the two centers, which are annexed hereto as Exhibits 6 and 7. All of these documents granted TLE extraordinary authority and control over the centers and over the Loganathans' and Creative American's substantial investment.

46.     The Management Agreement stated that TLE would contribute "invaluable effort and expenses" to the centers. TLE agreed, under the Management Agreement, that it was providing its services as a manager "in good faith" and agreed, among other things, to obtain childcare licenses for the centers in accordance with Colorado law and to open bank accounts for each center using Creative American's tax identification number. The Management Agreement states that only TLE will be a signatory on the accounts, and that Creative American will have no authority to withdraw funds from the accounts or take any funds from the centers while the Management Agreement was in effect. TLE agreed to use reasonable efforts to keep Creative American updated on center operations in a reasonable time, and to use reasonable efforts to manage the centers so they operate profitably as soon as commercially practical. The Management Agreements states that TLE will hire and train one Business Manager and one Center Director for

each center, and will "co-manage" the centers with Creative American for a period of six months after Creative American assumed operations.

47.    With regard to staffing the centers, the Management Agreement stated that TLE would hire and manage the centers' employees, however, the staff would at all times be Creative American's employees and all employment arrangements were therefore "solely [Creative American's] concern." Surprisingly, then, the Management Agreement also contained a clause which stated that Creative American shall have no contact with either Center Director, or with any other Center employees, and should address all communications, questions or concerns relating to the centers to Pat Campolo, a Senior Vice President of TLE.

48.    The Management Agreement also stated that in "any action or dispute, at law or in equity, that may arise under or otherwise relate to this Agreement or its enforcement, the prevailing party will be entitled to reimbursement of its attorneys' fees, costs and expenses from the non-prevailing party."

49.    On June 6, 2012, the Loganathans made a fourth payment to TLE of $364,212.50, bringing their total investment to $1 million.

50.    On July 20, 2012, TLE executed an assignment of lease (the "Parker Assignment of Lease") on Creative American's behalf, a copy of which is annexed hereto as Exhibit 8. Pursuant to the Parker Assignment of Lease, TLE "grant[ed], convey[ed], transfer[red] and assign[ed] to [Creative American] all of [TLE's] rights and obligations" under its lease for the Parker Center property. Pursuant to the lease that was assigned to it, Creative American became obligated to pay property taxes for the Parker Center property. This document was signed by Richard Weissman, on behalf of TLE, as the Assignor, and countersigned by Patrick Campolo, a TLE employee, on behalf of Creative American, as assignee.

51.     In September 2012, the Parker Center opened for operation. The Aurora Center opened in January 2013. As noted above, Korda did not submit an application for an E2 visa (or any other temporary visa to allow the Loganathans to enter the United States) until March 2013.

52.     On October 10, 2012, TLE executed an assignment of lease (the "Aurora Assignment of Lease") on Creative American's behalf, a copy of which is annexed hereto as Exhibit 9. Pursuant to the Aurora Assignment of Lease, TLE "grant[ed], convey[ed], transfer[red] and assign[ed] to [Creative American] all of [TLE's] rights and obligations" under its lease for the Aurora Center property. Pursuant to the lease which was assigned to it, Creative American became obligated to pay property taxes for the Aurora Center. This document was signed by Richard Weissman, on behalf of TLE, as the Assignor, and countersigned by Patrick Campolo, a TLE employee, on behalf of Creative American, as assignee.

53.     On June 17, 2013, the Loganathans arrived in Colorado under an E2 business visa. As soon as the Loganathans arrived in the United States, TLE demanded an additional infusion of $150,000.00, which was immediately paid, because both centers were rapidly losing money. In fact, by July 2013, the Parker Center had lost an average of nearly $20,000 each month in that year. TLE had rapidly burned through the $150,000 in operating capital, the Loganathans had provided, notwithstanding TLE's alleged experience in the industry.

**The Gross Mismanagement of the Centers**

54.     Pursuant to TLE's franchise system, and in accordance with Colorado's state regulations, each center is run by a Center Director and a Business Director. The Center Director and Business Director are employees of the center, paid from the center's payroll. TLE's

corporate offices employ an Area Director to oversee the operation of several centers in a geographic area.

55.     During their first month in Colorado, the Loganathans were shocked to hear of the appalling workplace conditions at the Parker Center. In or about June 2013, the Loganathans were informed by Parker Center staff that the Manager of the Parker Center Business Director, Jennifer Kinnan, and TLE's Area Director, Marrianne Giarttano, had mistreated the previous Center Director at the Parker Center and had harassed a former teacher at the Parker Center by making racist comments and acting abusively. The teacher had reported the racist comments to TLE but received no response.

56.     The Loganathans were understandably upset by the allegations, but had to immediately depart to Florida for their TLE training. While the Loganathans were at training, TLE fired Giarttano from her role as Area Director. Notwithstanding firing Giarttano for conduct, TLE hired her as the Center Director for the Parker Center. To make matters worse, TLE continued to pay Giarttano her former salary of $50,000.00 (far more than typical a typical Center Director salary), which was deducted from the Parker Center's payroll budget. This was shocking to the Loganathans, based on the reports of Giarttano's racist remarks and mismanagement as the Area Director, and because Item 7 of the FDD had estimated the expenses for payroll for the first six months of the center's operation to be between $15,000.00 and $50,000.00 total. Additionally, as stated above, the Parker Center was hemorrhaging money at that time. TLE hired a Center Director who it had just fired for making racist remarks, harassing and bullying staff members, and causing problems with teachers at the centers she oversaw to run the Parker Center and train the incoming owners who were foreign citizens. The situation was doomed to failure from the very beginning.

57.     The Loganathans returned to Colorado after completing their training in Florida, in July 2013, and contacted the Parker Center to arrange to drop their three children off the following afternoon. Immediately thereafter, the Loganathans received an irate phone call from TLE stating that they had put the Parker Center "at risk" by speaking to the staff, particularly Giarttano, directly.

58.     The next day, the Loganathans dropped their children off at the Parker Center. Upon arrival, they were immediately approached by Giarttano and Kinnan, who gave the Loganathans a list of grievances they had about the Parker Center, including, among other things, that the staff had received no curriculum or other, supplemental programs, that there was no money for marketing in the Parker Center's budget or money to hire new staff and, as a result, it was short staffed daily and "over-ratio," in violation of state laws, in several classrooms. The Loganathans were deeply troubled by the allegations, particularly those that put the center in violation of state rules, and asked Giarttano and Kinnan if they could document their grievances in an e-mail to be sent to TLE to facilitate a resolution. Giarttano and Kinnan agreed, and the Loganathans sent an e-mail detailing the same. The next day, TLE replied in a series of e-mails, stating that it was "done dealing with" the Loganathans, that TLE would not "babysit" the Loganathans and threatening to cancel the Management Agreement.

59.     In order to avoid the threatened cancellation of the Management Agreement, the Loganathans set up a conference call between the Loganathans, TLE, Giarttano and Kinnan. During the phone call, the Loganathans were told that they were to be trained at the Parker Center and would take orders from Giarttano and Kinnan until October 1, 2013. None of the issues raised by the Loganathans' e-mail were resolved. Instead, the Loganathans were warned not to bring up any grievances.

