# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No.  9:14-CV-80900-ROSENBERG/BRANNON

CREATIVE AMERICAN EDUCATION, LLC,
a Colorado Limited Liability Company,

       Plaintiff,

v.

THE LEARNING EXPERIENCE SYSTEMS,
LLC, a Delaware Limited Liability Company,
ANTHONY KORDA, an individual & KORDA,
ZITT & ASSOCIATES,

       Defendants.
_____/

THE LEARNING EXPERIENCE SYSTEMS, LLC,
a Delaware Limited Liability Company and
TLE AT PARKER, LLC, a Delaware Limited Liability
Company, & TLE AT AURORA, LLC, a Delaware
Limited Liability Company,

       Counter-plaintiffs,

v.

CREATIVE AMERICAN EDUCATION, LLC, a
Colorado Limited Liability Company,
BERNARD LOGANATHAN, an individual, &
KATIJAH BEEVE SHAIK ALUDEEN-
LOGANATHAN a/k/a KATIJAH SHAIK ALUDEEN,
an individual,

       Counter-defendants,
_____/

BERNARD LOGANATHAN, an individual, &
KATIJAH BEEVE BINTE SHAIK ALAUDEEN,
an individual,

       Counterclaim plaintiffs,

v.

THE LEARNING EXPERIENCE SYSTEMS, LLC,
a Delaware Limited Liability Company, ANTHONY
KORDA D/B/A KORDA, ZITT & ASSOCIATES, &
THE LAW OFFICES OF ANTHONY KORDA, LLC,
D/B/A KORDA, ZITT & ASSOCIATES, a Florida
Limited Liability Company,

       Counterclaim defendants.
_____/

**ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant's (The Learning Experience Systems, LLC) Motion for Summary Judgement [DE 101]. The Motion has been fully briefed by both sides and the Court heard oral argument on the Motion on May 5, 2015. The Court has reviewed the documents in the case file and is fully advised in the premises. For the reasons set forth below, the Motion is **GRANTED** as to the fraudulent misrepresentation claims (Count I), **GRANTED** as to the negligent misrepresentation claims (Count II), **DENIED** as to the contract rescission claim (Count III), **GRANTED IN PART AND DENIED IN PART** as to the FDUTPA claims (Count IV), **GRANTED** as to the securities fraud claim (Count V), **DENIED** as to the power of attorney claim (Count VI), and **DENIED** as to the breach of contract claims (Count VII, Count VIII, Count IX, and Count X).

## I.        BACKGROUND

This case is about the acquisition of a childcare franchise. Plaintiff, Creative American Education, LLC ("CAE"), is a business entity created by foreign investors (Mr. Loganathan and Ms. Alaudeen, collectively, the "Loganathans"), citizens of Singapore, who sought to obtain EB-5 visas that would allow them to immigrate to the United States. Acquisition of this visa requires, *inter alia*, investment in a business in the United States, active participation in the business by the investor, and the creation of at least ten full-time jobs for American citizens. The Loganathans therefore investigated the possibility of starting a childcare business in the United States through a franchise, The Learning Experience. The Learning Experience franchise ("TLE") is owned by Defendant Learning Systems Experience, LLC.

The Loganathans executed several agreements with TLE, including a Franchise Agreement, which were subsequently assigned to CAE. The agreements were assigned for the stated purpose of establishing two separate childcare franchises in Colorado. Although it was the Loganathans' intent to actively participate in the franchise (such participation was required for an EB-5 visa), the Loganathans were unable to arrive in the United States prior to the completion of the build-outs for their franchise locations. The Loganathans[1] and CAE therefore executed a Management Agreement with TLE that authorized TLE to manage the franchises for a certain period of time. The Management Agreement contemplated that the Loganathans eventually would co-manage the businesses with TLE and, after additional time, the Loganathans exclusively would manage the businesses and TLE would no longer be involved with any management responsibilities.

The Loganathans eventually obtained visas, immigrated to the United States, received training from TLE, and assumed certain managerial responsibilities for their franchises (although the parties dispute the level of management responsibilities the Loganathans' assumed). A plethora of complications with the operation of the franchises occurred during this period of time. After a series of staffing problems and warnings from state inspectors, Mr. Loganthan sent an e-mail to TLE that read in part as follows:

> So far have turned away two parents. One was a pregnant mum with two kids. She cried. I feel we are doing an injustice to the parents by keeping the center open. I propose closing the center tomorrow. Considering we don't have a director either. N are in State violations.
>
> Plus pulling staffs from Aurora is putting Aurora at risk as well. Considering that Aurora is also on State's probation list.

---

[1] Ms. Alaudeen-Loganathan signed the Management Agreement in both her individual capacity and her capacity as the managing member of CAE.

In response, TLE sent a letter to the Loganathans that read as follows:

## NOTICE

May 1, 2014

*VIA EMAIL*

Bernard Loganathan & Katijah Shaik-Loganathan
Creative American Education, LLC
10015 Twenty Mile Road
Parker, Colorado 80134

Re:    Franchise # 231 – TLE Parker, Colorado & Aurora, Colorado

Dear Bernard & Katijah:

This correspondence is being sent in response to your e-mail correspondence of today's date to Patrick Campolo, Tara Montenaro and Deborah O'Byrne, and your follow-up telephone conversation of this afternoon with Richard Weissman, regarding the TLE Centers in Parker and Aurora, Colorado.

In your e-mail correspondence, you set forth your intention to close the Parker Center tomorrow, May 2, 2014. We advised you in no uncertain terms that such closure would be unacceptable, and would constitute a breach of your Franchise Documents with respect to the Parker Center. In light of your failure to present any reasonable alternatives to closure, and in the interests of protecting and ensuring the safety and well-being of the children and staff at the Centers, as well as preventing irreparable harm to the TLE brand and System, <u>Franchisor shall immediately assume operational management of both the Parker and Aurora Centers, effective May 2, 2014</u>. This letter shall serve to memorialize that fact, as well as your agreement to such course of action, as expressed in your telephone conversation of this afternoon with Richard Weissman.

As you are aware, and pursuant to multiple prior conversations between yourselves and Franchisor's senior staff, I forwarded to you yesterday an Exclusive Center Management Agreement for your review and execution. As per your telephone conversation with Richard Weissman today, you will have one (1) week from the date of this Notice to review that Agreement with your counsel and respond to same.

In order to minimize potential disruptions to ongoing Center activities and avoid potential staff and/or parent conflicts, we must respectfully insist that you not be physically

4

present at either Center until the Agreement is fully executed by all parties, and that you refrain from having your own children attend either Center during such time.

As you have pointed out in multiple e-mails and telephone conversations, during the short time period when the Centers have been under your management, both Centers have had to contend with multiple licensing issues and violations. Accordingly, please note that Franchisor will also undertake a full review and investigation of all operations in both Centers, to determine how and why such issues and violations occurred, and to correct any outstanding deficiencies. Franchisor reserves all rights and remedies in connection therewith.

This Notice is sent without waiver of any rights available to us under the various Franchise Documents, at law, or in equity, all of which are hereby reserved in full.