60.     During July, August and September 2013, the Loganathans were subjected to daily harassment and abuse at the hands Giarttano and Kinnan. The Management Agreement was scheduled to expire for the Parker Center in September 2013, so during this time, TLE and the Loganathans agreed that TLE would train them to take over the centers. However, the Loganathans were forbidden by TLE from speaking with teachers at the center, were forbidden from inquiring as to basic TLE policies – including Giarttano and Kinnan's required hours as the Center Director and Business Director, and were repeatedly chastised by TLE. Moreover, Giarttano and Kinnan refused to train the Loganathans on the business management of the center.

61.     Also during this time, the Loganathans were approached by various staff members with concerns as to their workplace conditions. For example, a teacher with diabetes told the Loganathans that she had not been allowed to take a lunch break and that she had three special needs students in her class but no aide –a violation of state regulations. When the Loganathans attempted to facilitate conversations between this teacher and others and Giarttano or TLE, they were subjected, at best, to verbal abuse and condescension, and, at worst, to racist remarks and threats of termination.

62.     TLE's employees, such as Giarttano, were hired at or transferred to various positions in the Parker and Aurora Centers, and systematically undermined all attempts by the Loganathans to operate the centers. TLE's employees refused to train the Loganathans on various critical aspects of the centers' management – including any of the functions of the business manager, despite the fact that the Franchise Agreement required Creative American to serve as the business manager of its centers. TLE's employees refused at times to even speak to the Loganathans (a practice that was not only endorsed by TLE, but included as a term of the

Management Agreement), and repeatedly disparaged the Loganathans to parents and staff at the centers.

63.     In addition to failing to adequately train or facilitate the transition of the centers to the Loganathans, TLE repeatedly failed to adhere to its own system standards, incurring multiple violations of the Franchise Agreements while managing the operation of the centers, and, more importantly, violating multiple state regulations and putting the lives and well-being of the centers' children at risk. The Franchise Agreement prohibited Creative American from operating the center in any manner which reflected adversely on the TLE Marks, Trade Name or Franchise System, and yet TLE continued to employ Giarttano (and others) who made racist remarks, who physically intimidated other employees, and who failed to adhere to state regulations regarding the centers' staffing. Moreover, TLE's employment of Giarttano led to high employee turnover, exacerbating the problems with keeping the centers fully staffed, and leading to classrooms that were filled over-ratio, and unsatisfied teachers and staff. TLE was obligated by the Management Agreement to obtain state certifications. Its actions while managing the centers put those certifications at risk, and set in motion a series of events that have made it nearly impossible for the Loganathans to remain in compliance.

64.     On several occasions in or about September 2013, while TLE was still managing the centers, the Loganathans requested that TLE fire Giarttano for, among other things, violating TLE policies, failing to run the Parker Center in compliance with state regulations, and for her abusive behavior, both to the Loganathans and the Parker Center staff. TLE's refused, and instead, transferred Giarttano to the Aurora Center, again over the protestations of the Loganathans. The morning the transfer was communicated to Giarttano, the Loganathans arrived at the Parker Center to find that she had physically damaged property, thrown office supplies and

24

frightened the other staff members. Kinnan refused to speak to the Loganathans upon their arrival and then, after screaming obscenities, proceeded to storm out of the center. The next day, against the Loganathan's wishes, TLE ordered Kinnan to return to work at the Parker Center.

65.     TLE removed Giarttano from her position as Center Director at the Parker Center without having a replacement lined up. Days later, Giarttano reported the Parker Center to the Office of Early Childhood (the "OEC"), Colorado's state regulatory agency, for not having a Center Director – a violations of state law. The Loganathans contacted TLE to alert them to the report, and to request additional information regarding the state regulations. The Loganathans received no support whatsoever in responding to the OEC report, or in dealing with Giarttano. In fact, TLE stated that any trouble the Loganathans caused would reflect poorly on Giarttano – who was now running the Aurora Center.

66.     On one occasion in December 2013, the Loganathans left the Parker Center 30 minutes early, at approximately 4:30 p.m. Shortly thereafter, Kinnan also left early, despite being instructed to stay until 5:00 pm. This was reported to TLE by Giarttano, as it was a violation of TLE policy. TLE immediately threatened to terminate the Management Agreement and stated, contrary to the agreement's terms that it would refuse to allow the Loganathans to ever assume management of the Aurora Center. TLE also threatened to return Giarttano to Parker Center as the Center Director once again.

67.     Other employees quit due to interference from Kinnan, who had continued working at the Parker Center despite the Loganathans' objections. In January 2014, another Center Director quit, due to Kinnan's abusive behavior. In February 2014, Kinnan resigned from her duties at the Parker Center and the Loganathans assumed the role of Business Manager themselves.

68.     In January 2014, while still employed as the Center Director at the Aurora Center, TLE appointed Giarttano the Area Manager for Colorado, a position that put her directly in charge of the Loganathans' centers, despite the fact that Giarttano had put the Parker Center in danger of losing its certifications by reporting it to the OEC, had been abusive and professionally inappropriate, and had been accused on multiple occasions by multiple employees of making racist remarks. The Loganathans attempted to convince TLE that Giarttano was trying to sabotage their success, but their concerns were ignored. For the next few months, Giarttano was paid out of the Aurora Center's payroll, but was formally an employee of TLE.

69.     In April 2014, the Loganathans assumed management of the Aurora Center and discovered that it was on a one month probation with the OEC.  This had not been disclosed to the Loganathans by TLE, or by Giarttano. The Loganathans appointed a new Center Director, who, within days reported that staff refused to cooperate with her, and that she was unable to manage the facilities because Giarttano had repeatedly made racial slurs and comments about the Loganathans, in particular Mrs. Alaudeen's Arabic descent. Among other things, the Loganathans learned that Giarttano had advised parents and staff at the Aurora Center that the Loganathans were "inept business managers" that had ruined the Parker Center; and that the Loganathans "hated white people."

70.     The Loganathans immediately set up a video conference with TLE and four staff members at the Aurora Center, who confirmed the racist comments. Two of the staff members also provided written documentation of the remarks to TLE. Nothing was ever done by TLE to rectify the situation, and, again, no disciplinary action was taken against Giarttano.

71.     In or about February 2014, the Loganathans were sent a bill for the property tax at the centers, pursuant to the leases that had been assigned to them by TLE. The total property

26

tax bill for both centers cost more than $120,000.00. These costs were not disclosed to the Loganathans at the time the leases were assigned.

72.     In April 2014, the Loganathans recognized that their continued operation of the centers not sustainable. Thus, they approached TLE and asked if TLE would purchase the centers from them, as Barry Collins had assured them it would in 2011. TLE refused, and advised the Loganathans to try to sell the stores on their own. The Loganathans thereafter spoke to a broker, to see what their centers were potentially worth. The broker informed them that any potential buyer would have to be willing to invest millions to fix the problems that were plaguing the centers, and thus, the centers were unsellable. The Loganathans went back to TLE and again asked if they would buy back the centers or sell them on the Loganthans' behalf, but again, TLE refused.

73.     That same month, another Center Director left the Parker Center. That Center Director was immediately rehired by TLE and filed yet another report with the OEC. Thereafter, the OEC visited the Parker Center and noted staffing violations, including, among other things, that the center was understaffed. TLE's systematic re-hiring of abusive employees resulted in high employee turnover, which had caused these staffing shortages. In fact, during TLE's management of the Parker Center, more than six people were employed at the Center Director position. In addition to violating state regulations, this, foreseeably, led to tremendous operational problems as well, and damaged the centers' reputation to clients.