Sincerely

Michael A. Shafir, Esq.
Vice President & General Counsel

After sending this letter, TLE assumed full managerial control of CAE's franchises on May 2, 2014. Although TLE subsequently sent several e-mails to the Loganathans requesting certain documentation and funds, the Loganathans declined to respond and instead initiated the instant suit.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The existence of a factual dispute is not by itself sufficient grounds to defeat a motion for summary judgment; rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson*, 477 U.S. at 247-48). A fact is material if "it would affect the outcome of the suit under the governing law." *Id.*

5

(citing *Anderson*, 477 U.S. at 247-48).

In deciding a summary judgment motion, the Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007). Thus, upon discovering a genuine dispute of material fact, the Court must deny summary judgment. *See id.*

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "[t]he non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, to show that a reasonable jury could find in favor of that party. *See Shiver*, 549 F.3d at 1343.

### III.   ANALYSIS AND DISCUSSION

TLE argues it is entitled to summary judgment as to each count in CAE's Amended Complaint: (1) the fraudulent and negligent misrepresentation claims (Count I and Count II), (2) the contract rescission claim (Count III), (3) the FDUTPA claims (Count IV), (4) the securities fraud claim (Count V), (5) the power of attorney claim (Count VI), and (6) the breach of contract

claims (Count VII, Count VIII, Count IX, and Count X).  TLE's arguments are each addressed in turn.

### 1.  The Fraudulent and Negligent Misrepresentation Claims, Count I and Count II.

CAE alleges[2] that TLE fraudulently and negligently induced CAE to enter into the Franchise Agreement, the Management Agreement, the Lease Agreement and related assignments,[3] a power of attorney agreement, and certain personal guarantees.  In order to state a claim for fraudulent misrepresentation, a party must allege: (1) misrepresentation of a material fact, (2) that the representor knew or should have known of the statement's falsity, (3) that the representor intended that the representation would induce another to rely on it, and (4) that the plaintiff suffered injury in justifiable reliance[4] on the representation.  *Output, Inc. v. Danka Bus. Sys., Inc.*, 991 So. 2d 941, 944 (Fla. Dist. Ct. App. 2008).  Importantly, a party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written contract.  *See Hillcrest Pac. Corp. v. Yamamura,* 727 So. 2d 1053, 1056 (Fla. Dist. Ct. App. 1999).

---

[2] At the hearing on May 5, 2015, CAE clarified that it intended to bring Count I and Count II on behalf of CAE and the Loganathans individually.  For the sake of simplicity, the Court refers to Plaintiff and the Counterclaim-plaintiffs (the Loganathans) collectively as CAE when distinction is unnecessary.

[3] In an abundance of caution, the Court attempts to construe CAE's misrepresentation claims as to the Lease Agreement, despite the fact that CAE's arguments on this point are rife with confusion.  This confusion stems from the fact that CAE did not execute the lease assignment directly; instead, TLE executed the lease assignment on CAE's behalf through a power of attorney.  By virtue of the power of attorney, CAE was bound to the terms of the assignment. DE 41-12.  Therefore, to the extent CAE's misrepresentation claim is that it was unaware that property taxes would be owed, this claim fails because no record evidence has been cited to support this allegation and also because CAE was bound to the terms of the assignment which clearly specified that property taxes *would* be paid by CAE.  *See* footnote 5. Alternatively, to the extent CAE's misrepresentation claim is that the *amount* of property taxes was misrepresented, this misrepresentation goes to the power of attorney agreement—not the lease assignment—because the power of attorney is what granted TLE the authority to execute the assignment, and is addressed below.  Alternatively, to the extent CAE's misrepresentation claim is that TLE failed to properly select a suitable site (with suitable property taxes), this claim goes to TLE's alleged breach of fiduciary duty under the power of attorney—not the lease assignment—and is the subject of Count VI.

[4] The Court addresses the state of the law in Florida on justifiable reliance at length below.

With respect to CAE's negligent misrepresentation claim, the necessary elements for this claim are similar to the elements for fraudulent misrepresentation and are as follows: (1) a misrepresentation of a material fact; (2) the representor either knew of the misrepresentation, or made the representation without knowledge as to its truth or falsity, or made the representation under circumstances in which he or she ought to have known of its falsity; (3) the representor intended that the representation induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation. *See Wallerstein v. Hosp. Corp.,* 573 So. 2d 9, 10 (Fla. Dist. Ct. App. 1990). Similar to a claim for fraudulent misrepresentation, a party cannot recover under a theory of negligent misrepresentation for misrepresentations that are adequately dealt with or expressly contradicted in a later written contract. *See TRG Night Hawk Ltd. v. Registry Dev. Corp.*, 17 So. 3d 782, 784 (Fla. Dist. Ct. App. 1999).

TLE argues that the misrepresentations it is alleged to have made are addressed in the relevant agreements and, as a result, CAE is precluded from bringing its misrepresentation claims. It is therefore necessary to compare CAE's specific allegations with the text of the agreements. CAE has alleged TLE is responsible for:

- making false or misleading representations as to the EB-5 investment requirements and leading CAE and the Loganathans to believe that they were required by law to make a million-dollar investment in order for the Loganathans to qualify for an EB-5 visa;

- falsely asserting that it could get the Loganathans a "fast track to a Green Card" through CAE's and the Loganathans' investment;

- falsely telling CAE and the Loganathans that their investment would be "fully refundable" and that TLE would sell the centers and refund the money, if a refund was needed;

- failing to disclose to CAE or the Loganathans that they would almost certainly be required to execute a management agreement and powers of attorney which would give TLE extraordinary power over CAE and the Loganathans' centers and investment and would

require CAE and the Loganathans to deposit the full one-million dollar investment into a
bank account, under CAE's name, created by TLE and that TLE would have full access to,
90 days before CAE and the Loganathans' first center even opened;

- failing to disclose to CAE or the Loganathans that they would be required to pay property
  taxes for the property at the centers;[5]

- falsely stating to CAE and the Loganathans that as one-million-dollar investors, CAE's
  principal, Ms. Alaudeen, would be granted a green card to citizenship; and

- falsely stating that TLE had experience and expertise in managing centers
  for new franchisees.

DE 41 ¶ 78.  These allegations are supported by evidence in the record.  *See* DE 94-1 at 38-52, DE

94-2 at 150-52.

In refutation of these allegations, TLE cites to several contract provisions which it asserts

expressly contradict CAE's claims.  The majority of the contract provisions cited by TLE have no

relevance, but the following provisions have merit:

12.11 Entire Agreement. This Agreement, including the introduction, addenda and
Attachments to it, constitutes the entire agreement between you and us. There are no
other oral or written understandings or agreements between you and us concerning
the subject matter of this Agreement. However, nothing in this Agreement or in any
related agreement is intended to disclaim the representations we made in our
Franchise Disclosure Document, including any exhibits or amendments thereof.

. . .