**Wrongful Termination by TLE**

74.     The Loganathans contacted TLE to attempt to resolve the various violations and receive the guidance with regard to state regulations they had been promised. TLE had suggested 'borrowing' staff from the Aurora Center to temporarily fix the shortages at the Parker Center – a course of action that would have ultimately put the Aurora Center in danger of further

violations as well. Mr. Loganathan privately consulted with the temporary Center Director that was then employed at the Aurora Center, who advised that it might be wise to shut the Parker Center down for a few days to resolve the ongoing staffing issues without causing further violations. Mr. Loganathan suggested this course of action to TLE.

75.     In response, TLE wrote a letter, dated May 1, 2014, which stated that they would "assume operational management of the centers" starting the very next day, without citing to any basis for doing so. The letter also stated that TLE "must respectfully insist that [the Loganathans] not be physically present at either [c]enter" until a new Management Agreement was executed, and gave the Loganathans seven days to execute an attached contract, which Creative American has refused to do. Since that time, TLE has also prohibited Creative American from accessing any of the funds from the operations of the centers.

76.     Notwithstanding TLE's forceful takeover of the centers and the operating accounts, on May 12, 2014, TLE sent a second letter, again stating that Creative American had no choice but to sign a new Management Agreement, turning over complete control of the centers to TLE, and demanding that Creative American deposit additional funds into the centers operating accounts to pay ongoing expenses. Creative American advised TLE at that time that it would not be signing a Management Agreement.

**COUNT I and COUNTERCLAIM I**
**(FRAUDULENT MISREPRESENTATION)**

77.     Creative American and the Loganathans repeat and re-allege the allegations in paragraphs 4, 8-22, 27, 29-32, and 37-75 of the complaint as if fully set forth herein.

78.     TLE fraudulently induced Creative American to enter into the Franchise Agreements, Management Agreement Powers of Attorney, Parker Assignment of Lease and

28

Aurora Assignment of Lease and also fraudulently induced the Loganathans to enter into the Guarantys by, among other things:

- Making false or misleading representations as to the EB-5 investment requirements and leading Creative American and the Loganathans to believe that they were required by law to make a $1 million investment in order for the Loganathans to qualify for an EB-5 visa;
- falsely asserting that it could get the Loganathans a "fast track to a Green Card" through Creative American's and the Loganathans' investment;
- falsely telling Creative American and the Loganathans that their investment would be "fully refundable" and that TLE would sell the centers and refund the money, if a refund was needed;
- failing to disclose to Creative American or the Loganathans that they would almost certainly be required to execute a management agreement and powers of attorney which would give TLE extraordinary power over Creative American and the Loganathans' centers and investment and would require Creative American and the Loganathans to deposit the full $1 million investment into a bank account, under Creative American's name, created by TLE and that TLE would have full access to, 90 days before Creative American and the Loganathans' first center even opened;
- failing to disclose to Creative American or the Loganathans that they would be required to pay property taxes for the property at the centers;
- falsely stating to Creative American and the Loganathans that as $1 million investors, Creative American's principal, Ms. Alaudeen, would be granted a green card to citizenship; and
- falsely stating that TLE had experience and expertise in managing centers for new franchisees;

79.     TLE knew or should have known that the above representations were false, and with respect to TLE's promises to refund Creative American's and the Loganathans' investment, TLE never intended to do so. TLE made the false and material representations and promises with the intention that Creative American would rely on them and be induced to enter into the Franchise Agreements, Management Agreement, Powers of Attorney, Parker Assignment of Lease and Aurora Assignment of Lease, and with the intention that the Loganathans would rely on them and be induced to enter into the Guarantys, all to TLE's financial gain.

80.     Creative American justifiably relied on TLE's representations (particularly in light of TLE's representations that it had extensive experience in EB-5 investments and in the

child care industry) and entered into the Franchise Agreements, Management Agreement, Powers of Attorney, Parker Assignment of Lease, and Aurora Assignment of Lease to their detriment. The Loganathans justifiably relied on TLE's representations (particularly in light of TLE's representations that it had extensive experience in EB-5 investments and in the child care industry) and entered into the Guarantys, to their detriment. Creative American and the Loganathans also invested and lost in excess of $2.5 million. If TLE had not made the above representations, Creative American and the Loganathans would not have invested in TLE or subsequently been damaged.

**WHEREFORE,** Creative American demands judgment against TLE for (i) rescission of the Franchise Agreements, Management Agreement, Powers of Attorney, Parker Assignment of Lease and Aurora Assignment of Lease, or, in the alternative, (ii) compensatory and consequential damages in excess of $2.5 million plus interest and costs; all together with attorneys' fees pursuant to the Franchise Agreements, the Management Agreement; and such other and further relief as this Honorable Court deems just and proper, and the Loganathans demand judgment against TLE for (i) rescission of the Guarantys, or, in the alternative, (ii) compensatory and consequential damages in excess of $2.5 million plus interests and costs; all together with attorneys' fees pursuant to the Guarantys, and such other and further relief as this Honorable Court deems just and proper.

## COUNT II and COUNTERCLAIM II
### (NEGLIGENT MISREPRESENTATION)

81.    Creative American repeats and re-alleges the allegations in paragraphs 4, 8-22, 27, 29-32, and 37-75 of the complaint as if fully set forth herein.

82.    TLE made negligent misrepresentations to Creative American for the purpose of inducing Creative American to enter into the Franchise Agreements, Management

Agreement, Powers of Attorney, Parker Assignment of Lease and Aurora Assignment of Lease

by, among other things:

- Making false or misleading representations as to the EB-5 investment requirements and leading Creative American and the Loganathans to believe that they were required by law to make a $1 million investment in order for the Loganathans to qualify for an EB-5 visa;
- falsely asserting that it could get the Loganathans a "fast track to a Green Card" through Creative American's and the Loganathans' investment;
- falsely telling Creative American and the Loganathans that their investment would be "fully refundable" and that TLE would sell the centers and refund the money, if a refund was needed;
- failing to disclose to Creative American or the Loganathans that they would almost certainly be required to execute a management agreement and powers of attorney which would give TLE extraordinary power over Creative American and the Loganathans' centers and investment and would require Creative American and the Loganathans to deposit the full $1 million investment into a bank account, under Creative American's name, created by TLE and that TLE would have full access to, 90 days before Creative American and the Loganathans' first center even opened;
- failing to disclose to Creative American or the Loganathans that they would be required to pay property taxes for the property at the centers;
- falsely stating to Creative American and the Loganathans that as $1 million investors, Creative American's principal, Ms. Alaudeen, would be granted a green card to citizenship; and
- falsely stating that TLE had experience and expertise in managing centers for new franchisees;

83.     TLE knew or should have known that the above representations were false, and with respect to TLE's promises to refund Creative American or the Loganathans' investment, TLE never intended to do so. TLE made the false and material representations and promises with the intention that Creative American would rely on them and be induced to enter into the Franchise Agreements, Management Agreement, Powers of Attorney, Parker Assignment of Lease and Aurora Assignment of Lease, and with the intention that the Loganathans would rely on them and be induced to enter into the Guarantys, all to TLE's financial gain.