12.16 Disclaimer of Representations. YOU ACKNOWLEDGE, AGREE AND
REPRESENT THAT NO REPRESENTATIONS OR PROMISES OF ANY KIND
HAVE BEEN MADE BY US TO INDUCE YOU TO SIGN THIS AGREEMENT
EXCEPT THOSE SPECIFICALLY SET FORTH IN THE FRANCHISE
DISCLOSURE DOCUMENT THAT HAS BEEN DELIVERED TO YOU. YOU
FURTHER ACKNOWLEDGE, AGREE AND REPRESENT THAT NEITHER
WE NOR ANY OTHER PERSON HAS GUARANTEED THAT YOU WILL
SUCCEED IN THE OPERATION OF YOUR CENTER OR HAS PROVIDED

---

[5] After discovery, CAE's claim on this point appears to have been narrowed to the allegation that comparable property
taxes were not researched and that the facility selected had unusually high property taxes.  *See* DE 128 ¶ 48.  As a
result, this allegation is more pertinent to CAE's fiduciary duty claim.

ANY SALES OR INCOME PROJECTIONS OF ANY KIND TO YOU. YOU FURTHER AGREE THAT IF THE ABOVE IS NOT TRUE, YOU ARE OBLIGATED TO NOTIFY OUR PRESIDENT, IN WRITING OF ANY VIOLATION OF THIS SECTION. YOU HAVE MADE AN INDEPENDENT INVESTIGATION OF ALL IMPORTANT ASPECTS OF YOUR CENTER. YOU UNDERSTAND THAT WE ARE NOT A FIDUCIARY AND HAVE NO SPECIAL RESPONSIBILITIES BEYOND THE NORMAL RESPONSIBILITIES OF A SELLER IN A BUSINESS TRANSACTION. MOST IMPORTANTLY, YOU ACKNOWLEDGE, AGREE AND UNDERSTAND THAT WE HAVE BEEN INDUCED INTO EXECUTING THIS AGREEMENT BY VIRTUE OF THE ABOVE REPRESENTATIONS MADE BY YOU IN THIS SECTION.

The most pertinent portions of these clauses are: (i) that the Franchise Agreement constituted the entire agreement between the parties, (ii) that there were no oral or written understandings that induced CAE to enter into the agreement other than those set forth in the agreement (and a certain franchise disclosure document), and (iii) that CAE's agreement that there were no other representations (other than those delineated above) expressly induced TLE to enter into the Franchise Agreement and, without such a representation by CAE, TLE would not have entered into the Franchise Agreement.

CAE argues that these provisions do not address and contradict its specific claims. For example, CAE argues that the provisions do not specifically refute the allegation that TLE misrepresented its experience in managing and transitioning franchises to foreign investors obtaining visas. There is case law that contradicts CAE's position. In *Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283 (S.D. Fla. 2007), the district court considered a real estate purchasing contract. The contract contained the following block of bolded, capitalized text immediately above the signature block:

**ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE**

> **SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, *FLORIDA STATUTES,* TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.**

*Id.* at 1289.    Other provisions in the real estate contract in *Garcia* also addressed oral representations, including the disclaimer that "Purchaser has not relied upon any prior agreements or representations made by anyone other than Developer, or oral statements (*including oral statements of sales representatives*), except as specifically stated in this Contract." *Id.* The *Garcia* court compared the above-cited clauses, together with additional clauses of a more general nature (including a general integration clause) and concluded as a matter of law that any reliance upon the alleged fraudulent misrepresentations would have been unreasonable. *Id.* at 1295. In *Garcia* the court held that the plaintiffs' reliance was unreasonable due to express disclaimers in the agreement; other courts have noted that even mere silence in a contract may render similar reliance unreasonable. *See Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1428 (S.D. Fla. 1996) ("[I]t is a basic tenant of contract law that reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties.").

CAE attempts to distinguish *Garcia* by arguing the specific terms of the contract (in that case) clearly contradicted the specifics of plaintiffs' allegations. The Court finds this reading of *Garcia* to be shortsighted. In *Garcia,* the plaintiffs' claims were numerous and varied:

> Plaintiffs also allege that "Defendants" claimed that they had an agreement with a management company for an adjacent property to rent units for unit owners, that the common management would result in excess rentals for Santa Maria unit owners, that unit owners would have access to the adjacent property's amenities, that the condominium was a residential building, and that the condominium complied with the applicable building code requirements. Plaintiffs further allege that, again, "Defendants" advertised that they had contracted with a "long

11

established high-end restaurant called The Queens Table [to] operate out of the
Santa Maria resort."

*Garcia*, 528 F. Supp. 2d at 1289.  There is no indication in the *Garcia* decision that these allegations were clearly addressed in the agreement.  Instead, the *Garcia* court determined that plaintiffs' reliance upon the above-quoted representations was unreasonable as a matter of law because disclaimers in the purchase contract limited the scope of actionable representations.  *See id.* at 1295.

CAE also argues against the application of *Garcia* by citing to two district court cases: *Natarajan v. Paul Revere Life Insurance Co.*, 720 F. Supp. 2d 1321 (S.D. Fla. 2010) and *Galstadi v. Sunvest Communities, USA, LLC*, 637 F. Supp. 2d 1045 (S.D. Fla. 2009).[6]  Neither of these cases is persuasive.  In *Natarajan* the district court considered a contract that contained a merger and integration clause only—there is no indication in the *Natarajan* decision that a disclaimer was also at issue.[7]  *Natarajan*, 720 F. Supp. 2d at 1329.  *Galstadi* has even less persuasive value than *Natarajan*.  In *Galstadi*, the defendants took the position that they were not parties to the relevant contract and, as a result, the district court refused to give the defendants the benefit of using clauses in the contract in their defense.  *Galstadi*, 637 F. Supp. 2d at 1055.

---

[6] CAE also makes the inconsistent argument that a court can never find as a matter of law that reliance upon an oral misrepresentation is unreasonable.  Despite the fact that this contention would result in cases such as *Garcia* being wrongly decided, the authority CAE relies upon for this proposition, *Hetrick v. Ideal Image Development Corp.* and *Romo v. Amdex Insurance Co.*, are both distinguishable.  In *Hetrick*, the disclaimers at issue were not included in the franchise agreement contract—they were located in a separate questionnaire executed by the plaintiffs.  No. 07-CV-871, 2008 WL 5235131, at *3 (M.D. Fla. Dec. 13, 2008).  In *Romo*, the defendants limited their argument to the merger clause in the contract issue.  930 So. 2d 643, 651 (Fla. Dist. Ct. App. 2006).  In this sense, *Romo* is consistent with cases that focus on the sufficiency of merger and integration clauses.  *See* footnote 7.  Ultimately, as discussed below, the line of demarcation separating cases such as *Hetrick* and *Garcia* is the *specificity* of the terms of the agreement that contradict alleged misrepresentations.

[7] Cases akin to *Natarajan* are not uncommon.  For example, in *Wilson v. Equitable Life Assurance Society*, 622 So. 2d 25 (Fla. Dist. Ct. App. 25) the appellate court found that a merger clause did not preclude claims arising from the allegation of oral promises that preceded the agreement.  Even so, the *Wilson* court noted that the claims *could* have been precluded if that agreement had stated that *there were no other agreements or promises.*  *Id.* at 28 n.2.