84.     Creative American justifiably relied on TLE's representations (particularly in light of TLE's representations that it had extensive experience in EB-5 investments and in the

child care industry) and entered into the Franchise Agreements, Management Agreement, Powers of Attorney, Parker Assignment of Lease, and Aurora Assignment of Lease, to its detriment. The Loganathans justifiably relied on TLE's representations (particularly in light of TLE's representations that it had extensive experience in EB-5 investments and in the child care industry) and entered into the Guarantys, to their detriment. Creative American and the Loganathans also invested and lost in excess of $2.5 million. If TLE had not made the above representations, Creative American would not have invested in TLE or subsequently been damaged.

**WHEREFORE,** Creative American demands judgment against TLE for (i) rescission of the Franchise Agreements, Management Agreement, Powers of Attorney, Parker Assignment of Lease and Aurora Assignment of Lease, or, in the alternative, (ii) compensatory and consequential damages in excess of $2.5 million plus interest and costs; all together with attorneys' fees, pursuant to the Franchise Agreements, the Management Agreement; and such other and further relief as this Honorable Court deems just and proper, and the Loganathans demand judgment against TLE for (i) rescission of the Guarantys, or, in the alternative, (ii) compensatory and consequential damages in excess of $2.5 million plus interests and costs; all together with attorneys' fees pursuant to the Guarantys, and such other and further relief as this Honorable Court deems just and proper.

### COUNT III and COUNTERCLAIM III
### (RESCISSION)

85.     Creative American and the Loganathans repeat and re-allege the allegations in paragraphs 1-75 of the complaint as if fully set forth herein.

86.     Creative American and TLE entered into two Franchise Agreements, a Management Agreement, two Powers of Attorney, the Parker Assignment of Lease and the Aurora

Assignment of Lease. Simultaneously to Creative American executing the Franchise Agreements, the Loganathans signed the Guarantys.

87.     TLE has made numerous false representations to Creative American, through its communications with the Loganathans, of existing material fact, with knowledge that the representations were false, and with the intent that the representations induce injurious action, which Creative American and the Loganathans reasonably and justifiably relied upon, which caused Creative American to enter into the Franchise Agreements, Management Agreement, Powers of Attorney, the Parker Assignment of Lease and the Aurora Assignment of Lease, which caused the Loganathans to enter into the Guarantys, and which proximately caused injury to Creative American and the Loganathans.

88.     Creative American and the Loganathans have informed TLE via letters, dated May 9, 2014, May 16, 2014 and July 8, 2014, that Creative American and the Loganathans have been deprived of all benefits from the above-referenced contracts by virtue of TLE's wrongful takeover of the Parker Center and the Aurora Center (and, thus, have no further benefits to restore to TLE), that Creative American no longer wishes to be bound by any of its contracts with TLE, and that the Loganathans no longer wish to be bound by the Guarantys.

89.     Creative American and the Loganathans have no adequate remedy at law.

**WHEREFORE,** Creative American demands judgment against TLE for rescission of the Franchise Agreements, Management Agreement, Powers of Attorney, Parker Assignment of Lease and Aurora Assignment of Lease, returning the parties to the *status quo* and such other and further relief as this Honorable Court deems just and proper, and the Loganathans demand judgment against TLE for rescission of the Guarantys, returning the parties to the *status quo* and such other and further relief as this Honorable Court deems just and proper.

## COUNT IV
## VIOLATIONS OF FDUTPA

90.     Creative American repeats and re-alleges the allegations in paragraphs 1-75 of the complaint as if fully set forth herein.

91.     TLE violated Florida's Deceptive and Unfair Trade Practices Act, *F.S.A. §501.204* ("FDUTPA"), which is derived from the Federal Trade Commission Act, *15. U.S.C. §45(a)(1)*, by unlawfully and intentionally engaging in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of a trade or commerce, through its misrepresentations and its deceptive and fraudulent conduct as further described in the incorporated paragraphs. Specifically, TLE fraudulently induced Creative American to enter into a series of agreements and to invest $1 million, proceeded to, in the course of its unconscionable acts or practices and unfair or deceptive acts or practices, breach all of those agreements and all of the duties it owed to Creative American, and then wrongfully took over Creative American's centers.

92.     TLE misrepresented itself to be experienced in EB-5 investments and stated that it could get Creative American's principal, Ms. Alaudeen, and her family, a "fast track" to an EB-5 visa; told Creative American that it was required to make a $1 million investment in order for Ms. Alaudeen to qualify for an EB-5 visa; and falsely stated that Creative American's investment would be "fully refundable." TLE made these misrepresentations via e-mails, sent from its Florida offices, and also on its web site. TLE also failed to disclose that Creative American would almost certainly be required to execute a management agreement, due to the fact that it required plaintiff to invest money into an operating account that TLE intended to begin spending immediately, prior to Creative American's principal submitting the Loganathans' I-526 petition. TLE knew that I-526 petitions could take months to process, but demanded immediate investments

from Creative American (again, via e-mails, sent from Florida), and, further, did not provide for any safeguards in the event that the Loganathans' I-526 petition was rejected – meaning Creative American's investment was never "fully refundable" despite TLE's assurances otherwise. Once Creative American had invested money and entered into the Franchise Agreements (which contained Florida choice of law provisions), TLE demanded further investments, all prior to the Loganathans' submission of their I-526.

93.     Because the Loganathans did not have a visa to enter the United States during the build out and opening of its centers (because TLE had begun investing Creative American's money prior to submission of the Loganathans' I-526 petition), TLE was able to force Creative American to enter into a Management Agreement, which gave TLE power of attorney over the operation of Creative American's centers. The Management Agreement contained a Florida choice of law provision. TLE also required Creative American to execute two separate powers of attorneys, which it did, giving TLE enormous power and control over the centers and Creative American's investment, as noted above. Then, despite owing Creative American a fiduciary duty, and despite having represented to Creative American (via e-mails, sent from Florida) that it would "take on the responsibility of operations of [plaintiff's] centers" until the Loganathans were "100% trained," TLE, operating from its headquarters in Florida, ran Creative American's centers into the ground, operating the centers in violation of the Franchise Agreements and TLE's own system's standards, in violation of the Management Agreement and TLE's duties owed thereunder, and in violation of the Powers of Attorneys and TLE's duties as Creative American's fiduciary. Despite claiming on its web site to be the "fastest growing child care franchisor in the United States," opened by "pioneers in the child care business" and providing the "premier child care product available on the market today" which "set the standard" in the child

care industry, and despite the claims by Weissman that TLE will "do everything" for Creative American's centers, TLE grossly mismanaged the centers in such a way that it was impossible for Creative American to later assume management. In fact, despite assuring Creative American that $150,000 would be sufficient operating capital for a year, TLE demanded, via a phone call to Creative American from TLE's headquarters in Florida, an additional $150,000 from Creative American within 9 months of opening the first center. To date, both centers continue to lose money each month. TLE, acting from its headquarters in Florida and overseeing the actions of its corporate employees in Colorado, failed to manage the centers in accordance with Colorado state and local regulations, putting the centers' licenses at risk, and endangering the well-being of the children enrolled at the centers. Moreover, as Creative American's attorney in fact, TLE assigned the Parker Center's lease and the Aurora Center's lease to Creative American. Pursuant to the leases, Creative American became responsible for paying, among other things, excessive rent and over $120,000.00 in annual property taxes for the Parker and Aurora Center properties. TLE then wrongfully took over the centers – a further breach of all of the agreements with Creative American- on May 2, 2014, and continues to demand additional payments from Creative American, via e-mails and letters sent from Florida.