Ultimately, the issue before the Court is one of specificity. A specific disclaimer brings the instant case in line with *Garcia* and other cases that preclude misrepresentation claims that contradict written agreements, and a lack of specificity would cause this issue to be decided by a trier of fact. CAE argues that the clauses at issue are general while TLE characterizes the clauses as specific. Upon review of the Franchise Agreement, the Court finds that the agreement contains sufficient specificity to preclude CAE's misrepresentation claims. Although the relevant text in the Franchise Agreement is perhaps less visually striking than the text in *Garcia*, the disclaimer in the Franchise Agreement resembles the disclaimer in *Garcia* in the most important respects. In *Garcia,* the real estate purchase contract clearly limited the universe of potential misrepresentation claims: "For correct representations, reference should be made to this contract and the documents required by section 718.503, Florida Statutes." *Garcia*, 528 F. Supp. 2d at 1289. Similarly, the Franchise Agreement in this case expressly limits the universe of potential misrepresentations to the agreement itself and concrete documentation—just like the disclaimer in *Garcia.* The documentation CAE was directed to in the instant case was a franchise disclosure document which was, by all indications, a lengthy and thorough document that disclosed a voluminous amount of information about the TLE franchise. *See* DE 94-5 at 20. CAE does not base any of its claims on misrepresentations in the franchise disclosure document.[8]

Furthermore, the Franchise Agreement expressly stated that CAE's agreement to limit the universe of potential misrepresentation claims induced TLE to enter into the agreement. CAE has raised no legal argument refuting the significance of this provision, nor has CAE argued that the

---

[8] This document appears to have contained representations on a wide variety of subjects including, without limitation, representations as to specific TLE programs, the selection of suitable leased space, financial statements, and bookkeeper services. DE 94-5 at 20.

Loganathans were somehow surprised or unaware of this provision when they executed the Franchise Agreement. *See Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002) (noting that it is the duty of a signatory to read the contents of an agreement).

The Court's decision on this matter is strengthened by a survey of case law. *Garcia* has received favorable treatment in this district. For example, in *Gentry v. Harborage Cottages-Stuart, LLLP*, the district court examined a disclaimer provision that read as follows:

> This Agreement contains the entire understanding between Buyer and Seller. Any current or prior agreements, representations, understandings or oral statements of sales representatives or others, if not expressed in this Agreement, the Condominium Documents or in brochures for the Condominium, are void and have no effect. Buyer agrees that Buyer has not relied on them.

602 F. Supp. 2d 1239, 1258 (S.D. Fla. 2009). Citing *Garcia*, the district court held that the disclaimer precluded any justifiable reliance on oral representations.[9] *Id.* Similarly, in *Weaver v. Opera Tower, LLC*, the district court considered a disclaimer that read as follows:

> This Agreement contains the entire understanding between [Plaintiffs] and [Defendant], and [Plaintiffs] hereby acknowledge that the displays, architectural models, artist renderings and other promotional materials contained in the sales office and model suite are for promotional purposes only and may not be relied upon. [Plaintiffs] ha[ve] not relied upon any verbal representations, advertising, portrayals or promises other than as expressly contained herein and in the Condominium Documents.

No. 07-23333-CIV, 2008 WL 4145520, *2 (S.D. Fla. Aug. 1, 2008). Like *Garcia* and the instant case, the agreement in *Weaver* limited the universe of potential misrepresentation claims to a finite subset of documents. Citing *Garcia*, the court concluded that any reliance upon a brochure would

---

[9] The *Gentry* court permitted other representations that violated Florida Statute section 718.506 because the agreement at issue "did not deny or abridge the rights" granted under that statute. Although *Gentry* was later reversed on other grounds, this portion of the court's decision (which excluded oral representations and permitted representations that violated section 718.506) was undisturbed. *See Gentry v. Harborage Cottages-Stuart, LLLP*, 654 F.3d 1247, 1260 (11th Cir. 2011).

14

be unreasonable as brochures were not included in the finite list of actionable documents in the disclaimer clause. *See id.*

In another case that examined *Garcia*, *Trilogy Properties LLC v. SB Hotel Associates LLC*, No. 09-21406-CIV, 2010 WL 7411912 (S.D. Fla. Dec. 23, 2010), the district court applied *Garcia* without questioning its reasoning or holding. In *Trilogy*, the district court considered allegations pertaining to misrepresentations in a brochure. Like *Garcia* and like the instant case, the contract at issue limited the universe of potential misrepresentation claims to a finite number of documents. The court concluded that the representations were not precluded, unlike *Garcia*, because "[i]n *Garcia*, the representations were oral representations." *Trilogy*, 2010 WL 7411912 at *10. The *Trilogy* court noted that the brochure at issue in that case was *within* the universe of potential misrepresentation claims permitted by contract, because the contract limited representations to the "Agreement, the Condominium Documents, or . . . brochures for the condominium." *Id.* at *9. In the instant case, although CAE has cited to representations other than oral representations (such as the TLE website), the TLE website was not included in the universe of representations subject to litigation in the Franchise Agreement.

In summary, case law buttresses the Court's conclusion that the Franchise Agreement contained sufficient specificity in this case to preclude the misrepresentation claims brought by CAE and the Loganathans. Although some courts have described this area of law as "murky," *G Barrett LLC v. Ginn Co.*, No. 09-CV-374, 2011 WL 6752551, at *4 (M.D. Fla. Dec. 13, 2011), the reason for such a pronouncement is primarily that the Florida Supreme Court has held that justifiable reliance is not an element of fraudulent inducement. *See Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010). Although *justifiable* reliance is not a necessary element, *reliance is*, and courts

15

have dealt with this confusion by finding that when a contract contradicts an alleged representation, a plaintiff *cannot rely* on the misrepresentation. *G Barrett*, 2011 WL 6752551 at \*5. Although there are some characteristics in other cases (that upheld broad disclaimers to misrepresentation claims) that are not present in this case, such as agreements with an express covenant that extra-agreement promises are void or agreements with a highly visible disclaimer immediately above a signature block, there are sufficient factors and sufficient specificity in this case to preclude reliance: the disclaimer in this case clearly limited the universe of potential claims to two concrete documents and, importantly, TLE represented that without such a limitation it would have refused to grant CAE a franchise. CAE agreed to these terms. Accordingly, for all of the foregoing reasons, neither CAE nor the Loganathans could rely upon representations outside of the Franchise Agreement and franchise disclosure document and TLE is entitled to summary judgment as to Count I and Count II with respect to the Franchise Agreements.

CAE has also brought misrepresentation claims as to the personal guarantees executed by the Loganathans. The guarantees were executed in the context of the Franchise Agreement, however, and both guarantees include the following language: "All terms, covenants, provisions, and conditions of the Franchise Agreement are hereby incorporated with the same force and effect as of [sic] set forth at length in this Addendum." DE 41-7 at 7. Accordingly, the disclaimers in the Franchise Agreement apply to the guarantees and the Court finds that TLE is entitled to summary judgment as to Count I and Count II with respect to the guarantees.