94.     All of the misrepresentations listed above were communicated to Creative American via TLE's web site, via e-mails sent from Florida, or via telephone calls from TLE's corporate headquarters in Florida. Creative American's principal and Mr. Loganathan were required to attend training in Florida, and to communicate with TLE employees based in Florida. In fact, Creative American's principal and Mr. Loganathan were at times forbidden from speaking to employees at the centers in Colorado. The Franchise Agreements and the Management Agreement contain Florida choice of law provisions. Moreover, all of the management decisions

made by TLE with respect to Creative American's centers were made by TLE's corporate employees, who are based in Florida.

95.   As a direct, proximate and foreseeable result of TLE's violation of FDUTPA, Creative American invested and lost in excess of $2.5 million.

**WHEREFORE,** Creative American demands judgment against TLE for compensatory and consequential damages in excess of $2.5 million plus interest and costs; together with attorneys' fees pursuant to the Franchise Agreements, the Management Agreement and the FDUTPA statute; and such other and further relief as this Honorable Court deems just and proper.

### COUNT V
### SECURITIES FRAUD IN VIOLATION OF STATE AND FEDERAL LAW

96.   Creative American repeats and re-alleges the allegations in paragraphs 1-75 of the complaint as if fully set forth herein.

97.   TLE's sale of its two franchises to Creative American qualifies as the sale of a security pursuant to the Securities Act of 1933, *15 U.S.C.A. §77(b)*, the Securities Act of 1934, *15 U.S.C.A. §78(c)* and the Florida Securities and Investor Protection Act *§517.021* where, in conjunction with the Franchise Agreements Creative American and TLE also executed a Management Agreement which gave TLE full control of and authority over the management of the centers and gave Creative American only nominal or limited duties that had very little effect on the success or failure of the centers. Thus, the Franchise Agreements involved an investment of money by Creative American, in an enterprise, with profits to come solely from the efforts of TLE. The Management Agreement was necessary to carry out the Franchise Agreements, because Creative American's principal was out of the country. TLE purposely structured Creative American's investment, as described above, so that it would be compelled to execute the Management Agreement.

98.     TLE violated the Securities Act of 1933, *15 U.S.C.A. §77(l);* the Securities Act of 1934, *15 U.S.C.A. §78j*; Rule 10b-5 of the Securities Exchange Commission regulations, *17 C.F.R. §240.10b-5*; and Florida's Securities and Investor Protection Act *§517.301*, by selling a security by, among other things, using e-mail communications in interstate commerce, which included untrue statements of material facts, and statements which omitted material facts necessary, in order to make the statements not misleading, in the light of the circumstances under which they were made. The false and/or misleading statements and omissions made by TLE constitute a manipulative or deceptive device in contravention of the rules and regulations promulgated by the Securities Exchange Commission.

99.     Specifically, TLE made the following representations:

- Falsely stating and/or implying to Creative American that it was required by law to make a $1 million investment in order for the Loganathans to qualify for an EB-5 visa;
- falsely asserting that it could get the Loganathans a "fast track to a Green Card" through Creative American's investment;
- falsely telling Creative American that its investment would be "fully refundable" and that TLE would sell the centers and refund the money, if a refund was needed;
- failing to disclose to Creative American that it would almost certainly be required to execute a management agreement and powers of attorney which would give TLE extraordinary power over Creative American's centers and investment and would require Creative American to deposit the full $1 million investment into a bank account, under its name, created by TLE and that TLE would have full access to, 90 days before Creative American's first center even opened;
- failing to disclose to Creative American that it would be required to pay property taxes for the property at the centers;
- falsely stating that as $1 million investors Creative American's principal would be granted a green card to citizenship; and
- falsely stating that TLE had experience and expertise in managing centers for new franchisees;

100.    TLE knew or should have known, or, in the exercise of reasonable care should have discovered that its representations were untrue and/or misleading, and that misleading

omissions were made. TLE made the false and/or misleading representations with the intention that Creative American would rely on them and be induced to enter into the Franchise Agreements, Management Agreement, Powers of Attorney, Parker Assignment of Lease and Aurora Assignment of Lease, all to TLE's financial gain.

      101.   Creative American relied on the above-referenced representations and entered into the Franchise Agreements and Management Agreement, Powers of Attorney, Parker Assignment of Lease and Aurora Assignment of Lease. Despite the exercise of reasonable diligence, including hiring an attorney recommended by TLE for the purposes of its investment, Creative American did not know of the false and/or misleading nature of (i) the above-referenced representations regarding EB-5 requirements, (ii) that TLE did not, in fact have experience and expertise in managing centers for new franchisees, or (iii) TLE's failures to disclose the necessity of the Management Agreement due to various EB-5 application requirements until approximately May 2014, at which time this action was brought. Creative American did not know of the false and/or misleading nature of TLE's representation that it would fully refund Creative American's investment until Creative American demanded a refund of its investment, in or about April 2014, and TLE refused and, upon seeking the advice of counsel, Creative American determined that TLE had structured Creative American's investment in such a way that it was never possible for TLE to fully refund Creative American's money. Creative American did not know of TLE's failure to disclose that Creative American would be required to pay property taxes for the centers until it received a bill for its property tax, in or about February 2014. Creative American only discovered the false and/or misleading nature of TLE's representations or omissions after TLE wrongfully terminated the Franchise Agreement and took over Creative American's centers. After the wrongful takeover, Creative American was forced to hire an attorney to bring this action, at which

time creative American became aware of the false and/or misleading nature of the representations or omissions described herein. Creative American did not discover the above-referenced representations or omissions earlier than the times stated herein because it believed its interests were represented by the Korda Parties, and because it had entered into a Power of Attorney with TLE, which obligated TLE to act in Creative American's best interests. Creative American trusted its attorney and TLE to act in its best interests and to be truthful with Creative American based on the agreements and obligations of the parties.

102.    As a direct, proximate and foreseeable result of TLE's violation of the Securities Act of 1933, Creative American invested and lost in excess of $2.5 million. If TLE had not made the above representations, Creative American would not have invested in TLE or subsequently been damaged. To date, Creative American has been completely divested of its ownership or interest in its TLE franchises and has no adequate remedy at law.

**WHEREFORE,** Creative American demands judgment against TLE for rescission of the Franchise Agreements, Management Agreement, Powers of Attorney, Parker Assignment of Lease and Aurora Assignment of Lease and, in accordance with the Securities Act of 1933, return of consideration paid, which was in excess of $2.5 million, plus interest, reduced by any profits made, which were zero; or, in the alternative, in accordance with the Securities Act of 1933, for compensatory and consequential damages in excess of $2.5 million plus interest; all together with attorneys' fees, pursuant to the Franchise Agreements, the Management Agreement; and such other and further relief as this Honorable Court deems just and proper.

**COUNT VI**
**(VIOLATION OF F.S.A. §709.2114 – POWER OF ATTORNEY)**

103.    Creative American repeats and re-alleges the allegations in paragraphs 1-75 of the complaint as if fully set forth herein.