CAE has also brought misrepresentation claims as to the Management Agreement. CAE's misrepresentation allegations, however, would facially only appear to apply to their inducement to enter into the Franchise Agreement. For example, CAE's allegations are that the Loganathans were

16

misled about TLE's experience in the context of immigration and visas, that they were misled regarding the amount of investment necessary to obtain visas, that they were misled regarding TLE's ability to facilitate their acquisition of visas, that TLE misrepresented the refundability of the Loganathans' investment, that TLE misrepresented the likelihood a Management Agreement would be necessary, and that TLE misrepresented property tax obligations.[10]  Only one of these allegations, the allegation concerning the likelihood a Management Agreement would be necessary, bears any apparent connection to the Management Agreement.

Problematically, CAE has failed to direct the Court to any record evidence of a misrepresentation that the Loganathans or CAE relied upon in the context of executing the Management Agreement.  Instead, the record evidence (as more fully discussed below in section 4) is that once the Loganathans became aware of the need for a management agreement due to delays in the processing of their visa applications, the parties quickly agreed to and executed the Management Agreement.  DE 94-2 at 160-69, 173-75.  Prior to this exchange, it was clearly the intent of all parties, based upon record evidence, for CAE and the Loganathans to manage the franchises—not TLE.  DE 94-2 at 12.

The Court therefore finds that there is no record evidence to support the allegations in Count I and Count II as to the Management Agreement, nor has CAE pressed any argument of note in this regard; CAE's focus on the misrepresentation claims has consistently been in the context of the first transaction in this case, the Franchise Agreement, together with the documents that supported the Franchise Agreement.  Alternatively, the Court finds that the disclaimer in the Management Agreement, which is contained in section 9(k) and which disavowed the existence of

---

[10]  With respect to the property tax issue, see footnote 5.

17

extra-agreement representations, precluded any reliance upon the alleged misrepresentations as a matter of law.[11]  The Court's decision as to Count II is alternatively based on another aspect as well—the waiver provision in section 8 of the Management Agreement.

> Section 8 of the Management Agreement reads as follows:
>
> <u>Release and Indemnification</u>. Franchisee does hereby agree to indemnity, [sic] release, cancel, forgive, forever discharge and hold harmless Manager, its predecessors, parent corporations, holding companies, divisions, subsidiaries, affiliates, franchises, heirs, successors and assigns, and *all* of their respective officers, directors, employees, shareholders, representatives, insurers and agents from and against any and all existing actions, claims, demands, damages, obligations, liabilities, controversies and executions, of any kind or nature whatsoever, whether known or unknown, whether suspected or not, arising under, resulting from or in any way connected to the Franchise Agreements, this Agreement, the Leases, the Centers, its operations and Manager's management thereof, and does specifically waive any claim or right to assert any cause of action or alleged case of action or claim or demand which has, through oversight or error, intentionally or unintentionally, or through a mutual mistake, been omitted from this release.

Florida law, however, does not allow a party to contract against liability for its own fraud absent specific contractual language to the contrary.  *Bank of America, N.A. v. GREC Homes IX, LLC*, No. 13-CV-21718, 2014 WL 351962, at *6 (S.D. Fla. Jan 23, 2014).  Since the release does not include an express release for fraud, CAE's fraudulent misrepresentation claim would not be waived.  CAE's negligent misrepresentation claim, however, is another matter.

Neither party has provided the Court with authority as to whether a negligent misrepresentation claim may be waived through a general waiver.  Although minimal authority exists on this topic, the Court finds that the reasons for requiring an express waiver, namely the

---

[11] CAE's misrepresentation claims as to the power of attorney agreement fail for the same reasons because the power of attorney was executed in conjunction with the Management Agreement.  CAE's claims against TLE *under* the power of attorney agreement, however, are another matter and those claims are addressed below.

strong public policy of prohibiting a fraudulent actor from benefitting from their own fraud, does not exist in the context of a negligent misrepresentation claim which, by definition, does not involve the same level of intent. *See Windstar Club, Inc. v. WS Realty, Inc.*, 886 So. 2d 986, 987-88 (Fla. Dist. Ct. App. 2004). Accordingly, the Court finds in the alternative that CAE's negligent misrepresentation claim, Count II, is precluded by the scope of the general release contained in section 8 of the Management Agreement, which was sufficiently broad to encompass claims arising under the Franchise Agreement, Management Agreement, and all other related agreements.[12]

In summary, the Franchise Agreement precludes CAE and the Loganathans from bringing misrepresentation claims under the Franchise Agreement and related guarantees. CAE and the Loganathans have failed to provide record evidence in support of their misrepresentation claims under the Management Agreement and power of attorney agreement. Alternatively, the terms of the Management Agreement preclude CAE and the Loganathans from bringing misrepresentation claims under those agreements. The Court therefore grants summary judgment in TLE's favor as to Count I and Count II.

### 2.    CAE's Contract Rescission Claim, Count III.

TLE argues that it is entitled to judgment in its favor with respect to CAE's Count III, which seeks rescission of the agreements that are the focus of this case. The elements of a cause of action for rescission of contract are: (1) the character or relationship of the parties; (2) the making of a contract; (3) the existence of fraud, mutual mistake, false representation, impossibility of

---

[12] The general release applied to the franchisee, which was a defined term that included CAE and Ms. Katijah Alaudeen-Loganathan individually. DE 41-11 at 2. Although at the hearing on this matter CAE asserted that Mr. Loganathan was also bringing misrepresentation claims in connection with the Management Agreement, Mr. Loganathan was not a signatory to that agreement. As a final matter, the release provision would also waive negligent misrepresentation claims as to all other prior agreements, albeit only as to CAE and Ms. Alaudeen-Loganathan.

performance, or other ground for rescission or cancellation; (4) the party seeking rescission had rescinded the contract and notified the other party to the contract of such rescission; (5) if the moving party has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible; and (6) the moving party has no adequate remedy at law. *Bland v. Freightliner LLC*, 206 F. Supp. 2d 1202, 1206 (M.D. Fla. 2002) (interpreting Florida law).

TLE takes issue with the third, fourth, and sixth elements cited above. With respect to the third element, TLE argues there is no cognizable claim for fraud in this case. As discussed above in section 1, the Court agrees. The parties have failed to address the issue, however, of impossibility of performance. "Impossibility of performance refers to those factual situations, too numerous to catalog, where the purposes, for which the contract was made, have, on one side, become impossible to perform." *Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So. 2d 614, 617 (Fla. Dist. Ct. App. 1965) (quotations omitted). Given the circumstances in this case, which include TLE's unilateral seizure of managerial control, CAE's subsequent withdrawal from its role as a franchisee, and the passage of one year's worth of time, the Court finds, at the very least, a question of material fact remains as to whether the parties' performance under the relevant agreements has become impossible. As such, CAE is not precluded from rescission on this element.