104.    Pursuant to the Management Agreement, Creative American gave TLE power of attorney over the operation of plaintiff's centers. Additionally, Creative American executed two separate powers of attorney – one for each center. TLE, as Creative American's attorney-in-fact under the Management Agreement and Powers of Attorney, violated the Florida Statute governing Powers of Attorey, *F.S.A. §709.2114*, when it engaged in the wrongful and deceptive acts further described in the incorporated paragraphs.

105.    TLE violated F.S.A. §709.2114 and breached its fiduciary duties when it acted contrary to Creative American's best interests; failed to act loyally for the sole benefit of Creative American; failed to act so as not to create a conflict of interest that impairs TLE's ability to act impartially in Creative American's best interest; failed to act with the care, competence and diligence exercised by agents in similar circumstances, particularly because Creative American chose TLE to be its power of attorney and chose to invest in TLE due to the special skills and expertise possessed by TLE (which TLE represented to Creative American that it had, and which representations Creative American relied upon).

106.    In addition, TLE violated F.S.A. §709.2114 and breached its fiduciary duties by:

- Assigning the unfavorable leases for the Parker Center and for the Aurora Center lease to Creative American, which obligated Creative American to pay, among other things, excessive rent and over $120,000.00 in property taxes for the two centers;
- failing to adhere to Colorado state regulations in running either the Parker Center or the Aurora Center and endangering the licenses of both centers;
- failing to alert Creative American that the Aurora Center was on probation for violating state regulations;
- staffing the centers with grossly unqualified center directors such as Giarttano;
- failing to allow employment issues with problematic staff members to be "solely the concern" of Creative American and, instead, hiring, firing and transferring problematic staff in a transparent attempt to undermine Creative American;

- taking over and completely controlling the centers with complete disregard for Creative American's wishes or best interests, particularly with respect to employment related issues, and, in so doing, creating an adversarial relationship between Creative American and TLE and then operating the center for its own best interests and not Creative American's;
- failing to train and hire one business director and one center director for each center, and, in fact, failing to consistently maintain employment of a center director and business director at each center in violation of state and local laws and of TLE's own system's standards;
- failing to train Creative American so that it could take over the management of the centers or act as the Business Manager of the centers as Creative American is required to do under the Franchise Agreements;
- threatening on multiple occasions to wrongfully terminate the management agreement; and
- wrongfully taking over the centers in May 2014;

107.    As a direct, proximate and foreseeable result of TLE's violation of its fiduciary duties, Creative American invested and lost in excess of $2.5 million.

**WHEREFORE,** plaintiff demands judgment against TLE for (i) rescission of the Powers of Attorney, or, in the alternative, (ii) compensatory and consequential damages in excess of $2.5 million plus interest and attorneys' fees; all together with attorneys' fees, pursuant to the Franchise Agreements, the Management Agreement and Florida Statute; and such other and further relief as this Honorable Court deems just and proper.

## COUNT VII
## BREACH OF CONTRACT - MANAGEMENT AGREEMENT

108.    Plaintiff repeats and re-alleges the allegations in paragraphs 1-75 of the complaint as if fully set forth herein.

109.    As noted above, plaintiff and TLE entered into the Management Agreement on January 23, 2012.

110.    Pursuant to the Management Agreement, TLE agreed to obtain childcare licenses for the Centers in accordance with Colorado law; to set forth invaluable effort and expenses to the operating the Parker Center and Aurora Center; to provide its services in good

faith; and to be the legal agent for plaintiff pursuant to two Powers of Attorney. See Exhibit 5, §§ 2(b), 4(a), 4(b), 2(a), and Exhibit B. TLE also agreed to use reasonable efforts to keep plaintiff updated on center operations in a reasonable time; to use reasonable efforts to manage the centers so they operated profitably as soon as commercially practical; to hire and train one Business Manager and one Center Director for each center; to "co-manage" the centers with plaintiff for six months; and to hire and manage the centers' employees, allow all other employment arrangements to be the plaintiff's concern. See Exhibit 5, §§ 2(f), 6(e), 2(h), 3(d), 5.

111.    TLE breached the Management Agreement by mismanaging the centers by grossly mishandling nearly every aspect of their operation and by failing to act in good faith, to set forth invaluable effort or to use reasonable efforts in operating the centers by, among other things:

- Entering into the Parker Assignment of Lease and Aurora Assignment of Lease on plaintiff's behalf, pursuant to which plaintiff became responsible for TLE's obligations under its Leases for the two centers, and, among other things, became responsible for paying significant property taxes for the Parker Center property and Aurora Center property;
- failing to adhere to Colorado state regulations in running either the Parker Center or the Aurora Center and endangering the licenses of both centers;
- failing to alert plaintiff that the Aurora Center was on probation for violating state regulations;
- staffing the centers with grossly unqualified and incompetent employees, including center directors such as Giarttano;
- transferring incompetent employees to other positions where they had control over plaintiff's centers and operations;
- failing to allow Creative American to have any control over issues with problematic staff;
- failing to train and hire one business director and one center director for each center, and, in fact, failing to consistently maintain employment of a center director and business director at each center in violation of state and local laws and of TLE's own system's standards;
- failing to train the plaintiff so that plaintiff could take over the management of the centers or act as the Business Manager of the centers as plaintiff is required to do under the Franchise Agreement;
- threatening on multiple occasions to wrongfully terminate the management agreement; and

▪ wrongfully taking over the centers in May 2014.

112. TLE's breaches and misconduct were willful and material.

113. As a direct and proximate result of the foregoing, Creative American invested and lost in excess of $2.5 million.

**WHEREFORE,** Creative American demands judgment against TLE for (i) rescission of the Management Agreement, or, in the alternative, (ii) compensatory and consequential damages in excess of $2.5 million plus interest and costs; all together with attorneys' fees pursuant to the Management Agreement's terms; and such other and further relief as this Honorable Court deems just and proper.

## COUNT VIII
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING UNDER THE MANAGEMENT AGREEMENT

114. Creative American repeats and re-alleges the allegations in paragraphs 1-75 of the complaint as if fully set forth herein.

115. As noted above, Creative American and TLE entered into the Management Agreement on January 23, 2012. Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards designed to protect the parties' reasonable contractual expectations.

116. Pursuant to the Management Agreement, TLE agreed to obtain childcare licenses for the Centers in accordance with Colorado law; to set forth invaluable effort and expenses to the operating the Parker Center and Aurora Center; to provide its services in good faith; and to be the legal agent for plaintiff pursuant to two Powers of Attorney. See Exhibit 5, §§ 2(b), 4(a), 4(b), 2(a), and Exhibit B. TLE also agreed to use reasonable efforts to keep plaintiff updated on center operations in a reasonable time; to use reasonable efforts to manage the centers

so they operated profitably as soon as commercially practical; to hire and train one Business Manager and one Center Director for each center; to "co-manage" the centers with plaintiff for six months; and to hire and manage the centers' employees, allow all other employment arrangements to be the plaintiff's concern. See Exhibit 5, §§ 2(f), 6(e), 2(h), 3(d), 5.