With respect to the fourth element, which concerns notification, TLE argues that it was not timely notified that CAE sought rescission. Notification can be satisfied, however, by the filing of a complaint that includes a count for rescission. *See Bank of America v. GREC Homes IX, LLC*, No. 13-21718-CIV, 2014 WL 351962, at *9 (S.D. Fla. Jan. 23, 2014). In *Bank of America*, a

complaint that was filed four months after a dispute was considered proper notice for rescission. *Id.* Here, an amended complaint with a count for rescission was filed less than four months after the events in this case reached critical mass and, as such, the Court finds that CAE is not precluded from rescission on this element.

Finally, TLE argues that the sixth element for rescission—whether there is an available remedy at law—is not met in this case. The Court notes that this element has received minimal attention in the papers before the Court and minimal attention at oral argument, with both sides relying upon conclusory statements. The Court finds that TLE has failed to meet its burden on summary judgment to establish as a matter of law that CAE possesses an adequate remedy at law. With respect to CAE's Amended Complaint containing claims both for rescission and damages, counsel for CAE conceded at oral argument that these claims are exclusive and subject to the election of remedies doctrine. *See generally* 25 Am. Jur. 2d § 10. For all of the foregoing reasons, the Court finds that there are sufficient questions of material fact that the Court cannot grant summary judgment as to Count III.

### 3.       CAE'S FDUTPA Claim, Count IV.

A "claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Tracfone Wireless, Inc. v. GSM Group, Inc.,* 555 F. Supp. 2d 1331, 1337 (S.D. Fla. 2008) (quoting *Rollins, Inc. v. Butland,* 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006)). Here, TLE raises the same arguments against CAE's FDUTPA claims that it raised against CAE's misrepresentation claims—essentially that CAE's allegations are contradicted by the express terms of the relevant agreements in this case. A FDUTPA claim does not require justifiable reliance. *Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279, 1282-83 (11th

Cir. 2011).  Instead, a FDUTPA claim requires that an objectively reasonable consumer would be deceived by the complained-of practice.  *Id.*  When an ordinary consumer relies upon representations that are contrary to a subsequent written agreement, the consumer's behavior is no longer reasonable as a matter of law:

> A party has no right to rely upon alleged oral misrepresentations that are adequately covered and expressly contradicted in a later written contract. *Hillcrest Pacific Corp. v. Yamamura,* 727 So. 2d 1053, 1056 (Fla. Dist. Ct. App. 1999). Plaintiff's reliance upon oral statements which were at variance with the written documents were not reasonable as a matter of law.

*Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1368-69 (S.D. Fla. 2003).

As with CAE's misrepresentation claims, the ultimate question is one of specificity.  For the same reasons as set forth above in section 1, the Court finds that the written agreements in this case contained sufficient specificity that an ordinary consumer would be unreasonable to rely upon TLE's alleged misrepresentations as a matter of law.

CAE's FDUTPA claim is not limited, however, to alleged misrepresentations prior to the formation of the contracts in this case.  CAE has also alleged that TLE engaged in deceptive practices during its management of the franchises.  As more particularly described above in section 1 and in the Court's prior order of May 7, 2015 [DE 169], these allegations have support in the record.  TLE argues that these allegations may only be brought under a breach of contract claim—not FDUTPA.  "[C]onduct constituting a breach of contract is actionable under FDUTPA only if the conduct underlying the breach is, by itself, unfair or deceptive."  *N. Am. Clearing, Inc. v. Brokerage Computer Sys., Inc.*, 666 F. Supp. 2d 1299, 1310 (M.D. Fla. 2009).  The Court may not weigh the evidence in the record, and construing all evidence in the record in the light most favorable to CAE, the Court declines to find that the CAE's FDUTPA allegations (independent of

extra-agreement representations) are not actionable under FDUTPA for the same reason that the Court finds TLE is not entitled to summary judgment as to Count VII, Count VIII, Count IX, and Count X.   Accordingly, summary judgment is granted in TLE's favor as to Count IV with respect to all extra-agreement representations (for the same reasons TLE is entitled to judgment as to Count I and Count II) but denied as to TLE's performance under the relevant agreements (for the same reasons the Court denies summary judgment as to Count VII, Count VIII, Count IX, and Count X).

   4.   **CAE's Securities Claim, Count V**.

   In Count V, Creative American alleges that TLE's sale of a franchise under the Franchise Agreement, combined with the later-executed Management Agreement, effectively gave total control of the franchise to TLE, thereby transforming the sale of the franchise into an investment with profits to come solely from the efforts of TLE.  As such, CAE argues that this sale constitutes the sale of a security and violates the Securities Act of 1933, 15 U.S.C.A. § 77(b), the Securities Act of 1934, 15 U.S.C.A. § 78(c), and the Florida Securities and Investor Protection Act.  *See* Fla. Stat. § 517.301.

   Although the Securities Act of 1933 broadly defines securities to include the term "investment contract," the act itself does not define investment contracts.   Recognizing this shortcoming, the Supreme Court promulgated a definition of investment contracts under the act in *S.E.C. v. W.J. Howey Co.*, stating "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party." 328 U.S. 293, 298-99 (1946).[13]  Using this definition, the Court created a three part test to determine whether a security is

_____

[13] The *Howey* standard applies to CAE's claims under Florida law.  *See Rudd v. State*, 386 So. 2d 1216 (Fla. Dist. Ct.

involved, which requires (1) an investment of money, (2) in a common enterprise (3) with an expectation of profits to come solely from the efforts of others. *Id.* at 301; *see also Martin v. T. V. Tempo, Inc*., 628 F.2d 887, 889 (5th Cir. 1980) (applying the *Howey* test in the franchise context).

The only issue in dispute in the instant Motion is the third element in *Howey*—whether profits were made solely from the efforts of others. CAE does not argue that the Franchise Agreement in this case, standing alone, is an investment where profits are made solely from the efforts of others. Instead, CAE's contention is that the Franchise Agreement and Management Agreement *together* form an investment. Both parties argue that the case of *Bamert v. Pulte Home Corp.*, 445 F. App'x 256 (11th Cir. 2011), although an unpublished decision, resolves this question in their favor.

In *Bamert*, the plaintiffs purchased condominium units from a defendant, Pulte Homes. *Id.* at 257. The plaintiffs in that case also entered into a separate management agreement with another defendant, a real estate management company. *Id.* The thrust of the scheme at issue in *Bamert*[14] was that purchasers were induced to purchase condominiums "risk free" so that all of the costs normally associated with the purchase of real estate, such as mortgage payments, taxes, and association dues, would be fully paid. *Id.* at 258. Under this system, the purchased units would be rented for twenty-four months, with the profits from the rental being retained by the management company. *Id.* The benefit for the plaintiffs, as the purchasers, was that they would enjoy the appreciation of the real estate during that period of time. *Id.*

---

App. 1980).
[14] The procedural posture of the appeal in *Bamert* was that of an appeal of a motion to dismiss and the facts considered by the appellate court were the facts in the plaintiffs' complaint, accepted as true.