117.    TLE breached the Management Agreement by mismanaging the centers by grossly mishandling nearly every aspect of their operation and by failing to act in good faith, to set forth invaluable effort or to use reasonable efforts in operating the centers by, among other things:

- Entering into the Parker Assignment of Lease and Aurora Assignment of Lease on Creative American's behalf, pursuant to which Creative American became responsible for TLE's obligations under its Leases for the two centers, and, among other things, became responsible for paying significant property taxes for the Parker Center property and Aurora Center property;
- failing to adhere to Colorado state regulations in running either the Parker Center or the Aurora Center and endangering the licenses of both centers;
- failing to alert Creative American that the Aurora Center was on probation for violating state regulations;
- staffing the centers with grossly unqualified and incompetent employees, including center directors such as Giarttano;
- transferring incompetent employees to other positions where they had control over Creative American's centers and operations;
- failing to allow Creative American to have any control over issues with problematic staff;
- failing to train and hire one business director and one center director for each center, and, in fact, failing to consistently maintain employment of a center director and business director at each center in violation of state and local laws and of TLE's own system's standards;
- failing to train the plaintiff so that Creative American could take over the management of the centers or act as the Business Manager of the centers as Creative American is required to do under the Franchise Agreement;
- threatening on multiple occasions to wrongfully terminate the management agreement; and
- wrongfully taking over the centers in May 2014;

118.    TLE's breaches and misconduct were willful and material. TLE's breaches of the terms of the Management Agreement also violate the covenant of good faith and fair dealing.

119.    As a direct and proximate result of the foregoing, Creative American invested and lost over $2.5 million.

WHEREFORE, Creative American demands judgment against TLE for (i) rescission of the Management Agreement, or, in the alternative, (ii) compensatory and consequential damages in excess of $2.5 million plus interest and costs; all together with attorneys' fees, pursuant to the Management Agreement's terms; and such other and further relief as this Honorable Court deems just and proper.

**COUNT IX**
**BREACH OF CONTRACT -FRANCHISE AGREEMENTS**

120.    Creative American repeats and re-allege the allegations in paragraphs 1-75 of the complaint as if fully set forth herein.

121.    As described above, Creative American and TLE entered into two Franchise Agreements on September 19, 2011.

122.    Pursuant to the Franchise Agreements, Creative American is entitled to 30 days from the receipt of a written notice to cure any alleged default prior to termination by TLE. See Exhibits 2 and 3, §11.1.

123.    TLE breached the Franchise Agreements by effectively terminating the Franchise Agreements by letter, dated May 1, 2014, without providing a notice of default or allowing for any time for plaintiff to cure such alleged defaults, and by then wrongfully taking over the centers on May 2, 2014.

124.    Pursuant to the Franchise Agreements, TLE also agreed to provide continuing advice and support to Creative American. See Exhibits 2 and 3, §6.3(a). TLE further breached the Franchise Agreements by failing to provide any advice or support to Creative American, whatsoever regarding the operation of its centers.

125. TLE's breaches and misconduct were willful and material.

126. As a direct and proximate result of the foregoing, Creative American invested and lost in excess of $2.5 million.

**WHEREFORE,** Creative American demands judgment against TLE for (i) rescission of the Franchise Agreements, or, in the alternative, (ii) compensatory damages and consequential damages in excess of $2.5 million plus interest and costs; all together with attorneys' fees, pursuant to the Franchise Agreements' terms; and such other and further relief as this Honorable Court deems just and proper.

**COUNT X**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING OF THE**
**FRANCHISE AGREEMENTS**

127. Creative American repeats and re-allege the allegations in paragraphs 1-75 of the complaint as if fully set forth herein.

128. As described above, Creative American and TLE entered into the Franchise Agreements on September 19, 2011. Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards designed to protect the parties' reasonable contractual expectations.

129. Pursuant to the Franchise Agreements, Creative American is entitled to 30 days from the receipt of a written notice to cure any alleged default prior to termination by TLE. See Exhibits 2 and 3, §11.1.

130. TLE breached the Franchise Agreements by effectively terminating the Franchise Agreements by letter, dated May 1, 2014, without providing a notice of default or allowing for any time for Creative American to cure such alleged defaults, and by then wrongfully taking over the centers on May 2, 2014.

131.   TLE's breaches and misconduct were willful and material. TLE's breaches of the terms of the Franchise Agreements also violate the covenant of good faith and fair dealing.

132.   As a direct and proximate result of the foregoing, Creative American invested and lost in excess of $2.5 million.

**WHEREFORE,** Creative American demands judgment against TLE for (i) rescission of the Franchise Agreements, or, in the alternative, (ii) compensatory and consequential damages in excess of $2.5 million plus interest and costs; all together with attorneys' fees, pursuant to the Franchise Agreements' terms; and such other and further relief as this Honorable Court deems just and proper.

## COUNT XI and COUNTERCLAIM IV
## (ATTORNEY MALPRACTICE)

133.   Creative American and the Loganathans repeat and re-allege the allegations in paragraphs 1-75 of the complaint as if fully set forth herein.

134.   The Korda Parties represented the Creative American and the Loganathans in connection with their investment in TLE and the Loganathans' EB-5 application.

135.   The Korda Parties, in their capacity as legal counsel for Creative American and the Loganathans, had a legal duty and obligation to Creative American and the Loganathans to act diligently and competently to protect Creative American and the Loganathans' legal interests at all times and to represent Creative American and the Loganathans with the degree of care, skill, diligence and knowledge commonly possessed and exercised by a reasonable, careful and prudent lawyer in Florida at all times.

136.   The Korda Parties failed to exercise their duty of care to both Creative American and the Loganathans by, among other things:

- Failing to advise Creative American and the Loganathans that they were not required to make a $1 million investment to qualify for an EB-5 visa, and, in fact, could qualify by making only a $500,000 investment in a TEA area;
- failing to advise Creative American and the Loganathans that their money should have been invested into an escrow account;
- failing to review any of the documents TLE provided to Creative American and the Loganathans or to advise Creative American and the Loganathans to retain alternative counsel to do so;
- failing to advise Creative American and the Loganathans that they should have ensured that they had a written agreement with TLE stating that their money would be refunded if their I-526 petition was rejected for any reason;
- failing to advise Creative American and the Loganathans not to allow TLE to access or have control over their investment until their I-526 had been approved;
- failing to advise Creative American and the Loganathans that if they intended to invest money into the bank account in Creative American's name, set up by TLE and which would be accessible by TLE and spent immediately, that the Loganathans could and should have applied for an E2 visa in 2011 so that the Loganathans could be present for the build out of the centers;
- failing to review the Management Agreement despite the Loganathans' requests and failing to advise the Loganathans, in their individual capacity, or in their capacity as members of or investors in Creative American, that they could arrange to apply for a temporary visa to avoid the Management Agreement altogether; and
- failing to advise Creative American and the Loganathans that if they entered into the Management Agreement, that they would not be able to show that the Loganathans were managing the business, which would adversely impact their I-526 application.

137.    The Korda Parties failed to exercise their duty of care to the Loganathans by, among other things:

- Failing to ever submit the Loganathans' I-526 petition;
- failing to properly advise the Loganathans with respect to their B1/B2 visa application; and
- failing to submit an E2 visa application until March 2013, after both centers were already operational.

138.    The actions an inactions of the Korda Parties, as more fully set forth above and in the incorporated paragraphs, were negligent and in disregard of the professional duties they owed Creative American and the Loganathans.

49

139.     As a direct, proximate and foreseeable result of the Korda Parties' neglect of duty and legal malpractice, Creative American and the Loganathans invested and lost in excess of $2.5 million.