The Eleventh Circuit examined the purchase contract in *Bamert* and found that, standing alone, it was not an investment contract. *See id.* at 263-64. In reaching this conclusion, the Eleventh Circuit noted that the purchasing homeowner did retain discretion over what could be done with the condominium. *See id.* The court's analysis did not end there, however, since an investment contract may be found by looking to an entire transaction as a whole. *See id.* at 264. Accordingly, the court turned its attention to the relationship between Pulte and the real estate management company, and found that the plaintiffs had alleged sufficient, plausible facts to establish that Pulte was linked to the real estate management company and otherwise promoted the properties as investment opportunities. *Id.* at 265.

In the instant case, the facts are only partially analogous to the facts in *Bamert*. CAE's reliance on *Bamert* is supported by the fact that there is no need to link multiple defendants together in a single investment offering—the Franchise Agreement and Management Agreement were both executed with TLE in this case. In this sense, the case for an investment contract is stronger than the case in *Bamert*. In TLE's favor, the execution of the Franchise Agreement and Management Agreement were separated by several months' worth of time and, moreover, these agreements were executed under different circumstances. There is no evidence in the record that TLE simultaneously marketed its Franchise Agreement and Management Agreement to CAE or the Loganathans—instead the evidence in the record is that the facts of this case resulted in a highly unusual situation for TLE, insofar as TLE had never before offered to transition management in the manner that was contemplated in this case. DE 127-16 at 10-12. Finally, the record is also clear—regardless of which party suggested the Management Agreement—that it was the original intention of the Loganathans to manage their franchises themselves. DE 94-2 at 12. Indeed, the

evidence before the Court is that the Loganathans' acquisition of visas *depended* upon their active involvement in their franchises.  DE 94-1 at 88.  The Court therefore finds that, all factors considered, the instant case is distinguishable from *Bamert*.

CAE makes one other argument (in passing) under *Bamert* that bears consideration. Noting the plaintiffs' attempt to link multiple agreements in *Bamert*, the Eleventh Circuit stated: "Plaintiffs cannot create an investment contract by bootstrapping *their separate voluntary transaction* with [management companies] to their condominium purchase from Pulte."  *Id.* at 264-65 (emphasis added).  CAE therefore argues that the execution of the Management Agreement was not a voluntary transaction.  More specifically, CAE argues that once the Loganathans learned that they would not have visas by the time the build-out for their franchises was completed, they had no choice but to enter into the Management Agreement.  To the extent CAE briefly presses the argument that the execution of the Management Agreement was a non-voluntary transaction, CAE has failed to adequately develop the record, direct the Court's attention to specific portions of the record in this regard, and brief this issue with persuasive authority.  For example, CAE has not brought record evidence to the Court's attention that the Loganathans explored possibilities other than the Management Agreement that proved futile or that TLE refused to consider any alternatives to the execution of the Management Agreement; instead the record evidence is that the Loganathans quickly executed the Management Agreement without protest, without expressing substantive reservations, and without seeking legal counsel, notwithstanding their representations that they utilized legal counsel.  DE 94-2 at 160-69, 173-75.  The record also shows that the Loganathans' execution of the Management Agreement accomplished their goal of obtaining a childcare franchise in the United States that would allow them to obtain a visa. DE 94-1 at 42.  The

26

Court therefore finds that CAE has not met its burden as the non-moving party on this issue and declines to find that an issue of facts remains as to whether the Management Agreement represented a non-voluntary transaction. *See Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009). Alternatively, even if a question of fact does exist, the Court finds that the question of fact is non-material for the reasons set forth in this section.

CAE's sole remaining argument rests upon *Albanese v. Florida National Bank of Orlando*. 823 F.2d 408 (11th Cir. 1987). In that case, investors executed multiple agreements (including a management agreement, lease agreement, and an equipment lease agreement) in what was later determined to be a variation upon a ponzi scheme. *Id.* at 410. Although at least one agreement in that case was held as a matter of law to be an investment contract due to the lack of control the investor retained, the agreements in that case were all executed as part of a single transaction or scheme. *See id.* at 410-12. The record evidence in *Albanese* also showed the investors had no realistic alternative other than to surrender their control. *See id.* at 412. By contrast, the agreements in the instant case were executed at different times and record evidence as to the issue of whether CAE had realistic alternatives to the execution of the Management Agreement is unclear at best. Moreover, in relying upon *Albanese* CAE avoids the fact that the "delegation of rights and duties—standing alone—does not give rise to the sort of dependence on others which . . . [satisfies] *Howey*." *Williamson v. Tucker*, 645 F.2d 404, 423 (11th Cir. 1981). The proper question is not whether an investor has delegated management authority, but whether the investor has retained "ultimate authority" and whether the investor "is so dependent on a particular manager that they cannot replace him or otherwise exercise ultimate control." *Id.* at 424.

Applying *Albanese* to the instant case, CAE retained power under the Management Agreement to terminate the agreement:

> 3(b)  Upon expiration of the initial term, this Agreement shall thereafter be automatically renewed for successive periods of six (6) months each unless either party provides the other with a thirty (30) day written notice to terminate, subject to Section 3(c) below.
>
> 3(c)  In the event the Franchisee terminates this Agreement as provided for above, then at such time this Agreement shall be null, void and of no further force or effect provided Franchisee strictly follow [sic] Manager's operational guidelines with respect to the operations of the Centers, Franchisor's System and Manuals.

DE 41-11 at 4.  Thus, CAE's ultimate control was constrained to the extent that (i) termination of the Management Agreement could only be accomplished at certain intervals and (ii) management of the franchises subsequent to termination of the Management Agreement would still have to comply with the terms of the Franchise Agreement, which in turn required, *inter alia*, certain levels of training.  Alternatively, TLE's control under the Management Agreement could be removed by virtue of the limited term of the Management Agreement and the "co-management" period.  With respect to these limitations on CAE's managerial control, CAE presses no cohesive argument—for example that the training restrictions somehow divested CAE of ultimate control.  Instead, CAE relies upon conclusory statements and the subjective belief of the Loganathans that they had no alternative to the execution of the Management Agreement.

After consideration, the Court finds that the Management Agreement and Franchise Agreement are sufficiently distinct that, unlike *Bamert*, no investment contract was formed.  The Franchise Agreement and the Management Agreement represent two separate transactions.  Although it could be inferred that CAE's theory of the case is that TLE somehow knowingly anticipated, at the signing of the Franchise Agreement, that it would later be required to enter into a

Management Agreement (due to its knowledge of the period of time visa acquisition would require), there is no evidence of note in the record to support this contention. Instead, the evidence in the record is that TLE entered into the Management Agreement as a unique accommodation.[15] DE 127-16 at 10-12. The record also shows that the Loganathans had experience in owning, operating, and managing childcare businesses before they approached TLE which, by extension, means that the Loganathans executed the Management Agreement from the perspective of having previously managed a comparable business themselves, albeit in a different country. DE 94-1 at 12-22.