**WHEREFORE,** Creative American and the Loganathans demand judgment against the Korda Parties, for compensatory and consequential damages in excess of $2.5 million plus interest and costs; and such other and further relief as this Honorable Court deems just and proper.

**COUNT XII and COUNTERCLAIM V**
**(BREACH OF FIDUCIARY DUTY)**

140.     Creative American and the Loganathans repeat and re-allege the allegations in paragraphs 1-75 of the complaint as if fully set forth herein.

141.     The Korda Parties, had a fiduciary relationship with Creative American and the Loganathans as a result of the attorney-client relationship.

142.     Because of that fiduciary relationship, the Korda Parties owed duties to Creative American and the Loganathans, including, but not limited to, duties of loyalty, good faith, fairness and honesty, and full disclosure and fair dealing, and were obligated to act in the best interest of Creative American and the Loganathans at all times.

143.     The Korda Parties breached their duties to both Creative American and the Loganathans by, among other things:

- Failing to advise  Creative American and the Loganathans that they were not required to make a $1 million investment to qualify for an EB-5 visa, and, in fact, could qualify by making only a $500,000 investment in a TEA area;
- failing to advise Creative American and the Loganathans that their money should have been invested into an escrow account;
- failing to review any of the documents TLE provided to  Creative American and the Loganathans or to advise Creative American and the Loganathans to retain alternative counsel to do so;

- failing to advise Creative American and the Loganathans that they should have ensured that they had a written agreement with TLE stating that their money would be refunded if their I-526 petition was rejected for any reason;
- failing to advise Creative American and the Loganathans not to allow TLE to access or have control over their investment until their I-526 had been approved;
- failing to advise Creative American and the Loganathans that if they intended to invest money into the bank account in Creative American's name, set up by TLE and which would be accessible by TLE and spent immediately, that the Loganathans could and should have applied for an E2 visa in 2011 so that the Loganathans could be present for the build out of the centers;
- failing to review the Management Agreement despite the Loganathans' requests and failing to advise the Loganathans, in their individual capacity, or in their capacity as members of or investors in Creative American, that they could arrange to apply for a temporary visa to avoid the Management Agreement altogether; and
- failing to advise Creative American and the Loganathans that if they entered into the Management Agreement, that they would not be able to show that the Loganathans were managing the business, which would adversely impact their I-526 application.

144.    The Korda Parties breached their duties to the Loganathans by, among other things:

- Failing to ever submit the Loganathans' I-526 petition;
- failing to properly advise the Loganathans with respect to their B1/B2 visa application; and
- failing to submit an E2 visa application until March 2013, after both centers were already operational.

145.    As a result of The Korda Parties' negligence, Creative American and the Loganathans invested and lost in excess of $2.5 million.

    **WHEREFORE,** Creative American and the Loganathans demand judgment against The Korda Parties for compensatory and consequential damages in excess of $2.5 million plus interest and costs; and such other and further relief as this Honorable Court deems just and proper.

## COUNT XIII and COUNTERCLAIM IV
### (BREACH OF CONTRACT)

146.    Creative American and the Loganathans repeat and re-allege the allegations in paragraphs 1-75 of the complaint as if fully set forth herein.

147.    Creative American and the Loganathans entered into a valid and enforceable agreement with the Korda Parties on July 16, 2011, in connection with Creative American and the Loganathans' EB-5 investment with TLE and the Loganathans EB-5 application. The July 16, 2011 agreement stated that Korda would provide an analysis on the source of the Loganathans' investment funds; work with financial advisors to perfect or draft missing documents such as contracts, loan agreements or promissory notes;  liaise with TLE to obtain all relevant offering and filing documents; and prepare and file the I-526 Petition. See Exhibit 1. This necessarily included setting up an LLC, as the EB-5 investment had to be deposited into a business' bank account, which would be set up specifically for that purpose.

148.    Creative American and the Loganathans also entered into a valid and enforceable retainer agreement with the Korda Parties for legal representation in connection with it's the filing of the Loganathans I-526 petition and Creative American and the Loganathans proposed investment in TLE. Pursuant to the Retainer Agreement, the Korda Parties agreed to assist with the preparation and filing of the I-526 petition. See Exhibit 4.

149.    The Korda Parties breached the July 16, 2011 agreement and the Retainer Agreement with both Creative American and the Loganathans by, among other things:

- Failing to advise  Creative American and the Loganathans that they were not required to make a $1 million investment to qualify for an EB-5 visa, and, in fact, could qualify by making only a $500,000 investment in a TEA area;
- failing to advise Creative American and the Loganathans that their money should have been invested into an escrow account;

- failing to review any of the documents TLE provided to Creative American and the Loganathans or to advise Creative American and the Loganathans to retain alternative counsel to do so;
- failing to advise Creative American and the Loganathans that they should have ensured that they had a written agreement with TLE stating that their money would be refunded if their I-526 petition was rejected for any reason;
- failing to advise Creative American and the Loganathans not to allow TLE to access or have control over their investment until their I-526 had been approved;
- failing to advise Creative American and the Loganathans that if they intended to invest money into the bank account in Creative American's name, set up by TLE and which would be accessible by TLE and spent immediately, that the Loganathans could and should have applied for an E2 visa in 2011 so that the Loganathans could be present for the build out of the centers;
- failing to review the Management Agreement despite the Loganathans' requests and failing to advise the Loganathans, in their individual capacity, or in their capacity as members of or investors in Creative American, that they could arrange to apply for a temporary visa to avoid the Management Agreement altogether; and
- failing to advise Creative American and the Loganathans that if they entered into the Management Agreement, that they would not be able to show that the Loganathans were managing the business, which would adversely impact their I-526 application.

150.    The Korda Parties breached the July 16, 2011 agreement and the Retainer Agreement with the Loganathans by, among other things:

- Failing to ever submit the Loganathans' I-526 petition;
- failing to properly advise the Loganathans with respect to their B1/B2 visa application; and
- failing to submit an E2 visa application until March 2013, after both centers were already operational.

151.    As a result of the Korda Parties' breaches of contract, Creative American and the Loganathans invested and lost in excess of $2.5 million.

**WHEREFORE,** Creative American and the Loganathans demand judgment against the Korda Parties for compensatory and consequential damages in excess of $2.5 million plus interest and costs; and such other and further relief as this Honorable Court deems just and proper.

Dated:          August 22, 2014

Respectfully submitted,

**Hirzel & Dreyfuss, PA**
*Counsel for Plaintiff*
Wells Fargo Center
333 S.E. 2nd Avenue, Suite 2000
Miami, Florida 33131


/s/ Andre Dreyfuss_____
ANDRE DREYFUSS, ESQ.
Fla. Bar. No.: 94868
E-mail: andre.dreyfuss@hirzeldreyfuss.com
LEON HIRZEL, ESQ.
E-mail: leon.hirzel@hirzeldreyfuss.com
Fla. Bar. No.: 85966


**Einbinder & Dunn, LLP**
*Co-Counsel for Plaintiff*
104 West 40th Street
New York, New York 10018


 /s/ Michael Einbinder_____
MICHAEL EINBINDER, ESQ.
*Admitted Pro Hac Vice*
NY Bar No.: 1709500
E-mail: ME@ed-lawfirm.com
MACKENZIE DIMITRI, ESQ.
*Admitted Pro Hac Vice*
NY Bar No.: 4901682
E-mail: MLD@ed-lawfirm.com