Furthermore, the Court finds that CAE's contention that the Management Agreement completely divested CAE of all control over its franchise investment goes too far. The Management Agreement clearly contemplated a transition in management from TLE to CAE. DE 41-11 at 3-4. When the limited term of the Management Agreement is considered in the context of the facts of this case and this transaction, the purpose of the limited term of the Management Agreement is clear. Stated another way, TLE characterizes the Management Agreement as a temporary "gap filler" measure to help the Loganathans obtain visas (after delays accrued), and the Court agrees. Moreover, under *Howey*, an agreement is only an investment contract when it generates profits *solely* from the efforts of others. *Howey*, 328 U.S. at 301. This standard cannot be squared with the record in this case which establishes that the Loganathans intended to manage the franchises, needed to manage the franchises, and ultimately (at a minimum) *participated* in the management of the franchises to the extent profits were not generated solely from the efforts of

---

[15] As an aside, the Court notes the inconsistency, on CAE's part, in arguing that TLE knew it would later need to execute the Management Agreement with CAE (due to its knowledge pertaining to visas) when it is CAE's allegation in other counts that TLE had no knowledge or experience with visa acquisition.

others.  Finally, the Court finds that although the Franchise Agreement and Management Agreement placed certain restraints upon CAE's management of the franchises, CAE nonetheless retained ultimate control and, moreover, CAE has failed to develop record evidence on the issue of ultimate control to the contrary.  Accordingly, the Court grants summary judgment in favor of TLE as to Count V.

### 5.    CAE's Power of Attorney Claim, Count VI.

TLE argues that CAE's power of attorney claim fails as a matter of law.  This claim stems from the fact that at the time CAE executed the Management Agreement CAE also appointed TLE as its attorney-in-fact.[16]  An appointment of power of attorney confers certain fiduciary duties by statute, including the duty to act in good faith and the duty not to act contrary to a principle's reasonable expectations.  Fla. Stat. § 709.2114(1)(a).  The power of attorney conferred on TLE was broad in scope.  CAE empowered TLE, for example, to "act generally in relation to all matters of every kind in which Franchisor may be interested or concerned with respect to the operation and management of the [franchise]."  DE 41-12.

TLE's arguments in opposition to this count lack clarity.  TLE's arguments appear to be based, at least in part, on the fact that TLE was empowered to conduct a large variety of tasks related to management under the Management Agreement (which was not subject to statutory fiduciary duties).  But TLE was also appointed as an attorney-in-fact to "act generally" in relation to the operation and management of the center, which was subject to statutory fiduciary duties.  Fla. Stat. § 709.2114.  TLE appears, therefore, to have placed itself in the uncertain position of having

---

[16] The motivating factor behind the power of attorney appears to have been that, at that time, the Loganathans still lacked the necessary visas to immigrate to the United States and perform the necessary (local) tasks to launch their franchises.

30

potentially two different authorizations for its actions.  To the extent this question may be resolved as a matter of law, TLE has provided no authority for the proposition that doubts should be construed in favor of TLE and against any finding of fiduciary duty.[17]  *Contra Citibank, N.A. v. Data Lease Fin. Corp.*, 828 F.2d 686, 691 (11th Cir. 1987) (applying Florida law) ("The existence of an agency relationship, the nature and extent of the agent's authority, and the inclusion within the scope of that authority of a particular act are ordinarily questions to be determined by the jury or by the trier of facts in accordance with the evidence adduced in the particular case." (citation omitted)).  To the extent this question may be resolved as a matter of fact, the Court finds that TLE has not met its burden on summary judgment to establish the absence of any material fact on this issue and, as a result, only a trier of fact may determine (i) which actions of TLE were subject to the power of attorney, (ii) which actions were subject to the Management Agreement, and (iii) whether any fiduciary duty was violated.  *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Accordingly, the Court cannot grant summary judgment as to Count VI.

**6.      CAE's Breach of Contract Claims, Counts VII, VIII, IX, and X.**

TLE argues that CAE's breach of contract claims are deficient because (i) TLE's actions were authorized by contract, (ii) CAE executed a general waiver in favor of TLE,[18] and (iii) there is no record evidence that TLE breached any agreement.  TLE's position, succinctly stated, is that the record clearly shows (without any dispute of material fact) that CAE's breach of contract claims

---

[17] Instead, the Court notes that TLE drafted the relevant agreements, and ambiguities in drafting are generally construed against the drafter when a provision would benefit the drafting party.  *See Terminix Int'l Co., L.P. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1329 n.2 (11th Cir. 2005).  It is possible, however, that a finder of fact could determine after reviewing evidence of intent that the scope of the power of attorney was intended to be limited to a small subset of TLE's actions in connection with the launch and operation of the franchises.

[18] To the extent TLE's argument could be construed to include the interpretation that the general waiver executed by CAE releases it from all possible claims arising under the agreements in this case whatsoever, the Court finds any such interpretation of the waiver to be unreasonable.

31

fail as a matter of law.  The Court has considered at length the evidence in the record in both the instant order and an order entered on May 7, 2015 [DE 169].  Suffice it to say that TLE's characterization of the record is incorrect.

In the interest of brevity, the Court does not restate here all of the reasons the Court previously found (at docket entry 169) that issues of material fact remain as to which party is responsible for breach of the contracts at issue in this case.  Briefly summarized, the unique facts of this case have resulted in the question of who is responsible for the *origination* of the breaches at issue.  Here, TLE was unilaterally responsible for the management of the franchises before granting certain management responsibilities (the parties dispute the extent of the management responsibilities) to CAE.  While the record does contain evidence of multiple breaches of the relevant agreements, the breaches could originate, as TLE argues, from CAE's actions when CAE was participating in the management of the franchises.  Alternatively, the breaches could originate, as CAE argues, from the decisions that TLE made when it unilaterally managed the franchises (prior to granting some control to CAE).  Only a trier of fact can determine the origination of the disputed breaches.  Accordingly, the Court incorporates and adopts the reasoning in the Order of May 7, 2015 [DE 169] and finds, for the same reasons as delineated in that Order, that questions of material fact remain as to Count VII, Count VIII, Count IX, and Count X.  As such, summary judgment cannot be granted as to these counts.

### IV.    CONCLUSION AND RULING

In summary, Defendant TLE's Motion for Summary Judgement [DE 101] is **GRANTED IN PART AND DENIED IN PART**.  TLE's Motion is **GRANTED** as to CAE's fraudulent misrepresentation claims (Count I), **GRANTED** as to CAE's negligent misrepresentation claims

(Count II), **DENIED** as to CAE's contract rescission claim (Count III), **GRANTED IN PART AND DENIED IN PART** as to CAE's FDUTPA claims (Count IV), **GRANTED** as to CAE's securities fraud claim (Count V), **DENIED** as to CAE's power of attorney claim (Count VI), and **DENIED** as to CAE's breach of contract claims (Count VII, Count VIII, Count IX, and Count X).

**DONE and ORDERED** in Chambers, Fort Pierce, Florida, this 11th day of May, 2015.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to: Counsel of Record

33