**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.  9:14-CV-80900-ROSENBERG/BRANNON**

CREATIVE AMERICAN EDUCATION, LLC,
a Colorado Limited Liability Company,

       Plaintiff,

v.

THE LEARNING EXPERIENCE SYSTEMS,
LLC, a Delaware Limited Liability Company,
ANTHONY KORDA, an individual & KORDA,
ZITT & ASSOCIATES,

       Defendants.
_____/

THE LEARNING EXPERIENCE SYSTEMS, LLC,
a Delaware Limited Liability Company and
TLE AT PARKER, LLC, a Delaware Limited Liability
Company, & TLE AT AURORA, LLC, a Delaware
Limited Liability Company,

       Counter-plaintiffs,

v.

CREATIVE AMERICAN EDUCATION, LLC, a
Colorado Limited Liability Company,
BERNARD LOGANATHAN, an individual, &
KATIJAH BEEVE SHAIK ALUDEEN-
LOGANATHAN a/k/a KATIJAH SHAIK ALUDEEN,
an individual,

       Counter-defendants,
_____/

BERNARD LOGANATHAN, an individual, &
KATIJAH BEEVE BINTE SHAIK ALAUDEEN,
an individual,

       Counterclaim plaintiffs,
v.

THE LEARNING EXPERIENCE SYSTEMS, LLC,
a Delaware Limited Liability Company, ANTHONY
KORDA D/B/A KORDA, ZITT & ASSOCIATES, &
THE LAW OFFICES OF ANTHONY KORDA, LLC,
D/B/A KORDA, ZITT & ASSOCIATES, a Florida
Limited Liability Company,

       Counterclaim defendants.
_____/

## MEMORANDUM OPINION

This case is about a failed childcare franchise. More specifically, this case is about which party should bear the liability associated with the failed franchise—the franchisor or the franchisee. Plaintiff Creative American Education ("CAE") is the franchisee and Defendant The Learning Experience ("TLE") is the franchisor. After Plaintiff filed the instant suit, primarily asserting breach of contract, Defendant counterclaimed against the individuals who created and managed the Plaintiff business entity: Bernard Loganathan and his wife, Katijah Alaudeen-Loganathan (collectively referred to as the Loganathans).[1] All parties actively litigated pretrial matters. After the Court entered two orders on summary judgment, granting judgment in TLE's favor as to some of CAE's claims, this case was tried before the Court from June 1, 2015, to June 5, 2015, and from June 8, 2015 to June 12, 2015.

At the heart of this case are two agreements: a Franchise Agreement and a Management Agreement. CAE contends that TLE breached these agreements through a failure to provide appropriate training, advice, and guidance and through an improper seizure of the CAE franchise. TLE contends that CAE breached the agreements through a failure to comply with TLE standards and state regulations. The Court ultimately concludes that judgment is entered solely in favor of TLE. The witnesses for TLE were credible and the evidence in favor of TLE was substantial. Additionally, the agreements in this case (which were drafted by TLE) allocated the risks in this transaction almost exclusively on CAE. Based on the evidence presented at trial, the memoranda submitted, and oral argument of the parties, the Court makes the following findings of fact and conclusions of law:

---

[1] The Court occasionally refers to Plaintiff CAE and the Counterclaim-plaintiffs (the Loganathans) collectively as CAE when a distinction is unnecessary.

## I.    INTRODUCTION

The Court first briefly summarizes the background facts before delineating the specific factual findings of the Court.

### A.  Background Facts

The Loganathans are citizens of Singapore.  In June of 2011 the Loganathans began to explore a plan to immigrate to the United States.  Because Ms. Alaudeen-Loganathan had some experience in the childcare industry in Singapore, she began to research childcare franchises in the United States.  The Loganathans believed that a childcare franchise would be a good vehicle for their immigration to the United States because it would provide them with income and would serve as the basis for obtaining a visa.  This belief was founded upon a visa program of the United States government known as "EB-5".

An EB-5 visa is issued to foreign nationals who invest one million dollars[2] in a business in the United States, who actively manage that business, and who employ at least ten United States citizens.  In the course of their research, the Loganathans located TLE's website.  TLE's website contained information on the EB-5 visa and asserted that a TLE franchise was an appropriate vehicle for obtaining the visa.  The Loganathans initiated contact with TLE and TLE provided franchise disclosure documents (in July of 2011) to the Loganathans for their review.

The franchise disclosure documents were lengthy and thorough.  After review of the documents, the Loganathans decided that they were interested in moving forward with the purchase of a franchise.  The Loganathans initialed the documents, indicating they had reviewed them, however, the Loganathans did not obtain counsel to assist them in their review.  On September 19, 2011, the Loganathans executed two franchise agreements, again without seeking legal counsel.  One agreement was executed for a franchise in Parker, Colorado and the other

---

[2] Although the one million dollar requirement can be reduced in certain circumstances, those circumstances do not apply in this case.

was executed for a franchise in Aurora, Colorado. The Loganathans' interest in acquiring two franchises, as opposed to one, appears to have been driven by the one-million dollar requirement for an EB-5 visa. The Loganathans executed the agreements in trust for an entity to be formed. That entity was formed—Creative American Education—and the entity is the Plaintiff in this case. The Franchise Agreements were thereafter assigned to Plaintiff.

In 2010 TLE had begun exploring franchise opportunities in the Denver, Colorado area. In November of 2010, TLE executed an agreement with a commercial landlord to lease certain space in Parker, Colorado. That agreement required the landlord to construct a space that was suitable for TLE's specific requirements. On June 22, 2011, TLE executed a similar agreement for another commercial space in Aurora, Colorado. When the Loganathans executed their franchise agreements in September of 2011, it was with these two locations in mind.

The Loganathans paid all necessary funds in connection with their execution of the Franchise Agreements. Construction for their franchise facilities had already begun. In November of 2011, however, the Loganathans began to experience difficulties in their application for a visa. They had yet to apply for an EB-5 visa, and were instead pursuing a different visa that would allow them to be present in the United States at the time their franchises opened. By the following December and January, the Loganathans believed that it would not be possible for them to be in the United States for the opening of their franchises or for the necessary activities that predated the opening of their franchises.

Ultimately, the parties reached a solution to the delay imposed upon the Loganathans' arrival in the United States. Although it is disputed which party suggested it, CAE executed a management agreement with TLE on January 23, 2012. Under the Management Agreement, TLE was responsible for managing the centers on behalf of CAE for one year. At the conclusion of that period of time, TLE would co-manage the centers with CAE for six months. Following

that period of time (provided TLE agreed), the Management Agreement would terminate.  The Management Agreement, therefore, bought the Loganathans time—time to obtain visas, time to immigrate to the United States, time to train, and time to prepare for the management of their franchises

Construction on CAE's franchises continued.  On July 20, 2012, the lease that a TLE subsidiary had obtained for the site in Parker, Colorado was assigned to CAE.[3]  This location opened in September of 2012 and the Aurora location opened in January of 2013.

During TLE's management of both centers, enrollment grew.  The Loganathans eventually secured visas and arrived in the United States in the summer of 2013.  Although training programs were not scheduled for that time, the Loganathans expressed a great desire to manage their centers as soon as possible. (This had visa implications for them.)  TLE accommodated the Loganathans by rescheduling their initial training program, which the Loganathans attended in late summer of 2013.

At the initial training program, it was agreed that the Loganathans would, after training, begin to manage their franchise in Parker, Colorado.  TLE declined to turn over management of the Aurora Center, at that time, because, in TLE's opinion, two franchises would have overwhelmed the Loganathans.  During the initial training program, the problems that gave rise to the instant case began.

TLE learned that Mr. Loganathan had been communicating about operational matters with an employee at the Parker Center.  This contravened the terms of the Management Agreement, which prohibited such communication, but Mr. Loganathan felt, for various reasons, that his communications were both justified and innocent of wrongful intent.  TLE strongly disagreed.

---

[3] A similar assignment was executed for the Aurora site on October 10, 2012.

As the initial training period came to an end, problems continued.  Due to an e-mail miscommunication, it appeared to TLE that the Loganathans continued to improperly insert themselves into operational matters before a formal transition of management took place.  Ultimately, the disputes that arose from the e-mails between the Loganathans and TLE in August and September of 2013 placed TLE and the Loganathans into an uneasy relationship.

In September of 2013, the Loganathans began to train at the Parker Center.  Training consisted of observations of center operations, web-based training, and some in-person instruction from the center business manager.  The Parker Center director, Ms. Marianne Giarratano, was initially unable to train the Loganathans because of a sudden maternity leave request by an infant room employee; covering the room required Ms. Giarratano's full attention.  At this time, the Loganathans developed an intense dislike of Ms. Giarratano.  The Loganathans' feelings about Ms. Giarratano appear to have been based primarily upon, as they perceived it, racial attacks by Ms. Giarratano.  The Loganathans refused to work with Ms. Giarratano, in any capacity, and demanded that Ms. Giarratano be removed.  TLE removed Ms. Giarratano from the Parker Center, but did not fire her; instead, TLE placed Ms. Giarratano in the Aurora Center, which was still under TLE control.  This decision by TLE greatly distressed the Loganathans.

Problems escalated.  Without Ms. Giarratano, the Parker Center was without a center director, which placed the center in a difficult position with respect to regulatory compliance.  Perhaps not realizing the impact of their decision to remove Ms. Giarratano, the Loganathans were surprised when they were, on short notice, required to find a replacement director.  Furthermore, the removal of Ms. Giarratano had a direct impact on the training of the Loganathans, as Ms. Giarratano was intended, by TLE, to train the Loganathans on certain business functions.  Nonetheless, TLE continued to provide training to the Loganathans in the

form of web-based training, conference calls, and training from the Parker Center business manager.

The Loganathans ultimately located a new center director and assumed managerial control of the Parker Center in October of 2013.  Under their leadership, the Parker Center experienced a number of problems.  Problems arose in such areas as finances, billing, regulatory compliance, and staffing.  The relationship between the Loganathans and TLE continued to be strained.  From the Loganathans' perspective, TLE continued to belittle them and offer them little support—instead requiring that they handle problems themselves.  From TLE's perspective, the Loganathans were unable to competently fulfill the duties of a franchise owner and, moreover, were unable to take responsibility for their problems and decisions.

In the spring of 2014, TLE became aware that the Aurora Center would be placed on a probationary license.  This action by the state of Colorado stemmed primarily from an incident involving injury to a child approximately one year earlier.   This information was not communicated to the Loganathans.

Although the Loganathans continued to have trouble with the Parker Center, operations continued and on April 1, 2014, the Loganathans assumed managerial control of the Aurora Center as well.  At or around this time, a former Parker Center director notified the state of Colorado of a plethora of alleged regulatory violations at the Parker Center.  This prompted the state of Colorado to investigate, and this investigation initiated a series of events that ultimately culminated in this lawsuit.

Once the Parker Center began to receive serious scrutiny from Colorado inspectors, numerous issues with the operation of the Parker Center began to surface.  At one point, state inspectors began to arrive at the Parker Center every day.  Each additional inspection by Colorado authorities resulted in the need for more changes, and more reform, by the

Loganathans.  During this time, the Loganathans learned that the Aurora Center was destined for a probationary license, further increasing their stress and concerns.

Ultimately, the Loganathans were overwhelmed by the problems at the Parker Center and the relentless scrutiny that center was receiving from Colorado inspectors.  The Loganathans therefore requested help from TLE.  Alternatively, the Loganathans proposed a temporary closure of the Parker Center.

The Loganathans' proposal to close the Parker Center, even temporarily, greatly concerned TLE.  Combined with the magnitude of problems that the state of Colorado had identified at the Parker Center (the state had begun to communicate with TLE directly without the Loganathans' knowledge), TLE ultimately proposed that it return to manage the Parker Center.

At this point, the parties dispute the sequence of events.  According to TLE, the Loganathans consented to TLE's unilateral assumption of managerial authority due to the volume of problems the Loganathans had encountered during their tenure as managers.  According to the Loganathans, while they requested help, they did not request help that necessarily carried with it any implication that they would be excluded from the future management of their franchises—which is exactly what TLE decided to do.

After TLE assumed managerial control, the Loganathans were banned from returning to their franchises and were even prohibited from enrolling their children in the school.  TLE demanded that CAE execute a new management agreement that vested permanent managerial control of the centers with TLE.  TLE succeeded in returning the Parker Center and Aurora Center to full regulatory compliance (TLE flew in teachers from out of state to accomplish this), but all requests from TLE to CAE on ownership matters were ignored.  For example, CAE did

not make lease payments for the centers and did not fund payroll. CAE's ultimate response to

TLE's assumption of managerial control was to initiate this lawsuit.

**B.    Procedural History**

**1.    Creative American's Amended Complaint and the Loganathans' Counterclaim**

On August 22, 2014, CAE filed an Amended Complaint on behalf of CAE and

Counterclaims on behalf of the Loganathans [DE 41] against the TLE parties, as follows:

- Count I and Counterclaim I by CAE and the Loganathans for Fraudulent Misrepresentation against TLE (summarily adjudicated in favor of TLE).

- Count II and Counterclaim II by CAE and the Loganathans for Negligent Misrepresentation against TLE (summarily adjudicated in favor of TLE).

- Count III and Counterclaim III by CAE and the Loganathans for Rescission against TLE.

- Count IV by CAE for Violations of Florida's Deceptive and Unfair Trade Practices Act against TLE (partially summarily adjudicated in favor of TLE).

- Count V by CAE for Violation of the Securities Act of 1933, 15 U.S.C.A. § 77(b), the Securities Act of 1934, 15 U.S.C.A. § 78(c), and the Florida Securities and Investor Protection Act § 517.021 against TLE (summarily adjudicated in favor of TLE).

- Count VI by CAE for Violation of Florida's Power of Attorney Statute, § 709.2114 against TLE.

- Count VII by CAE for Breach of the Management Agreement against TLE.

- Count VIII by CAE for Breach of Covenant of Good Faith and Fair Dealing Under the Management Agreement against TLE.

- Count IX by CAE for Breach of the Franchise Agreement against TLE.

- Count X by CAE for Breach of Covenant of Good Faith and Fair Dealing Under the Franchise Agreement against TLE.

CAE and the Loganathans also asserted claims against Defendants Anthony Korda,

individually, Anthony Korda d/b/a/ Korda, Zitt and Associates (together "Korda"), and The Law

Offices of Anthony Korda, LLC d/b/a/ Korda, Zitt and Associates ("Korda LLC" and, together

with Korda, the "Korda parties"), but those claims were settled amongst the CAE and Korda

parties prior to trial.

**2.      The TLE parties' Counterclaim**

On September 15, 2014, the TLE parties filed a Counterclaim against the CAE parties [DE

50], and on November 19, 2014, filed an Amended Counterclaim [DE 70], as follows:

- Count I by TLE for Breach of the Parker Franchise Agreement against CAE.

- Count II by TLE for Breach of Guaranty of the Parker Franchise Agreement against the Loganathans.

- Count III by TLE AT PARKER for Breach of Assignment and Assumption of Lease Agreement for the Parker Franchise against CAE.

- Count IV by TLE for Breach of Aurora Franchise Agreement against CAE.

- Count V by TLE for Breach of Guaranty of the Aurora Franchise Agreement against the Loganathans.

- Count VI by TLE for Breach of Assignment and Assumption of Lease Agreement for the Aurora Franchise against CAE.

- Count VII by TLE for Breach of Management Agreement against Alaudeen and CAE.

- Count VIII by TLE for Declaratory Relief against CAE

**3.      Motions for Summary Judgment**

On or about May 7, 2015, this Court entered an Order [DE 169] denying summary

judgment in favor of the TLE parties on Counts I–VIII of their Amended Counterclaim [DE 70].

On or about May 11, 2015, this Court entered an Order [DE 170] which granted summary

judgment in favor of TLE on Count I, Count II, and Count V of the Amended Complaint and

Counterclaim [DE 41], granted summary judgment in part as to Count IV of the Amended

Complaint and Counterclaim [DE 41], and denied summary judgment in favor of TLE as to the

remaining counts of the CAE parties' Amended Complaint and Counterclaim [DE 41].

The Court thereafter conducted a bench trial commencing on June 1, 2015 on the remaining claims from CAE's Amended Complaint and Counterclaim [DE 41]:

- Count III and Counterclaim III by CAE and the Loganathans for Rescission against TLE;

- Count IV by CAE for Violations of Florida's Deceptive and Unfair Trade Practices Act against TLE—the only portion remaining was as to whether TLE's performance under the relevant agreements constituted a deceptive and unfair trade practice;

- Count VI by CAE for Violation of Florida's Power of Attorney Statute, § 709.2114 against TLE.

- Count VII by CAE for Breach of the Management Agreement against TLE.

- Count VIII by CAE for Breach of Covenant of Good Faith and Fair Dealing Under the Management Agreement against TLE.

- Count IX by CAE for Breach of the Franchise Agreement against TLE.

- Count X by CAE for Breach of Covenant of Good Faith and Fair Dealing Under the Franchise Agreement against TLE; and

- all of the TLE parties' claims asserted in their Amended Counterclaim [DE 70].

## II.     FINDINGS OF FACT

### *The Parties*

CAE is a Colorado limited liability company with its principal place of business in Colorado. **Katijah Alaudeen ("Alaudeen") Test., Trial Tr. Vol. 1, Page 68:13–20; Amended Joint Pretrial Stipulation [DE 203]**.

The Loganathans are foreign nationals who are currently residents of Colorado. ***See* Alaudeen Test., Trial Tr. Vol. 1, Pages 51:9–52:10**.

TLE is a Delaware limited liability company with its principal place of business at 4855 Technology Way, Suite 700, Boca Raton, FL 33756. **Amended Joint Pretrial Stipulation [DE 203]**.

TLE AT PARKER is a Delaware limited liability company with its principal place of business at 4855 Technology Way, Suite 700, Boca Raton, FL 33756. **Amended Joint Pretrial Stipulation [DE 203]**.

TLE AT AURORA is a Delaware limited liability company with its principal place of business at 4855 Technology Way, Suite 700, Boca Raton, FL 33756. **Amended Joint Pretrial Stipulation [DE 203]**.

TLE is the franchisor of The Learning Experience ® system, and owns, operates, and franchises childcare and early education centers nationwide.  TLE was established by the Weissman family, which also developed the Tutor Time franchise. Today there are 155 operating units and 77 units in various forms of development.  *See* **Richard Weissman ("Weissman") Test. Trial Tr. Vol. 8, Pages 164:1–5, 168:12–169:7**.

TLE has developed an extensive franchise system and standards and provides training and assistance in operations to all franchisees.  *See* **Patrick Campolo ("Campolo") Test. Trial Tr. Vol. 4, Pages 11:23–13:10; Weissman Test. Trial Tr. Vol. 8, Pages 164:19–21, 170:8–18**.

A center typically becomes profitable when it reaches 55–60% of its license capacity, and it could take a franchised center 18–24 months to reach this break-even point.  *See* **Campolo Test. Trial Tr. Vol. 4, Pages 118:25–119:8; Weissman Test. Trial Tr. Vol. 8, Page 173:4–20**.

Approximately 80–85% of the TLE centers in operation are franchised.  *See* **Campolo Test. Trial Tr. Vol. 4, Page 119:20–21; Weissman Test. Trial Tr. Vol. 8, Page 165:15–18**.

TLE also manages centers for franchisees.  *See* **Campolo Test. Trial Tr. Vol. 4, Pages 120:2–8; Weissman Test. Trial Tr. Vol. 8, Pages 164:24–165:11**.

When TLE manages a center for a franchisee, (i) the franchisee does not have any role in management of the center, and (ii) the franchisee may not contact the center's employees.  *See* **Campolo Test. Trial Tr. Vol. 4, Pages 151:6–152:15**.

TLE's primary source of revenue is the royalties it receives from franchisees. As such, TLE has a vested interest in seeing its franchises succeed. *See* **Campolo Test. Trial Tr. Vol. 4, Page 125:4–13**.

Franchisees pay royalties to TLE for the continuing use of TLE's marks, systems, and processes. The royalty fee charged by TLE is currently seven percent of gross revenue. *See* **Weissman Test. Trial Tr. Vol. 8, Page 183:15–25**.

### *The Loganathans' Acquisition of TLE Franchises*

The Loganathans, as residents and citizens of Singapore, sought to immigrate to the United States with their family. *See* **Alaudeen Test. Trial Tr. Vol. 1, Pages 51:9, 54:7–11; Bernard Loganathan ("Loganathan") Test. Trial Tr. Vol. 5, Page 58:13–20, Vol. 6, Page 8:12–14**.

The Loganathans initially sought to immigrate to the United States under a visa program administered by the U.S. Citizenship and Immigration Services, specifically, the EB-5 Visa, which permits foreign investors who wish to become permanent residents of the United States to do so if they invest a minimum amount of money, typically at least one million dollars, into a business in the United States that will create at least ten full-time jobs for United States citizens. *See* **Alaudeen Test. Trial Tr. Vol. 1, Page 59:7–8; Loganathan Test. Trial Tr. Vol. 5, Pages 59:20–60:7; Anthony Korda ("Korda") Test. Trial Tr. Vol. 3, Page 5:9–18**.

In conjunction with their desire to become permanent residents of the United States, sometime in June of 2011, after reviewing TLE's website, the Loganathans contacted TLE to request information about investing in a TLE franchise. *See* **Alaudeen Test. Trial Tr. Vol. 1, Pages 61:15–62:19; CAE's Trial Exhibit 2; Loganathan Test. Trial Tr. Vol. 5, Page 60:8–14**.

The Loganathans were interested in TLE because they had prior experience in the

childcare industry in their home country of Singapore.  **See Alaudeen Test., Trial Tr. Vol. 1, Pages 52:13–53:12, 21–54:6, Vol. 2, Page 41:1–7; Loganathan Test. Trial Tr. Vol. 6, Pages 6:16–8:11**.

In conjunction with the acquisition of their franchise, the Loganathans submitted a financial questionnaire to TLE that indicated they had approximately six million dollars in net worth.  *See* **Loganathan Test. Trial Tr. Vol. 6, Page 8:22–25; Weissman Test. Trial Tr. Vol. 8, Pages 201:19–202:3**.

The Loganathans wanted to acquire two franchise locations from TLE, and sought locations that would be available as soon as possible because they wished to move to the United States expeditiously. *See* **Alaudeen Test. Trial Tr. Vol. 1, Pages 72:19–73:4; CAE's Trial Exhibits 4 and 5**.

Specifically, the Loganathans chose the Parker and Aurora, Colorado locations because they were going to be operating sooner than other sites.  *See* **Alaudeen Test. Trial Tr. Vol. 2, Page 48:5–10; Loganathan Test. Trial Tr. Vol. 6, Page 13:19–25**.

At the time, there was one TLE franchised center in Colorado, located in Colorado Springs.  **Campolo Test. Trial Tr. Vol. 4, Page 17:3–7**.

In or about July, 2011, TLE sent the Loganathans a Franchise Disclosure Document ("FDD") for their review.   **Alaudeen Test. Trial Tr. Vol. 1, Page 63:3–24; Vol. 2, Pages 41:20–42:1; CAE's Trial Exhibit 3; Loganathan Test. Trial Tr. Vol. 5, Page 60:15–61:1**.

The FDD is important to a potential franchisee because it provides them with the information necessary for the franchisee to make their own decision regarding the purchase of a franchise and perform their own due diligence as to whether they want to pursue the business. *See* **Weissman Test. Trial Tr. Vol. 8, Pages 179–182**.  The FDD contains financial disclosures regarding the amounts of money that a franchisee will need to invest in the franchise.  *See*

**Weissman Test. Trial Tr. Vol. 8, Page 182:5–9; TLE's Trial Exhibit 1**.

On or about July 13, 2011, the Loganathans executed a receipt, which acknowledged receipt of the FDD. **Alaudeen Test. Trial Tr. Vol. 2, Page 42:2–4; TLE's Trial Exhibit 2**.

Ms. Alaudeen acknowledged that per the FDD, to operate a center, the cost ranges from $480,950.00 to over one million dollars. ***See* Alaudeen Test. Trial Tr. Vol. 2, Page 46:21–25**.

The Loganathans decided to purchase two franchised locations and, on or about September 19, 2011, the Loganathans—in trust for an entity to be formed, CAE—executed a Franchise Agreement for operation of a child care center in Parker, Colorado ("Parker Center") ("Parker Franchise Agreement") and a separate but otherwise identical Franchise Agreement for operation of a child care center in Aurora, Colorado ("Aurora Center") ("Aurora Franchise Agreement") (collectively the "Franchise Agreements"). ***See* Alaudeen Test. Trial Tr. Vol. 1, Pages 67:11–69:3, Vol 2. Page 48:15–49:1; CAE's Trial Exhibits 4, 5; TLE Trial Exhibits 3, 4; Loganathan Test. Trial Tr. Vol. 5, Page 64:7–19, Vol. 6, Page 15:12–19**.

In conjunction therewith, the Loganathans, individually, executed personal guaranties (hereinafter referred to as the "Guaranty Agreements") and certain other documents described therein, including an addendum that addressed site development costs. ***See* Alaudeen Test. Trial Tr. Vol. 1, Pages 67:11–69:3; Vol. 2, Page 49:11–25; CAE's Trial Exhibits 4, 5; TLE's Trial Exhibits 3, 4; Loganathan Test. Trial Tr. Vol. 6, Pages 15:20–16:17**.

The sites in Parker and Aurora, Colorado were already selected and under lease with TLE affiliates and the respective landlords prior to entry into the Franchise Agreements. **Campolo Test. Trial Tr. Vol. 4, Page 138:12–139:4; Michael Shafir ("Shafir") Test. Trial Tr. Vol. 9, Page 37:5–15**.

The Loganathans were aware at the time they signed the Franchise Agreements that TLE affiliates were already under lease for the Parker and Aurora, Colorado centers. ***See* Alaudeen**

**Test. Trial Tr. Vol. 2, Page 48:11–14; Loganathan Test. Trial Tr. Vol. 6, Page 14:1–6**.

Specifically, on or about November 24, 2010, TLE AT PARKER, a TLE affiliate, had entered into an agreement with DCL-LM4, LLC, ("Parker Landlord") to lease a property to operate the Parker Center (the "Parker Lease"), which has been amended from time to time. *See* **TLE's Trial Exhibits 6, 7**.

On or about June 22, 2011, TLE AT AURORA, a TLE affiliate, had entered into an agreement with Saddlerock Investment Co., LLC, ("Aurora Landlord") to lease a property to operate the Aurora Center (the "Aurora Lease"), which has been amended from time to time. *See* **TLE's Trial Exhibits 8–10**.

On or about September 19, 2011, the CAE parties paid an initial deposit to TLE. *See* **Alaudeen Test. Trial Tr. Vol. 1, Page 72:7–8; Shafir Test. Trial Vol. 9, Page 39:18–24; CAE's Trial Exhibit 79**.

On or about December 15, 2011, the Loganathans paid an additional sum of $305,787.50 to TLE as required pursuant to the Franchise Agreements. *See* **CAE's Trial Exhibit 78**.

On or about December 31, 2011, Creative American Education, LLC, was registered as a limited liability company, with its principal place of business in Colorado. The sole member of CAE is Ms. Alaudeen. *See* **Alaudeen Test. Trial Tr. Vol. 1, Page 68:13–20**.

In November 2011, the Loganathans experienced problems leaving their home country of Singapore and were not able to enter the United States prior to the opening of the Parker and Aurora Centers. Therefore, they requested[4] that TLE manage the Parker and Aurora Centers, which would entail opening and operating the Centers, until the Loganathans could enter the country and assume management of the centers. *See* **Alaudeen Test. Trial Tr. Vol. 1, Pages 74:22–76:15, Vol 2, Page 51:12-20; CAE's Trial Exhibit 7; Loganathan Test. Trial Tr. Vol.**

---

[4] The parties dispute who first suggested TLE's management of the centers, however, the identity of the initiating party is ultimately irrelevant.

**5, Pages 70:11–25; 71:14–24; 76:4-6, Vol. 6, Page 18:11–15**.

Mr. Weissman, CEO of TLE, testified that TLE agreed to manage the centers as an accommodation to the Loganathans given their visa issues and agreed to turn over the centers to them once they entered the country.  ***See Weissman Test. Trial Tr. Vol. 8, Pages 193:19–194:11***.

As such, on or about January 23, 2012, Ms. Alaudeen and CAE (the "Franchisee") entered into an Exclusive Center Management Agreement ("Management Agreement") with TLE, with respect to the management and operations of the Parker and Aurora Centers.  ***See Alaudeen Test. Trial Tr. Vol. 1, Pages 78:13–79:12; CAE's Trial Exhibit 8; TLE's Trial Exhibit 5; Loganathan Test. Trial Tr. Vol. 6, Page 18:16–18***.

The Loganathans chose not to use counsel in connection with negotiating the terms of the Management Agreement.  **Alaudeen Test. Trial Tr. Vol. 2, Page 52:5–24; Loganathan Test. Trial Tr. Vol. 6, Page 14:12–25**.

The Loganathans did not request any sort of refund at this point in time, and still wished to pursue the acquisition and development of the franchises, presumably due to the important role the franchises were anticipated to play in the Loganathans' immigration to the United States. The Loganathans believed, at that time, that the Management Agreement was in their best interest.  ***See* Loganathan Test. Trial Tr. Vol. 6, Pages 18:20–19:6, 19:7–12**.

During the term of the Management Agreement, TLE managed the centers in the same manner as they manage centers for other franchisees and corporate-owned centers.  ***See Weissman Test. Trial Tr. Vol. 8, Page 194:12–19; Tara Montenaro ("Montenaro") Test. Trial Tr. Vol. 7, Page 9:8–22***.

Pursuant to the Management Agreement, CAE was responsible for paying TLE a four percent management fee while TLE solely managed the centers.  ***See Alaudeen Test. Trial Tr.***

**Vol. 1, Page 77:8–14; Vol. 2, Pages 61:25–62:24; CAE's Trial Exhibit 8; TLE's Trial Exhibit 5**.

Once CAE assumed full-time management under the terms of the Management Agreement, TLE stopped charging a management fee. **Alaudeen Test. Trial Tr. Vol. 2, Pages 61:25–62:24; CAE's Trial Exhibit 8; TLE's Trial Exhibit 5; Campolo Test. Trial Tr. Vol. 4, Page 19:2–5**.

Ms. Alaudeen admitted that pursuant to the terms of the Management Agreement, the Franchisee was not to have contact with either the center director or any center employee during TLE's management phase. **Alaudeen Test. Trial Tr. Vol. 2, Pages 74:18–75:19**. Communications between the Loganathans and center staff would be a violation of the Management Agreement. **Campolo Test. Trial Tr. Vol. 4, Page 145:17–146:1**. The purpose of this clause is so that there is a clear chain of command for the employees **Campolo Test. Trial Tr. Vol. 4, Pages 23:20–24:20; Weissman Test. Trial Tr. Vol. 8, Page 268:10–23; Montenaro Test. Trial Tr. Vol. 7, Page 14:20–15:22; Shafir Test. Trial Tr. Vol. 9, Pages 19:21–22, 108:8–109:15**.

In conjunction with the Management Agreement, on or about January 23, 2012, Ms. Alaudeen executed an assignment and assumption agreement, whereby Ms. Alaudeen, who had entered into the Franchise Agreement in trust for an entity to be formed, as Assignor, assigned all of her interests in the Franchise Documents to the Assignee, CAE." **TLE's Trial Exhibit 5**.

In connection with the Management Agreement, on or about January 23, 2012, CAE, as Franchisee, executed two powers of attorney appointing TLE as its attorney-in-fact to act with respect to the Parker and Aurora Center, respectively. **Alaudeen Test. Trial Tr. Vol. 1, Page 79:13–19; CAE's Trial Exhibit 8; TLE's Trial Exhibit 5**.

Pursuant to the Site Development Service Charge Addendum ("SDSC") to the Parker

Franchise Agreement, Section 3 (executed by the Loganathans, individually, in trust for an entity to be formed), on July 20, 2012, TLE AT PARKER and CAE executed an assignment and assumption agreement, whereby TLE AT PARKER assigned its rights and interests in the Parker Lease to CAE for purposes of operating the Parker Franchise ("Parker Lease Assignment"). **TLE's Trial Exhibit 11**.

Pursuant to the Site Development Service Charge Addendum ("SDSC") to the Aurora Franchise Agreement, Section 3 (executed by the Loganathans, individually, in trust for an entity to be formed), on or about October 10, 2012, TLE AT AURORA and CAE executed an assignment and assumption agreement, whereby TLE AT AURORA assigned its rights and interests in the Aurora Lease to CAE for purposes of operating the Aurora Franchise ("Aurora Lease Assignment"). **TLE's Trial Exhibit 12**.

### *TLE's Operation of the Franchised Centers Prior to the Loganathans' Arrival*

Prior to the formal opening of the Centers, TLE, as manager, began the process of licensing the Centers in accordance with Colorado regulations and hiring Center staff. TLE obtained licenses for each center prior to its opening. *See* **Deborah O'Byrne ("O'Byrne") Test. Trial Tr. Vol. 6, Pages 151:17–152:17, 153:2–15; Montenaro Test. Trial Tr. Vol. 7, Page 10:6–15**.

Each TLE center typically has a center director and business manager, who work side by side. **Beers Test. Trial Tr. Vol. 4, Page 235:7–8**. A franchisee may also opt to serve as a business manager. **Beers Test. Trial Tr. Vol. 4, Page 235:12–16**. If the center is managed by the franchisee, the center management reports directly to the franchisee. **Beers Test. Trial Tr. Vol. 4, Page 235:16–17**. For a corporate-managed center, the center management reports directly to a TLE Area Manager. The TLE Area Manager reports to the TLE Regional Manager, who reports to the TLE Vice President of Operations, who reports to the TLE Executive Vice-

President.  **Beers Test. Trial Tr. Vol. 4, Page 235:7–20**.

TLE does not require that a TLE Area Manager physically reside within the same state as the centers that he or she oversees.  **O'Byrne Test. Trial Tr. Vol. 6, Page 154:21–24**.  In these cases, the TLE Area Manager supports those centers by Lync video conference systems, phone calls, e-mails and visits**.  *See* O'Byrne Test. Trial Tr. Vol. 6, Page 155:18–23**.

TLE does not dictate the salaries that the franchisee pays their employees. *See* **O'Byrne Test. Trial Tr. Vol. 6, Page 157:17–20**.  Franchisees can also offer benefits if they choose to do so.  *See* **O'Byrne Test. Trial Tr. Vol. 6, Page 157:21–23**.

In April of 2012, Ms. Marianne Giarratano was hired as a general manager/area manager to oversee the opening and operations of the Colorado franchised centers, including the Parker and Aurora Centers.  *See* **Campolo Test. Trial Tr. Vol. 4, Page 36:1–17; Beers Test. Trial Tr. Vol. 4, Page 234:11–23**.

Ms. Giarratano was interviewed by several TLE employees prior to being hired, and the employment search was led by Ms. Amanda Beers, a TLE corporate employee. *See* **Campolo Test. Trial Tr. Vol. 4, Pages 40:25–41:14; Beers Test. Trial Tr. Vol. 4, Page 239:2–13; O'Byrne Test. Trial Tr. Vol. 6, Pages 153:16–154:20**.

Ms. Giarratano has an extensive background in early childhood care and education and was licensed as a center director in the state of Colorado at the time she was hired.  She was highly qualified to open and operate large childcare centers at the time she was hired.  **Beers Test. Trial Tr. Vol. 4, Pages 239:14–21; 240:9-16; TLE's Trial Exhibit 268, the Dep. of Marianne Giarratano ("Giarratano Deposition") at Vol 1, Pages 16:5–23, 17:1–12, 17:19–25, 18:1–3, 6–10, 19:1–20:25, 21:6–8, 11–20, 22–25, 22:1–24:25, 25:10–15, 18–25, 26:1–27:7, 27:14–30:4, 30:17–31:25, 32:13–35:11**.

Marianne Giarratano provided TLE with references from her prior employers, including a

reference from her supervisor at her most recent employer, the Goddard School, which stated that Ms. Giarratano "would be a tremendous asset to any company." **See Beers Test. Trial Tr. Vol. 4, Pages 237:18–20; 238:15–239:1; 240:20–22; 241:15–21; 243:15–244:6; TLE's Trial Exhibit 13, 268 CAE's Trial Exhibit 122**.

Although there is a certain lack of clarity with regard to the level of scrutiny Ms. Giarratano's references received, it was the testimony of the TLE employee who reviewed Ms. Giarratano's application, Ms. Amanda Beers, that Ms. Giarratano's references were checked, to an extent. **See Beers Test. Trial Tr. Vol. 4, Pages 50, 240:20–22**.

Even when TLE contacts a prior employer over the phone, the prior employer commonly and typically only provides length of employment and salary information. **See Beers Test. Trial Tr. Vol. 4, Page 241:5–9**.

After she was hired, Ms. Giarratano attended training at TLE corporate headquarters in Boca Raton, Florida, which included assisting with opening a center in Florida. **See Beers Test. Trial Tr. Vol. 4, Pages 244:25–245:5**.

The Parker Center opened for business and formally began providing childcare services in or around September 2012, and was initially managed and operated by TLE pursuant to the Management Agreement. **Alaudeen Test. Trial Tr. Vol. 1, Page 83:14–17**.

The Aurora Center opened for business and formally began providing child care services in or around January 2013, and was initially managed and operated by TLE pursuant to the Management Agreement. **Alaudeen Test. Trial Tr. Vol. 1, Page 83:18–19**.

Prior to the Loganathans arriving in the United States, TLE sent reports and correspondence to the Loganathans, keeping them apprised of the operations at the centers, including positive Yelp reviews for the centers. **See Alaudeen Test. Trial Tr. Vol. 2, Page 76:7–21; TLE's Trial Exhibit 14; O'Byrne Test. Trial Tr. Vol. 6, Pages 157:24–158:25**.

In May 2013, the Loganathans advised TLE that their (E2, not EB-5) visas had been approved for two years and that they anticipated arriving in the United States in June 2013.  At that time, the Loganathans inquired about the training opportunities provided by TLE.  ***See TLE's Trial Exhibit 15***.

Somewhat surprisingly, despite the central role the EB-5 visa played in the Loganathans' interest in acquisition of a TLE franchise, the Loganathans had not submitted, as of trial, an application for an EB-5 visa.  ***See Alaudeen Test. Trial Tr. Vol. 2, Page 56:15–18***.  The Loganathans never instructed their attorney to submit an application for an EB-5 visa, apparently because of anticipated tax consequences associated with the visa.  ***See Loganathan Test. Trial Tr. Vol. 6, Page 10:5–7; Korda Test. Trial Tr. Vol.  3, Pages 9:1–25, 10:8–16***.

In May 2013, TLE advised the Loganathans that the two-week initial training program was currently planned for October 2013 and that the annual convention was scheduled for January 2014.  TLE advised the Loganathans that attendance at the convention was mandatory.  The convention provides franchisees the opportunity to meet the corporate team, other franchisees, and vendors, and offers additional training opportunities.  ***See Alaudeen Test. Trial Tr. Vol. 2, Page 77:2–17; TLE's Trial Exhibit 15***.

The Loganathans requested earlier training dates as they were arriving in the United States in June 2013 and were eager to manage their centers.  ***See Alaudeen Test. Trial Tr. Vol. 1, Page 86:14–17, Vol. 2, Page 77:2–17; TLE's Trial Exhibit 15; CAE's Trial Exhibit 11***.

### *The Loganathans Arrive in the United States*

The Loganathans arrived in the United States in or about June 2013.  **Alaudeen Test. Trial Tr. Vol. 1, Page 87:13–15**.

The Loganathans visited the Parker and Aurora Centers in June 2013 and after touring the Centers with Ms. Giarratano, they were satisfied with the appearance, condition, and

management of the Centers.   In particular, the Loganathans noted what a great job Ms. Giarratano was doing at the Centers.  ***See* Alaudeen Test. Trial Tr. Vol. 2, Page 78:2–24; TLE's Trial Exhibit 16; Loganathan Test. Trial Tr. Vol. 6, Pages 20:20–22:8**.

TLE advised the Loganathans that it had decided to hold a training session in August instead of October 2013, as an accommodation to the Loganathans.  **Beers Test. Trial Tr. Vol. 4, Pages 245:15–247:8; TLE's Trial Exhibit 15 and 16**.

In or about July 2013, pursuant to the express terms of the Management Agreement (Section 2(c)), TLE, as manager, requested an infusion of an additional $150,000.00 in working capital from the Franchisee to fund operations of the Centers through year end—$75,000.00 for each center.  The Loganathans provided the funds without objection.  ***See* Alaudeen Test. Trial Tr. Vol. 1, Pages 87:25–88:1, Vol. 2, Page 80:7–24; CAE's Trial Exhibit 12; TLE's Trial Exhibit 17; Campolo Test. Trial Tr. Vol. 4, Pages 160:4–161:24; TLE's Trial Exhibit 24**.

At or around the end of July 2013, the Loganathans inquired about the management positions at the respective centers and the role of Ms. Giarratano, whom they praised for doing an excellent job overseeing the centers.  ***See* Alaudeen Test. Trial Tr. Vol. 1, Pages 102:22–103:22; CAE's Trial Exhibit 13; TLE's Trial Exhibit 20**.

Under Ms. Giarratano's oversight, enrollment at the Parker Center was on an upward trend.  ***See* Giarratano Dep. at Vol. 3, Pages 26:10–27:9**.

From August 12–23, 2013, the Loganathans attended TLE's standard two weeks of initial training for new franchisees (known as "ITP") at TLE's corporate headquarters in Boca Raton, Florida.  ***See* Alaudeen Test. Trial Tr. Vol. 1, Pages 104:24–105:5; CAE's Trial Exhibit 12; Beers Test. Trial Tr. Vol. 4, Page 245:13–14**.

TLE provides training opportunities to all of its franchisees, including two weeks of training at the corporate headquarters in Boca Raton, Florida, and two weeks of training at a

corporate-managed center location.  In addition, if a site has not yet opened, a franchisee typically attends training during site set up.  *See* **Campolo Test. Trial Tr. Vol. 4, Pages 25:17–26:7, 26:17–28:24; Beers Test. Trial Tr. Vol. 4, Pages 247:11–261:14**.

Occasionally, there are also scenarios in which a franchisee may start training in its own center and not attend ITP until the next time it is offered during the calendar year.  *See* **Beers Test. Trial Tr. Vol. 5, Page 17:24–18:16**.

During ITP, franchisees attend training at a special training facility located at the corporate headquarters in Boca Raton, Florida, which allows franchisees to participate "hands-on" during training presentations.  *See* **Beers Test. Trial Tr. Vol. 4, Page 248:2–17**.

In addition to the Loganathans, there were other franchisees present at the same ITP training session in August 2013.  *See* **Beers Test. Trial Tr. Vol. 4, Page 248:18–20**.

ITP consists of a two-week training program.  Each day's session typically starts at 9:00 a.m. and various departments will present during ITP.  Each day has time allotted for a morning and afternoon break, and a lunch break.  Lunch also provides an additional opportunity for training, as various departments will attend the lunches so that franchisees can get acquainted with corporate staff.  *See* **Beers Test. Trial Tr. Vol. 4, Page 256:13–257:3**.  The afternoon break showcases different "themed" events so that franchisees can learn different types of fun events to host for their staff.  *See* **Beers Test. Trial Tr. Vol. 4, Page 257:4–23**.  There are also special dinners provided by TLE, which allow for the franchisees to meet corporate staff and ask them questions, as an additional learning opportunity.  *See* **Beers Test. Trial Tr. Vol. 4, Page 257:24–258:12**.

Some of the topics addressed during ITP include, but are not limited to, center director functions, licensing, new center set up, human resources, hiring, coaching, terminating, monitoring, training, franchise documents, legal, curriculum, question and answer session with a

current franchisee, business manager functions, use of CCM (childcare management software), student enrollment, state rules and regulations, staff and student files, accounting, billing, trending, forecasting, accountants receivable, tuition payments, and payment plans.  ***See* Beers Test. Trial Tr. Vol. 4, Page 249:21–256:11; O'Byrne Test. Trial Tr. Vol. 6, Page 159:1–14**.

ITP also includes two site visits to operating centers, where trainees apply what they learned in training class to the actual classroom setting.  ***See* Beers Test. Trial Tr. Vol. 4, Pages 250:3–251:10**.

After ITP, the trainees are sent electronic files of all of the presentations from ITP.  ***See* Beers Test. Trial Tr. Vol. 4, Page 260:11–20**.  Additionally, franchisees have access to a website portal which contains all of the ITP trainings, as well as the presentations from the monthly trainings that corporate provides.  ***See* Beers Test. Trial Tr. Vol. 4, Pages 260:21–261:4**.

TLE also offered to provide childcare for the Loganathans' children at one of the corporate-managed centers in Florida.  In effect, the Loganathans had additional opportunities to observe a center in operation when they dropped off and picked up their children during two weeks of ITP.  ***See* Beers Test. Trial Tr. Vol. 4, Pages 258:25–259:17**.

TLE never received any complaints from the Loganathans, or other franchisees that attended the same ITP, regarding their training at that ITP session.  ***See* Beers Test. Trial Tr. Vol. 4, Page 262: 1–5**.

Typically, franchisees also participate in two weeks of "on-site" training at a corporate-managed operating franchise center, which is a standard training offered to all new franchisees. **Beers Test. Trial Tr. Vol. 4, Pages 261:5–14; 262:6–20**.

However, the Loganathans were eager to assume active, "full-time" management of their centers. The Loganathans were offered the opportunity to participate in training at an existing

TLE center, but declined to attend that training. *See* **Campolo Test. Trial Tr. Vol. 4, Page 163:10–20; Montenaro Test. Trial Tr. Vol. 7, Page 27:6–17**.

Instead, as a special accommodation to the Loganathans, TLE agreed to provide the Loganathans with one month of on-site training at the Parker Center during September 2013. This training consisted of daily training calls with TLE employees at corporate headquarters, including group training calls with all franchisees in the morning, and individualized training calls in the afternoon for the Loganathans. This was in addition to the on-site training from the Parker Center's staff, and observation of the center's daily operations. *See* **Campolo Test. Trial Tr. Vol. 4, Pages 47:5–10; 48:5–11; 49:7–14; Beers Test. Trial Tr. Vol. 4, Page 263:6–8; Vol. 5, Pages 4:11–10:2; s***ee also*** TLE's Trial Exhibit 34; Montenaro Test. Trial Tr. Vol. 7, Page 28:14–29:11**.

Given the magnitude of assuming management of two centers, and the timing of the 12-month initial management period by TLE under Section 3 of the Management Agreement, the parties agreed that initially, the Loganathans would assume "full-time" management of only the Parker Center as of October 1, 2013 (approximately 12 months after it opened in September 2012 (See Section 3(a) of the Management Agreement)), with the Loganathans' assumption of "full-time" management of the Aurora Center to follow at a later, to-be-determined date (anticipated to be January 2014, which was 12 months after the Aurora Center opened). However, the Loganathans continued to request that they immediately be permitted to assume full-time management of both the Parker and Aurora Centers. *See* **Alaudeen Test. Trial Tr. Vol. 1, Page 116:2–15; CAE's Trial Exhibit 14; TLE's Trial Exhibits 20–21; Campolo Test. Trial Tr. Vol. 4, Pages 51:11–17**.

The Loganathans were also eager to take over the Aurora Center in order to stop paying management fees to TLE as soon as possible. *See* **Alaudeen Test. Trial Tr. Vol. 2, Page**

**85:12–86:23; TLE's Trial Exhibit 23; Campolo Test. Trial Tr. Vol. 4, Page 172:20–24; Loganathan Test. Trial Tr. Vol. 6, Pages 36:10–16, 26:25–37:21**.

Specifically, the Loganathans stated that they were interested in assuming management of both centers immediately so that they could assume the business manager role, and eliminate that expense. *See* **TLE's Trial Exhibit 23; Loganathan Test. Trial Tr. Vol. 6, Page 38:16–39:23**.

However, TLE declined these repeated requests from the Loganathans, and reiterated that assuming management of two centers was a large undertaking and stated that the Aurora Center would remain under TLE's management until the Loganathans were trained and experienced at running the Parker Center. *See* **Alaudeen Test. Trial Tr. Vol. 1, Pages 117:21–118:3; Vol. 2, Page 83:15–20; CAE's Trial Exhibit 14; TLE's Trial Exhibit 21; Campolo Test. Trial Tr. Vol. 4, Pages 51:18–52:23, 172:9–19**.

At the initial training program session ("ITP"), the parties also discussed the transition of management from TLE to CAE at the Parker Center and agreed to a plan of action regarding the same. *See* **Alaudeen Test. Trial Tr. Vol. 1, Page 117:16–20; CAE's Trial Exhibit 14; TLE's Trial Exhibit 21; Campolo Test. Trial Tr. Vol. 4, Pages 18:17–19:2**.

The Loganathans also expressed interest, and inquired in August 2013 at ITP, about purchasing additional franchised centers from TLE. *See* **Alaudeen Test. Trial Tr. Vol. 2, Page 85:2–18; TLE's Trial Exhibit 22; Loganathan Test. Trial Tr. Vol. 6, Pages 34:24–35:19**.

The Loganathans also expressed confusion over whether they leased or owned the subject buildings which housed the Centers, and TLE explained that they were only leasing the subject buildings (as was previously disclosed and part of the Franchise Agreements). *See* **Alaudeen Test. Trial Tr. Vol. 2, Pages 87:23–88:3; TLE's Trial Exhibit 24; Campolo Test. Trial Tr. Vol. 4, Pages 129:5–130:6; Loganathan Test. Trial Tr. Vol. 6, Pages 40:18–41:25**.

During ITP, TLE became aware that the Loganathans had been communicating with a

teacher-employee at the Parker Center, Ms. Brittany Smart.   Although Mr. Loganathan characterized these communications as brief, primarily focused on the Loganathans' children, and initiated by Ms. Smart, the evidence inferred that the conversations went far beyond the Loganathans' children.  For example, there was evidence that text messages were exchanged between Mr. Loganathan and Ms. Smart at a time when the Loganathans' children were not at the Parker Center, and that a certain in-person conversation was lengthy.  Regardless of which party initiated these communications, discussions between the Loganathans and employees at the Parker Center, outside of communications strictly limited to the Loganathans' children and the Loganathans' training, clearly contravened the terms of the Management Agreements.  Ms. Montenaro addressed this situation with the Loganathans while they were at ITP and reminded them they were to refrain from contacting center employees.  ***See* Montenaro Test. Trial Tr. Vol. 7, Pages 15:23–16:11**.

Upon completion of ITP, on or about August 25, 2013, without express authorization from TLE, the Loganathans advised Ms. Giarratano, who was currently overseeing the Centers, via e-mail that they would be "coming in to the [Parker] Center from tomorrow onwards." ***See* TLE's Trial Exhibits 25–28**.

This e-mail (and phrase) was construed by Ms. Giarratano to mean that the Loganathans were going to assume management of the Parker Center immediately.   Moreover, this communication appeared to (again) constitute a breach of the Management Agreement, by the Loganathans, by virtue of their direct contact with Parker Center employees.   When Ms. Giarratano communicated the content of this e-mail to TLE, TLE was understandably concerned that the Loganathans were not adhering to the training and transition plan established at ITP.  In perfect hindsight, this e-mail communication appears to have been poorly read, in that the Loganathans' communication could reasonably be interpreted to have meant that the

Loganathans would be bringing their children into the Parker Center for childcare, at which time they would see Ms. Giarratano.   Nonetheless, the misunderstanding surrounding this communication certainly resulted in the Loganathans' relationship with both Ms. Giarratano and TLE getting off to a tumultuous start.  Finally, TLE's misunderstanding of the e-mail is, to an extent, understandable, in that shortly before the e-mail was sent TLE had drafted a very specific plan for the transition of management from TLE to CAE, which included TLE's advising management at the Parker Center, including Ms. Giarratano, about the plan for the Loganathans to have on-site training at the Parker Center.  This was a very sensitive time, and a very sensitive topic.  As such, the timing of the Loganathans' e-mail was unfortunate.  *See* **TLE's Trial Exhibits 25–28; Campolo Test. Trial Tr. Vol. 4, Pages 59:19–60:21; Campolo Test. Trial Tr. Vol. 4, Pages 165:2–166:22; Montenaro Test. Trial Tr. Vol. 7, Pages 17:18–19:20**.

Due in no small part to the miscommunication that resulted from the aforementioned e-mail, on or about August 26, 2013, a conference call was held with Tara Montenaro, from TLE, the Loganathans, as well as Ms. Giarratano and Jennifer Kinnan (management at the Parker Center), to discuss the logistics of the assumption of management by CAE at the Parker Center. *See* **Alaudeen Test. Trial Tr. Vol. 1, Pages 122:21–123:6; TLE's Trial Exhibit 28; Montenaro Test. Trial Tr. Vol. 7, Page 20:3–8**.

The background to this conference call was that all parties had previously agreed that the Loganathans were not to be involved in the operation of the Parker Center until October 1, 2013, after they completed their on-site training at the Parker Center in September 2013; until October 1, 2013, all decisions would be made by TLE, with the Loganathans kept informed during the process. After the conference call concluded, the Loganathans engaged Ms. Giarratano and Ms. Kinnan in substantive discussions about the operation of the Parker Center.  The Loganathans did not attempt to call TLE or otherwise involve TLE in their post-conference call discussion.

Yet subsequently, the Loganathans e-mailed TLE with numerous issues they had discussed with Ms. Giarratano and Ms. Kinnan regarding the Parker and Aurora Centers, all of which concerned the operation and management of the centers. From the Loganathans' point of view, refusing to have this conversation would have been unreasonable (as they were the owners) and counterproductive, and also from their point of view they complied with the Management Agreement by forwarding the substance of the conversation to TLE. From TLE's point of view, the Loganathans had involved themselves in management immediately after a conference call concluded that discussed that they would not, as of yet, involve themselves in management. ***See* CAE's Trial Exhibit 19; TLE's Trial Exhibits 30–31; Campolo Test. Trial Tr. Vol. 4, Pages 166:23–169:9; Montenaro Test. Trial Tr. Vol. 7, Page 20:9–21:19; Loganathan Test. Trial Tr. Vol. 6, Pages 49–53**.

### *The Loganathans Begin Training at the Parker Center*

On or about August 30, 2013, Amanda Beers, a TLE corporate employee, contacted the Loganathans regarding the schedule for their on-site training during September 2013, and provided them with a training schedule, which included the daily training call for all franchisees, as well as the individualized call for the Loganathans. ***See* Campolo Test. Trial Tr. Vol. 4, Pages 47:5–10; 48:5–11; 49:7-14; Beers Test. Trial Tr. Vol. 4, Page 263:6–8, Vol. 5, Pages 4:11–10:2; 10:22–14:11; TLE's Trial Exhibit 34, 253**.

Mr. Loganathan testified that he understood the group training calls were ongoing training provided by TLE. ***See* Loganathan Test. Trial Tr. Vol. 5, Pages 119:21–120:1**.

During the day, the Loganathans were also to observe center operations. **Loganathan Test. Trial Tr. Vol. 6, Pages 56:12–59:9**.

The Loganathans failed to participate in some of the training sessions provided to them. ***See* Beers Test. Trial Tr. Vol. 5, Pages 10:3–5, 14:12–24, 16:1–8; Montenaro Test. Trial Tr.**

**Vol. 7, Page 29:12–22**.

TLE's training programs require a certain amount of self-study on the part of the franchisee. *See* **Montenaro Test. Trial Tr. Vol. 7, Pages 29–30**.

Mr. Loganathan admitted he did not read some of the materials provided to him, particularly the Colorado rules and regulations governing childcare centers. *See* **Loganathan Test. Trial Tr. Vol. 5, Page 121:19–20**.

During the month of September 2013, the Loganathans were required to send daily summaries of their trainings to Amanda Beers. *See* **Alaudeen Test. Trial Tr. Vol. 1, Pages 137:12–16; CAE's Trial Exhibit 22**.

Ms. Beers never received any communications from the Loganathans in which they complained about the training or stated that they did not understand the training they received. **Beers Test. Trial Tr. Vol. 5, Pages 14:25–15:25**. Ms. Montenaro never received any complaints from the Loganathans that they were inadequately trained or needed additional training. **Montenaro Test. Trial Tr. Vol. 7, Page 31:5–8**. Ms. Beers never received any requests from the Loganathans after September 2013 for additional trainings. Ms. Beers never refused to provide additional training to the Loganathans after the month of September 2013. *See* **Beers Test. Trial Tr. Vol. 5, Page 18:17–23**.[5]

Almost immediately after the Loganathans arrived for training at the Parker Center, problems arose. Although the testimony surrounding this period of time lacks clarity, it appears that the Loganathans requested a meeting with a Parker Center teacher. After this request was reported to TLE, Ms. Alaudeen immediately sought to have the reporting employee, Ms. Kinnan, terminated. The Loganathans also expressed great dissatisfaction that their employees would

---

[5] Furthermore, TLE hosts an annual convention for its franchisees, which consists of additional trainings and opportunities to meet with other franchisees. Attendance is mandatory for franchisees. The Loganathans chose not to attend. *See* **Beers Tst. Trial Transcript Vol. 5, Pages 16:22–17:16**.

report certain actions by them to TLE as, from their perspective, they were the owners of the business and the employees were, in fact, their employees—not TLE's. Ultimately, the Loganathans discovered the reporting employee was not Ms. Kinnan; it was Ms. Giarratano. **See Alaudeen Test. Trial Tr. Vol. 2,  Pages 95:22–96:3; TLE's Trial Exhibits 25, 35, 37, 38, 43; Montenaro Test. Trial Tr. Vol. 7, Pages 14:12–15:1; 31:9–15**.

The Loganathans' state of mind on these types of issues and conflicts was clarified in that Mr. Loganathan testified that he expected the employees to be "loyal" to him and that "[t]hese are my centers, my business, my family business." **See Loganathan Test. Trial Tr. Vol. 5, Page 171:3, Vol. 6, Pages 45:21–46:17**.

Although they had not yet assumed management of the center, the Loganathans then insisted that TLE remove Ms. Giarratano, who had overseen the center from its inception, from the Parker Center.  In an e-mail to TLE, Ms. Alaudeen stated the following:

> Tara,
>
> This is how Marrianne replied to me...)
> ($50,000 annually paid- employee talking like that)
> - no wonder Corporate let her go-
>
> I'm confused. She wants to have her way.
> Now I'm beginning to understand why everyone wants to leave the center.
> I'm beginning to understand why other CDs left.
>
> I cannot work with this woman. I'm sorry.
>
> Pls do me a favor and get her out of my way.
>
> I have more to say, but I'm not because I don't want to spoil her name. If there is a need I'll email you and Pat more.
>
> Call me if you are avail.
> Your help is needed.
>
> Kat

The Loganathans' opinion of Ms. Giarratano was premised upon their belief that Ms. Giarratano had made racist comments, was spreading rumors about them, and was generally unhelpful and rude.  **Alaudeen Test. Trial Tr. Vol. 1, Pages 145:10, Vol. 2, Pages 95–96, 112:17–113:9; CAE's Trial Exhibit 12; TLE's Trial Exhibit 36, 37, 38; Loganathan Test. Trial Tr. Vol. 5,**

**Page 123:20–25; Giarratano Dep. at Vol III, Pages 48:1–13, 62:6–17, 69:6–14; Montenaro Test. Trial Tr. Vol. 7, Pages 22:7–24, 23:13-16, 32:16–33:21**.

TLE acquiesced to the Loganathans' request, and Ms. Giarratano was instructed by TLE to leave Parker Center by noon on Friday, September 12, 2013, and report to the Aurora Center as of Monday, September 15, 2013.  ***See* Campolo Test. Trial Tr. Vol. 4, Pages 72:25–73:18, 171:11–172:3; Giarratano Dep. at Vol III, Pages 48:1–13, 62:6–17, 69:6–14; Montenaro Test. Trial Tr. Vol. 7, Page 34:14–16**.  As a result of Ms. Giarratano's removal, she was unable to participate in the ongoing training of the Loganathans.  Accordingly, the removal of Ms. Giarratano, essentially by the Loganathans, had a negative impact upon the training the Loganathans could receive on-site.[6]  ***See* Montenaro Test. Trial Tr. Vol. 7, Page 34:8–13**.

As a result of the Loganathans' request to move Ms. Giarratano, Rich Miniconzi, a TLE corporate employee, was designated the TLE Area Manager for the Parker Center.  **Loganathan Test. Trial Tr. Vol. 5, Page 135:23–25; Montenaro Test. Trial Tr. Vol. 7, Page 48:10–20**.

While TLE accommodated the Loganathans' request to remove Ms. Giarratano from the Parker Center, a franchisee does not have authority to hire or fire a TLE Area Manager. **Campolo Test. Trial Tr. Vol. 4, Pages 158:25–159:9**.

Ms. Giarratano was also required by state regulations to report to the state of Colorado that she was no longer center director at the Parker Center and that her license was being transferred to the Aurora Center.  **Alaudeen Test. Trial Tr. Vol. 2, Pages 115:25–118:1*; *TLE's Trial Exhibit 40–42; Giarratano Dep. at Vol. III, Pages 73:20–74:16, 77:8–78:7; Montenaro Test. Trial Tr. Vol. 7, Pages 23:17–24:20, 25:14–26:20, 37:21–38:11**.

---

[6] The Loganathans' refusal to work with Ms. Giarratano on a professional level extended to all forms of interaction. For example, the Loganathans threatened to call the police if Ms. Giarratano entered CAE property as they believed she was "evil" and "manipulative." **TLE's Trial Exhibit 52; Loganathan Tst. Trial Transcript Vol. 5, Page 149:6–10**.

Since Ms. Giarratano was no longer center director at the Parker Center, a replacement center director had to be hired for the Parker Center.  TLE made efforts to assist in finding a new center director.  Staff member Brooke Hill was already working at the Parker Center and was center director qualified.  ***See* Montenaro Test. Trial Tr. Vol. 7, Pages 34:22–35:14**.

### *The Transition of the Parker Center to CAE's Control*

Elizabeth Chase is a childcare licensing specialist with the division of early care and learning of the Colorado Department of Human Services ("DHS").  ***See* TLE's Trial Exhibit 264, Designated Dep. of Elizabeth Chase ("Chase Deposition"); Dep. Tr. Vol. 1, Pages 6:8–18**.  As part of her position with DHS, Chase's duties are to license and inspect childcare facilities, including supervising TLE at the Parker Center.  **Chase Dep. at 6:19–7:9**.

During the time period TLE managed the Parker Center, from September 2012 to September 2013, there was no indicia of any issues or lack of compliance with Colorado rules and regulations.  ***See* Chase Dep. at 21:2–14**.

During TLE's management of the Parker Center, any violations cited by the state of Colorado were either corrected at the time of inspection or were corrected within the timeframe permitted by the state.  In any event, all violations noted by the state were corrected prior to CAE's taking over management of the Parker Center on or about October 1, 2013.  ***See* Montenaro Test. Trial Tr. Vol. 7, Pages 12:12–13:20**.

At the time the Parker Center was turned over to CAE on October 1, 2013, the Center's license was in good standing with the state of Colorado. There were no outstanding violations; any previous violations had been corrected.  **Montenaro Test. Trial Tr. Vol. 7, Pages 12:12–13:20, 21:20–22:6**.

Mr. Loganathan acknowledged that there were no outstanding violations at the Parker Center at the time CAE assumed management, although it was Mr. Loganathan's belief that

violations existed that were unknown to state inspectors. **Loganathan Test. Trial Tr. Vol. 6, Page 86:23–87:1**.

The Parker Center, at the time of transition, was on an upward trend toward profitability, and enrollment was growing at a rapid pace, with an enrollment between 80 and 90 students as of September 2013.[7] *See* **Montenaro Test. Trial Tr. Vol. 7, Page 121:11–24**.

Upon assuming full-time management of the Parker Center on October 1, 2013, CAE no longer paid TLE a management fee for the Parker Center. **Alaudeen Test. Trial Tr. Vol. 2, Pages  62:20–63:3; TLE's Trial Exhibit 5; Campolo Test. Trial Tr. Vol. 4, Pages 172:25–173:7, 8-11**.

Although the Management Agreement required TLE to "co-manage" the Parker Center with CAE subsequent to CAE's assumption of managerial control, TLE was not compensated in any way during the co-management period of time other than what it was entitled to as a franchisor under the Franchise Agreement. **Campolo Test. Trial Tr. Vol. 4, Page 173:12–16**. CAE was the full-time manager with support from TLE. **Montenaro Test. Trial Tr. Vol. 7, Page 42:7–44:19**.

### Problems Arise During CAE's Control of the Parker Center

A number of issues soon developed after CAE assumed control of the Parker Center. These problems included inaccurate financial reporting, dropping enrollment numbers, staffing problems, violations of employment laws, a deteriorating physical condition of the Center, and most significantly, and of grave concern, major health and safety violations cited by state regulators during CAE's management. Notwithstanding the large number of problems that arose with the Parker Center, it is the Loganathans' position and testimony, particularly Ms. Alaudeen's, that all problems at the Parker Center were attributable to TLE (and traceable to

---

[7] Mr. Loganathan disputes that the enrollment at the time of CAE's assumption of management was 80 to 90 students. **TLE's Trial Exhibit 47**.

TLE's previous unilateral management decisions); their position was that none of the responsibility for these problems was attributable to the Loganathans. **See Alaudeen Test. Trial Tr. Vol. 2, Pages 118:2–119:25; 122:4–125:10; 125:23–127:6; 142–43; TLE's Trial Exhibit 45, 47, 48; Campolo Test. Trial Tr. Vol. 4, Pages 84:4–87:21; 92:8–16; 174:10–175:16; 180:9–183:3; CAE's Trial Exhibit 68; Montenaro Test. Trial Tr. Vol. 7, Pages 44:17–46:15**.

The Loganathans' position that the blame for the aforementioned problems rests with TLE is primarily based upon three factors.  First, the Loganathans contend their training was deficient.  Notably, however, at no point did the Loganathans substantively inform TLE that they were not trained or that they needed more training.  Second, the Loganathans contend that the staff selected by TLE, particularly Ms. Giarratano, was grossly incompetent.[8]   Third, the Loganathans assert that they received deficient support and aid from TLE, particularly in light of the fact that TLE was supposed to "co-manage" the franchises with CAE.  Stated simply, it was the testimony of the Loganathans that the problems at the Parker Center originated from TLE's decisions during TLE's unilateral management of the center.  **See Loganathan Test. Trial Tr. Vol. 6, Pages 89:3–14, 18–25; Montenaro Test. Trial Tr. Vol. 7, Pages 47:23–48:4; see generally Alaudeen Test. Trial Tr.s Vol. 1–2**.  After problems began to surface at the Parker Center, TLE offered to step back in and manage, but the Loganathans declined the offer.  **TLE's Trial Exhibit 47**.

On November 6, 2013, TLE corporate employee Rich Miniconzi, who was serving as TLE Area Manager for the Parker Center due to the Loganathans' feelings about Ms. Giarratano, visited the Parker Center and noted extensive issues at the center.  He provided detailed feedback

---

[8] In one instance, on November 5, 2013, when questioned about their accounts and the fact that they had zero deposits from students at the Parker Center registered in their computer system, the Loganathans attributed blame for this failure on Ms. Giarratano, who had been transferred from the Parker Center two months prior at the Loganathans' insistence. *See* **TLE's Trial Exhibits 45–48; Campolo Tst. Trial Transcript Vol. 4, Pages 176:7–178:3**.

about the problems he noted, as well as specific recommendations on how to improve operations. **TLE's Trial Exhibit 49**.

In mid-December 2013, Mr. Campolo, in an attempt to reach the Loganathans regarding complaints TLE had received about the Parker Center, left a voice-mail message for the Loganathans in which he stated his grave concerns regarding CAE's operation of the Parker Center. **TLE's Trial Exhibit 144**.

In January 2014, the Loganathans notified TLE that the Center Director for Parker, Brooke Hill, whom they had selected and hired to replace Ms. Giarratano in September 2013, had resigned due to various problems at the center. *See* **TLE's Trial Exhibit 53**.

In February 2014, Mr. Miniconzi reported to the Loganathans that TLE had received a complaint from a Parker Center parent regarding, among other things, the infant room, where a child had been fed double the amount on the feeding schedule and that the parent had still not received confirmation of tuition payments because no one at the center could e-mail receipts. This lack of confirmation was likely attributable to the fact that the Loganathans had terminated Jennifer Kinnan's access to CAE e-mail.[9]  *See* **TLE's Trial Exhibit 265, Designated Dep. of Jennifer Kinnan ("Kinnan Deposition"); Dep. Tr. Vol. 1, Pages 94–96, 101:16–102:22**.  Mr. Miniconzi advised the Loganathans that a plan needed to be in place immediately to address these complaints and, furthermore, that the Loganathans should restore Ms. Kinnan's access to company e-mail so she could better perform her job functions. *See* **TLE Trial Exhibit 56**.  The Loganathans did not restore Ms. Kinnan's access to company e-mail. *See generally* **Kinnan Dep. Tr. Vol 1**.

Conditions at the Parker Center continued to degrade.  In February, the Loganathans

---

[9] It is easily inferred that it was the personal belief of Ms. Kinnan that her access to company e-mail had been eliminated to reduce the possibility that she would confer or otherwise interact with TLE corporate without the Loganathans' knowledge and consent. **Kinnan Dep. Tr. Vol. 1, Pages 94–96**.

instructed the Parker Center business manager, Ms. Kinnan, to stop using TLE's accounting program, CCM, and to start using QuickBooks. The Loganathans' request, and other matters related to accounting, was complicated by the fact that the Loganathans had taken control of all bank deposits for the Parker Center away from Ms. Kinnan since December 2013. Nonetheless, it was the belief of the Loganathans that all accounting errors were attributable solely to Ms. Kinnan. In response to the blame the Loganathans placed upon Ms. Kinnan, Mr. Miniconzi advised the Loganathans that they needed to be more professional in their handling of their employees. Notwithstanding this advice, the Loganathans at times requested that TLE contact CAE employees directly to reprimand them. *See* **TLE's Trial Exhibits 57–59; Campolo Test. Trial Tr. Vol. 4, Page 189:4–7; Kinnan Dep. Vol. 1, Pages 111:19–112:23**.

After a series of contentious e-mails and encounters, the Loganathans fired Ms. Kinnan[10] in February 2014 and assumed the role of business manager at the Parker Center themselves. *See* **Loganathan Test. Trial Tr. Vol. 5, Page 138:1–4; Vol. 6, Pages 95:4–22; 97:6–101:9; TLE's Trial Exhibit 61; Kinnan Dep. Vol. 1, Page 11:15–19**. It was not TLE's decision to fire Ms. Kinnan. **Montenaro Test. Trial Tr. Vol. 7, Page 53:9–10**.

At the time she left, Ms. Kinnan was primarily responsible for scheduling to ensure the center was appropriately staffed. *See* **Montenaro Test. Trial Tr. Vol. 7, Page 53:11–17**. Mr. Loganathan assumed that role after he fired Ms. Kinnan. **Montenaro Test. Trial Tr. Vol. 7, Page 53:18–20**.

During their tenure from October 2013 to February 2014, the Loganathans had still not completely learned the business manager role, despite their training and the availability of training resources. *See* **Loganathan Test. Trial Tr. Vol. 6, Pages 19:25–80:4; Kinnan Dep. Vol. 1, Pages 76:7–77:18**. However, the Loganathans never indicated they needed more training

---

[10] The parties dispute whether Ms. Kinnan was fired or whether Ms. Kinnan quit. The distinction is ultimately irrelevant.

specifically on the business manager function. *See* **Montenaro Test. Trial Tr. Vol. 7, Page 48:5–9**.

### *The Transition of the Aurora Center to CAE Control*

In March 2014, the parties began preparations for the Loganathans to assume full-time management of the Aurora Center as of April 1, 2014, which the Loganathans had previously requested on multiple occasions.  In anticipation of this, given that Ms. Giarratano was at that time serving as acting center director of the Aurora Center, a new center director had to be hired due to the Loganathans' personal issues with Ms. Giarratano. *See* **TLE's Trial Exhibits 70–76; Campolo Test. Trial Tr. Vol. 4, Pages 190–91**.

As of April 1, 2014, both the Aurora and Parker Center were franchisee-managed centers, and as such, fell under TLE's Vice President of Operations, Ms. O'Byrne's division.  **O'Byrne Test. Trial Tr. Vol. 6, Pages 159:19–160:7; TLE Trial Exhibit 74**.

Given the difficulty in finding a new center director, Mr. Campolo offered for TLE to continue to manage the Aurora Center.  **Campolo Test. Trial Tr. Vol. 4, Pages 192:12–193:8;** *See* **TLE's Trial Exhibit 76**.

The Loganathans did not accept Mr. Campolo's offer for TLE to manage the Aurora Center, nor did the Loganathans ever express that they were unprepared to take over management of the Aurora Center. *See* **Campolo Test. Trial Tr. Vol. 4, Page 193:2–8**.

At the time the Aurora Center was transitioned to the Loganathans in April 2014, it was in excellent condition. *See* **Loganathan Test. Trial Tr. Vol. 6, Page 102:16–19**.  In April of 2014, Julie Szabo, the center director who the Loganathans hired, stated that this was a reflection of the excellent job Marianne Giarratano had done with the staff and organization of the center, prior to Ms. Szabo coming on board. *See* **Julie Szabo ("Szabo") Test. at Trial Tr. Vol. 3, Page 230:10–17**.

Not everything at the Aurora Center was well, however.  On February 19, 2014, TLE received a letter from state regulators indicating that the Aurora Center's license would be placed on probation.  **CAE Trial Exhibit 47 (sub Exhibit 7); Montenaro Test. Trial Tr. Vol. 7, Pages 215:23–216:10**.  The primary reason for the probation appears to have been an allegation of child abuse that occurred approximately one year prior to receipt of the letter.  Despite the fact that the probationary status of the license would require CAE to send a letter to all of the parents at the Aurora Center and that the terms of the probation would require certain additional training by Aurora staff, TLE never disclosed the impending probation to the Loganathans.  **Montenaro Test. Trial Tr. Vol. 7, Page 230**.

### *CAE Assumes Management of the Aurora Center*

After full-time management of the Parker Center for approximately six months, on or about April 1, 2014, CAE, as franchisee, assumed full-time management and operation of the Aurora Center.  Immediately after assuming full-time management of the Aurora Center, the Loganathans continued to have difficulties with Ms. Giarratano, who at this time was TLE's area manager for the state of Colorado.  During the month of April 2014, Ms. O'Byrne testified that she continuously tried to assist and support the Loganathans in operating their centers, spending a third of her day dealing with CAE franchises, even though she had 28 to 34 other franchisees to oversee.  *See* **O'Byrne Test. Trial Tr. Vol. 6, Page 162:17–163:5, 178:3–12**.

In April, the Loganathans continued to complain to TLE about Ms. Giarratano.  A conference call was held to address these issues.  The Loganathans brought several employees to the conference call with the anticipation that they would say negative things regarding Ms. Giarratano.  However, only two of the employees had anything to say regarding Ms. Giarratano, and others opted not to say anything at all.  TLE requested written statements from these employees, but never received them. *See* **Campolo Test. Trial Tr. Vol. 4, Pages 102:1–104:11,**

**194:17–195:14;** *See* **O'Byrne Test. Trial Tr. Vol. 6, Pages 164:6–168:21**.

Although it is CAE's position that TLE should have taken, at this time, some action in regard to Ms. Giarratano, TLE's reluctance to do so may be attributable to other circumstances surrounding the conference. Two teachers from the Aurora Center who participated in the conference call with TLE, and who made negative statements regarding Ms. Giarratano, were Cara Mallory and Barbara Campbell. *See* **Szabo Test. at Trial Tr. Vol. 3, Page 231:6–8**. Those teachers received significant raises from the Loganathans following the call. *See* **Alaudeen Test. Trial Tr. Vol. 2, Pages 196:12–201:18; TLE's Trial Exhibits 129; Szabo Test. at Trial Tr. Vol. 3, Page 231:19–232:10**. Ms. Mallory testified that she disliked Ms. Giarratano, who had reprimanded her, and wanted to "take her down." *See* **CAE's Trial Exhibit 220, CAE Designated Deposition and TLE Cross-Designations of Cara Mallory ("Mallory Deposition"); Dep. Tr. Vol. 1, Pages 142:22–147:9, 156:15–159:7, 160:6–11, 165:9–14 and Exhibit 2 to Mallory Deposition**.

### *The Parker Center Crisis in April 2014*

As of April, 2014, the Loganathans continued to struggle with the management of the Parker Center. For example, the Loganathans requested that corporate assist with their financial reporting as the Loganathans remained unaware of many critical state regulations that affected their franchises. *See* **Alaudeen Test. At Trial Tr. Vol. 2, Pages 159:12–160:22; TLE's Trial Exhibit 90; O'Byrne Test. Trial Tr. Vol. 6, Pages 168:22–171:8; Kinnan Dep. Vol. 1, Page 78:14–25**.

In April, Brenda Morrison, who had previously been hired by the Loganathans to replace Brooke Hill as center director for the Parker Center, resigned and submitted a complaint to the state and to TLE regarding numerous regulatory problems at the Parker Center. The problems included severe violations of state regulations, such as hiring employees who had no background

checks conducted and who were not legally authorized to work in the United States, grossly inadequate staffing, and improper teacher-to-child classroom ratios. **See Alaudeen Test. Trial Tr. Vol. 2, Pages 138:7–12, 156:11–160:22; TLE's Trial Exhibits 79, 89–90; Loganathan Test. Trial Tr. Vol. 6, Page 104:13–18; O'Byrne Test. Trial Tr. Vol. 6, Pages 171:9–174:12; TLE's Trial Exhibit 267, Designated Dep. of Brenda Morrison ("Morrison Deposition"), Morrison Dep. Tr. Vol. 1, Pages 53:13–21**. Brenda Morrison observed certain difficulties that the Loganathans had with understanding and complying with the rules and regulations in the state of Colorado governing childcare centers. **See Morrison Dep. Tr. Vol. 1, Page 44:20–24**.

Ms. Morrison's testimony was very critical of the Loganathans. For example, Ms. Morrison testified that while she was center director at the Parker Center, and attempting to convince the Loganathans to run the center in compliance with Colorado law, Ms. Alaudeen told her that instead, she was "going to do it the Singaporean way." ***See* Morrison Dep. Tr. at Vol. 1, Page 45:2–17**. Ms. Morrison testified about a specific instance where Ms. Alaudeen had hired a woman as her own personal nanny, who was not in the country legally, and then brought her to the center to work without proper qualifications, background checks, or legal immigration status. ***See* Morrison Dep. Tr. at Vol. 1, Page 46:3–18**. Ms. Morrison further testified that despite her personal protests, Ms. Alaudeen paid her nanny cash "under the table," instead of putting her on the payroll. ***See* Morrison Dep. Tr. at Vol. 1, Pages 46:23–47:9**.

The staffing problems at the Parker Center were sufficiently bad that an infant was left alone in a classroom during a fire drill, a severe safety violation (which was later admitted by Ms. Alaudeen to state inspectors, albeit belatedly). ***See* TLE's Trial Exhibit 117; Montenaro Test. Trial Tr. Vol. 7, Pages 84:18–85:16**.

After receiving Ms. Morrison's official complaint, state licensors took notice and began immediate inspections and other measures to ensure the health and safety of the children enrolled

at the Parker Center.  *See* **Alaudeen Test. Trial Tr. Vol. 2, Pages 161:3–164:23; TLE's Trial Exhibits 90–91; Campolo Test. Trial Tr. Vol. 4, Page 195:18–25**.

On Wednesday, April 23, 2014, state licensor Beth Chase visited the Parker Center and noted the following violations:

- Substitute teacher had no experience in childcare;

- Employees were missing background checks and fingerprints;

- Aides were being left without group leaders in classrooms;

- Insufficient amount of materials/equipment at the center for the children to use;

- Children's records were not current;

- Furniture was blocking emergency exits; and

- A six month old was left swaddled in the crib.

After the visit, the Loganathans were required to send Ms. Chase staff schedules and staff qualifications.  *See* **TLE's Trial Exhibits 91–93; Chase Dep. at Pages 21:15–23, 47:12–17; TLE's Trial Exhibit 130B; Exhibit 1 to TLE's Trial Exhibit 264**.

Ms. Kathi Wagoner is a licensing administrator with the division of early care and learning of the Colorado Department of Human Services ("DHS").  **TLE's Trial Exhibit 263, Designated Dep. of Kathi Wagoner ("Wagoner Deposition"); Dep. Tr. Vo1 1, Pages 6:14–7:6**. Ms. Wagoner's primary role with DHS is to oversee adverse or negative licensing actions taken against childcare facilities in the state of Colorado. **Wagoner Dep. at Page 7:7–16**.  This includes overseeing all necessary staff, *i.e.* paralegals, advisory witnesses, etc., as well as preparing summary suspensions, denials, and any probationary licensing actions.   **Wagoner Dep. at Page 7:7–16**. Recommendations for negative licensing actions are made to the licensing administrator from the licensing specialists who perform the inspections in the field.  **Wagoner Dep. at Page 10:1–8**.

The goal of the division of early care and learning is to ensure the health, safety, and welfare of the children attending childcare facilities through on-site inspections. **Wagoner Dep. at Page 11:11–18**. The purpose of those inspections is to ensure compliance with the Colorado rules and regulations, which are in turn designed to ensure child safety. *See* **Wagoner Dep. at Page 13:11–14:2**.

It is not atypical for a childcare facility to have violations during a site inspection. *See* **Wagoner Dep. at Page 99:2–7**. Some violations can be cured promptly or on the spot, but other violations take time to cure. **Wagoner Dep. at Page 103:11–15**. Violations that take longer to cure may put a center in more jeopardy in terms of licensing, particularly because those health and safety problems cannot be cured immediately. *See* **Wagoner Dep. at Page 105:7–12**. A complaint received by DHS in April 2014 was the trigger for the onsite inspections and consideration of negative licensing action at the Parker Center. *See* **Wagoner Dep. at Pages 120: 13–19, 124:18–24**.

Failure to have properly qualified and cleared staff can result in a serious sanction against the licensee, such as suspension, revocation, or closure. **Wagoner Dep. at Page 106:7–21**. All violations are deemed to be "willful and deliberate violations" per DHS policy, even where it may be a case of lack of attention. **Wagoner Dep. at Page 108:4–13**. The issuance of a probationary license, the penalty imposed on the Aurora Center, is among the least harsh of sanctions available. *See* **Wagoner Dep. at Page 109:20–24**.

By contrast, summary suspension of a license, an immediate action through the Colorado Attorney General's office, occurs when DHS is notified that there is an imminent danger to children, and is considered the most severe penalty by DHS. **Wagoner Dep. at Page 110:2–11**. In a summary suspension, the center's license is suspended and the center must close immediately, while DHS works to seek a revocation. **Wagoner Dep. at Page 110:10–15**. DHS

had very serious concerns with the Parker Center for a period of time in late April 2014, and DHS had actually contacted TLE corporate to intervene or DHS would be seeking a summary suspension. *See* **Wagoner Dep. at Page 114:13–115:25**. In fact Ms. Wagoner testified that, due to the severity of improper child-to-teacher ratios at the Parker Center, DHS was just 20 or 30 minutes away from commencing summary suspension proceedings unless qualified staff was placed in the center. *See* **Wagoner Dep. at Pages 118:18–119:2, 131:14–25**.

As these regulatory matters pertained to the CAE franchise, Ms. Wagoner called Ms. Montenaro at TLE to advise them of the situation at the Parker Center and Ms. Montenaro contacted Ms. Chase directly to assist with addressing the staffing issues. *See* **Montenaro Test. Trial Tr. Vol. 7, Pages 54:21–56:7, 57:16–19; TLE's Trial Exhibit 91**.

The Loganathans were required to provide proof of staff qualifications to DHS within a certain time period so as to correct these safety violations. However, the proof Ms. Alaudeen sent to Ms. Chase confirmed that certain staff members did not meet early childhood qualifications. *See* **Chase Dep. at 52:1–14; Exhibit 5 to TLE's Trial Exhibit 264**. Despite express warnings from Ms. O'Byrne to handle staff qualification issues themselves and not delegate such matters to center administration, Ms. Alaudeen did not follow up to correct or address these issues and instead deferred this task to Mindy Neal, the newly hired center director, on her first day on the job. *See* **TLE's Trial Exhibit 90; Chase Dep. at Pages 53–54; Alaudeen Test. Trial Tr. Vol. 2, Pages 168:3–5; TLE's Trial Exhibit 95; Montenaro Test. Trial Tr. Vol. 7, 58:24–59:7**.

The severity of the situation at the Parker Center during the April 23, 2014 site visit prompted Ms. Chase's supervisor to mandate a daily site inspection for the rest of the week to ensure that the center was operating in ratio. **Chase Dep. at Pages 21:23–22:14, 41:25–32:13**. During her investigation, Ms. Chase learned that the previous center director, Brenda Morrison,

had left because the Loganathans were "not letting the director do their job appropriately." **Chase Dep. at Pages 40:8–41:1**.

Ms. Chase characterized this daily on-site inspection as "unusual," pointing out that licensing specialists cannot be present in every facility that frequently. **Chase Dep. at Page 22:5–9**. The ratio violations at the center led to a situation in which no staff member could leave a classroom to prepare lunch for the children; Ms. Chase herself had to step in the kitchen and actually assist with preparing food for the children. **Chase Dep. at Page 23:19–24**.

During these visits Ms. Chase was also forced to step in and teach in a classroom—something she had never had to do before in her capacity as a licensing specialist—so that a teacher could go to the front office and start calling parents to come pick up their children due to the observed child-teacher ratio violations and Ms. Chase's safety concerns for the children. *See* **Chase Dep. at Pages 23:25–24:10, 26:22–27:4**. Ms. Chase notified the Loganathans that the next day they would not be allowed to accept children beyond the amount of qualified staff that they had, and would be forced to turn parents away once they had reached the maximum child-teacher ratio. As part of her duties, Ms. Chase also prepared inspection reports noting the violations at the Parker Center. *See* **Chase Dep. at Page 37:5–10; Montenaro Test. Trial Tr. Vol. 7, Pages 57:23–58:6, 76:1–80:4, 80:25–81:11; 82:9–17, 83:24–85:9, TLE's Trial Exhibit 130B**.[11]

At one point, parents picking up their children observed police officers conducting an investigation (pertaining to a dispute between two teachers); the police officer investigation took place during an inspection by Colorado authorities:

---

[11] Ms. Chase testified that on May 2, 2014, she received an e-mail from Ms. Alaudeen admitting that a child had been left unsupervised and unattended in a classroom during a fire drill, in violation of Colorado rules and regulations. **Chase Dep. at Page 35:3–17; TLE's Trial Exhibit 264**. Ms. Chase also testified about the fact that the Loganathans, as managers, had not reported the incident within 24 hours of it occurring, which was a violation of the rules and regulations in and of itself. **Chase Dep. at Page 35:18–20**.

> Ms Holmes then hung up the phone and walked to Ms Seward's class. Ms Seward continued to raise her voice to Ms Holmes. Ms Seward then collected her bag and dashed out of the class and the building. The state officer was in the parking lot. Ms Seward walked to the state officer and said the "They are not letting me go for my lunch break because you are here. I had lied to you earlier when I said my class is in ratio."

> After speaking to her supervisor for a long time over the phone, the state officer came back into the building and said she now needed to interview the staff individually to find out if what was stated in Ms Brenda's report was founded. While conducting the individual interviews, Ms Seward called the police. The reason Ms Seward claims to have called the police is because she wants to press charges against Ms Holmes as Ms Seward claims to have been pushed by Ms Holmes. Ms Holmes has denied this fact to the police. And of course all this is going on during pick up time, between 4-5pm. Discussions and interviews were behind closed doors in the office.

> Ms Holmes was not present at the center by the time the police arrived. Ms Holmes was interviewed by the police via Katijah's mobile phone. The police officer said that Ms Holmes advised that she did not push Ms Seward but was merely trying to remove herself from the room and had to go between Ms Seward and another teacher, Ms Denice. And while doing so had brushed against Ms Seward.

**TLE's Trial Exhibit 90 (narrative e-mail of Mr. Loganathan).**

Enrollment dropped significantly during the last week in April 2014, due at least in part to CAE notifying parents that they could not bring their children to the center because of child-to-teacher ratio issues. *See* **Chase Dep. at Page 26:1–7**.

The Loganathans were not on site at the Parker Center during some of the time Ms. Chase was performing the daily on-site inspections in late April of 2014. *See* **Chase Dep. at Page 32:6–19**. TLE corporate became involved in helping properly staff the Parker Center during that period of time. *See* **Chase Dep. at Page 39:8–17**.

The state informed TLE and the Loganathans that if the violations by CAE at the Parker Center were not immediately corrected, the state could place the center on probation, or if the center did not have the required number of qualified teachers on any one day, students would need to be turned away as their parents arrived to leave them at the center. *See* **TLE's Trial Exhibit 95**.

By this time, four staff members had resigned, including two out of six lead teachers (which represented one-third of the classrooms). *See* **TLE's Trial Exhibits 91, 108, 109**.

Notwithstanding the severity of the problems at the Parker Center, the Loganathans

continued to attribute the blame for these problems to others who were seeking to "sabotage" their business.  For example, upon being shown a negative Yelp review from a parent, Ms. Alaudeen responded with the following e-mail:

> Well, well what can I say Deb?
> Libel & Slander at the same time from everybody!
>
> Is there a way you can help find out a way we can remove these 3 reviews and start fresh.
>
> KATIJAH
> Parker/Aurora

**Loganathan Test. Trial Tr. Vol. 6, Page 84:4-11; TLE's Trial Exhibit 87.**[12]

The Loganathans shifted much of the burden of addressing state regulatory violations at the Parker Center to the center director, Mindy Neal.  Ms. Neal was hired in late April.  The Loganathans' decision to place this burden on Ms. Neal was likely attributed, at least in part, to the fact that, as of this time, they still did not know many of the rules and regulations governing childcare centers in the state of Colorado.  *See* **Alaudeen Test. At Trial Tr. Vol. 2, Page 168:3–5; TLE's Trial Exhibit 95; Alaudeen Test. Trial Tr. Vol. 2, Page 24:19–21; Loganathan Test. Trial Tr. Vol. 6, Pages 72:6–13; 106:14–107:17; TLE's Trial Exhibit 90**.

Ms. O'Byrne again reiterated the need for the Loganathans to know their rules and regulations and to never allow a center director to know more regarding the business than the franchisee.  *See* **Loganathan Test. Trial Tr. Vol. 6, Pages 109:2–16, 112:9–12; TLE's Trial Exhibit 90; O'Byrne Test. Trial Tr. Vol. 6, Pages 176:12–178:2, 179:21–25**.

Notwithstanding Ms. O'Byrne's advice, on Monday, April 28, 2014, Ms. Loganathan contacted Ms. Chase and informed her of an incident at the school where a child was hurt; Ms.

---

[12] The Yelp review contained the following text: "This place is hazard to your children if you value their health and well-being you will shop else-where for daycare, My wife just pulled our kids out and can say that regret not doing it sooner. NONE of the facilities are clean there are different teacher in the infant rooms everyday, The people that run the place are the most rude and unprofessional management have ever met. If the State Dept doesnt step in and do something about the conditions of this Daycare then my wife and several other concerned parents will have to. The treatment of the children all ages in this program are unacceptable and I for one know my children deserve better than this place." **TLE's Trial Exhibit 87.**

Chase told Ms. Loganathan that the incident needed to be reported immediately to the Department of Social Services. Ms. Loganathan's response was to pass this task along to Ms. Neal. ***See* Alaudeen Test. At Trial Tr. Vol. 2, Pages 168:24–172:7; TLE's Trial Exhibits 96, 102; O'Byrne Test. Trial Tr. Vol. 6, Pages 184:24–185:23**.

After Ms. Chase's inspection that day, the Loganathans contacted TLE to address the severe situation at the Parker Center. The Loganathans admitted to TLE that they had problems controlling the staff and that the staff would not listen to them. ***See* Montenaro Test. Trial Tr. Vol. 7, Page 88:20–89:4; TLE's Trial Exhibits 99–100**.

Without proper staffing, the center would need to turn away parents in order to remain in compliance with state regulations, which carried a severe risk that parents would in turn seek alternative care. ***See* Campolo Test. Trial Tr. Vol. 4, Page 199:2–12**. This is, in fact, what happened, as CAE began to turn parents and children away on April 29, 2014. ***See* Alaudeen Test. At Trial Tr. Vol. 2, Page 180:11–16; *See* TLE's Trial Exhibit 105**.

Mr. Campolo asked the Loganathans what their plan of action was to avoid having their license being frozen or suspended:

> Bernard we will note.
> Now let's talk about protecting the brand.
> We cannot allow your license to be frozen or
> Suspended.
> You are in a dire situation with licensing.
> Please submit your plan of action to correct
> Your licensing violations for tomorrow and going
> Forward.

**TLE Trial Exhibit 103**.

Due to the severe situation at the Parker Center, TLE corporate operations personnel undertook extraordinary efforts and worked late into the night on April 29, and the early morning of April 30, to ensure that the Parker Center would be adequately staffed on April 30, 2014. These efforts included arranging the staffing schedules and classroom ratios, contacting CAE's

employees of the Aurora Center and asking them to cover at the Parker Center, and hiring substitute teachers from a childcare staffing agency.  This also included having Ms. Giarratano assist in a classroom at the Aurora Center to allow Aurora staff to cover at the Parker Center. Despite the severity of the situation, the Loganathans were greatly concerned with the presence of Ms. Giarratano in the Aurora Center.  *See* **TLE's Trial Exhibits 98–101, 103–106; Campolo Test. Trial Tr. Vol. 4, Pages 100:5–101:6; 104:13–106:5; 108:3–4; 196:10–198:11; 203:1–204:3; O'Byrne Test. Trial Tr. Vol. 6, Pages 181:7–182:23, 183:14–184:5; Montenaro Test. Trial Tr. Vol. 7, Pages 82:2–8, 83:14–18, 87:12–11, 90:7–19**.

Ms. Montenaro, at TLE corporate, contacted Ms. Chase to advise her of the plan of action outlined above and to tell Ms. Chase that TLE would step in the next day.  *See* **TLE's Trial Exhibit 106; O'Byrne Test. Trial Tr. Vol. 6, Page 187:2–4**.

At this point, TLE corporate staff had spent more time with CAE than it had with any other franchise center.  *See* **Campolo Test. Trial Tr. Vol. 4, Page 202:22–24**.

Given the crisis situation, on or about April 29–30, 2014, TLE's operations managers and the Loganathans discussed TLE's taking over management of the Parker and Aurora Centers immediately.  During these discussions, Mr. Loganathan stated he wanted to close the Parker Center in order to have time to remedy the numerous problems.  TLE's management strongly disagreed and on April 30, 2014, Michael Shafir, in-house counsel for TLE, sent a Management Agreement to the Loganathans per Mr. Campolo's, the Executive Vice President of Operations for TLE, instructions. *See* **TLE's Trial Exhibit 107; Campolo Test. Trial Tr. Vol. 4, Pages 109:18–111:4; 114:3–6; Loganathan Test. Trial Tr. Vol. 5, Pages 160:17–25; 161:20–162:13; Vol. 6, Pages 115:5–23, 116:20–23**.

Mr. Weissman, the CEO of TLE, testified that a new Management Agreement was prepared because the prior one had a co-management term.  **Weissman Test. Trial Tr. Vol. 8,**

**Pages 208:22–209:6**.

The Loganathans had no alternative plan other than closing the Parker Center.  More specifically, the Loganathans' plan was to merge the students from the Parker Center to the Aurora Center, correct staffing problems at the Parker Center, and then move children back from the Aurora Center to the Parker Center.  ***See* Loganathan Test. Trial Tr. Vol. 6, Page 116:18–19; Alaudeen Test. At Trial Tr. Vol. 2, Pages 191:4–193:18; TLE's Exhibit 112; Shafir Test. Trial Tr. Vol. 9, Page 63:15–20**.

On May 1, 2014, Ms. Chase again visited the Parker Center and found that there were not enough qualified staff that day to operate with the number of children in attendance and the Loganathans had to turn parents away.  ***See* Alaudeen Test. Trial Tr. Vol. 2, Page 27:15–24; 183:24–186:18; CAE's Trial Exhibits 59, 108–112**.

Numerous employees on May 1st had either elected not to come to work, or quit, which left the Parker Center ill-equipped to handle the number of children enrolled.  Ms. Neal, the center director, did not report to work and Ms. Alaudeen asked Ms. Montenaro at TLE corporate to try and find her. Citing an elderly dog and a migraine headache, Ms. Neal then tendered her resignation via e-mail after being contacted by Ms. Montenaro.  Understandably concerned, Ms. Montenaro e-mailed Ms. Alaudeen the following:

> I need to know when both you and Bernard are free to speak.

 Ms. Alaudeen's initial response was:

> I can't talk- I've lost my voice.
> Email works fine.

Citing illness, Ms. Alaudeen declined to go to the Parker Center, and instead elected to stay home on May 1st.  ***See* Alaudeen Test. Trial Tr. Vol. 2, Page 26:15–17; TLE's Trial Exhibits 105, 108–11; Montenaro Test. Trial Tr. Vol. 7, Pages 89:5–90:1, 103:23–104:8; Alaudeen**

**Test. Trial Tr. Vol. 2, Pages 26:22–24, 175:11–21, 182:5–12**.

At this time, it was TLE's perception that Ms. Alaudeen continued to attribute the problems at the Parker Center solely to the actions of others.  *See* **Montenaro Test. Trial Tr. Vol. 7, Page 105:15–24**.

Mr. Loganathan was not at the Center when it opened on May 1, 2014.  *See* **Campolo Test. Trial Tr. Vol. 4, Pages 204:15–207:6;** *See* **TLE's Trial Exhibit 109–110**.

TLE was utilizing substantial resources to staff the Parker Center so that it would be in compliance with state regulations.  *See* **Campolo Test. Trial Tr. Vol. 4, Pages 201:16–202:1**. TLE has a vested interest in their franchisees succeeding.  *See* **Weissman Test. Trial Tr. Vol. 8, Page 178:14–21; Montenaro Test. Trial Tr. Vol. 7, Page 46:17–23**.

Mr. Campolo testified that in his twenty-five years of experience he had never had a center suspended or shut down by state order.  *See* **Campolo Test. Trial Tr. Vol. 4, Page 201:7–15**.

Ms. Alaudeen admitted that her own center directors, Ms. Neal and Ms. Szabo, told her that if the state were to shut down the Parker Center, CAE would never be able to have a childcare business in Colorado again and that it would have been a "calamity" to have the center shut down.  *See* **Alaudeen Test. Trial Tr. Vol. 2, Page 73:17–25**.

Ms. Alaudeen also admitted that if the Parker Center had been closed down by the state, it is very likely that the Parker Center would never have reopened under CAE's management again.  *See* **Alaudeen Test. Trial Tr. Vol. 2, Page 74:7–12**.

After the Parker Center director, Ms. Neal, quit, CAE advised TLE that the earliest a new center director could start was approximately two weeks later.  *See* **Alaudeen Test. Trial Tr. Vol. 2, Pages 190–193; TLE's Trial Exhibit 111**.  The severity of the situation, the mental state of the Loganathans at this time, and the impending prospects for regulatory compliance at the

Parker Center were expressed by Ms. Alaudeen in an e-mail to TLE:

> Hi Tara,
> Plan for CD- I don't want to build castles in the air- Any CD will quit if we do not follow their advise. They know more than us. Btw- Julie is going through a lot too- we just need to ensure she doesn't quit too.
>
> I'm extremely traumatized at the escalation of the staffing issues on a day to day basis. I've lost Mindy too in just 3 days & I'm very depressed about it. I'm done taking the blame for people quitting. I'm made to look like a laughing-stock each time a CD quits. The problem was never rooted off the ground to begin with! Yelp reviews & other negative comments that are being arrowed at me is not called for.
>
> In any case- off Hand- I have only 2 Resumes. Next week is the earliest they can meet & 15th is the earliest they can start.
>
> Craigslist Ad- needs to be re-posted.
> ---------------
> Extremely Traumatized that Mindy left!
> Katijah

**TLE's Trial Exhibit 111**.

On the evening of May 1, 2014, Mr. Loganathan, on behalf of CAE, e-mailed Ms. Montenaro, Mr. Campolo and Ms. O'Byrne at TLE and advised them that he proposed "closing the center tomorrow." This e-mail was sent in the context of CAE's lack of any prospects for a center director for approximately two weeks. The Loganathans provided no alternative to closing the center. *See* **Alaudeen Test. Trial Tr. Vol. 2, Pages 192:19–193:18; TLE's Trial Exhibit 112, 115; Campolo Test. Trial Tr. Vol. 4, Pages 108:18–109:15; 207:4–208:8; Loganathan Test. Trial Tr. Vol. 5, Pages 163:9–20, 164:2–5; Weissman Test. Trial Tr. Vol. 8, Page 209:5–8; Montenaro Test. Trial Tr. Vol. 7, Pages 87:1–9, 96:14–97:1**.

Events at the Parker Center had become so severe that TLE senior management had to apprise Richard Weissman, TLE's CEO, of the situation. *See* **Loganathan Test. Trial Tr. Vol. 5, Page 167:13–20; Weissman Test. Trial Tr. Vol. 8, Pages 203:14–205:2; TLE Trial Exhibit 112**.

Mr. Loganathan admitted to Mr. Weismann that he had not reviewed the new management agreement previously forwarded to him by TLE because he wanted to seek legal

advice first.  *See* **Loganathan Test. Trial Tr. Vol. 5, Page 168:9–15, 19–20; Weissman Test. Trial Tr. Vol. 8, Page 209:7–12**.

Three possible scenarios appeared to exist.  The first possible scenario was that the state of Colorado would close the Parker Center.  The second was the Loganathans' plan to close the Parker Center and attempt to merge the student body there into the Aurora Center while Parker Center staffing issues were corrected. (This plan carried with it the inherent difficulty of the lack of immediate hiring prospects.)  The third possible scenario was that TLE would return to manage the Parker Center.  *See* **Loganathan Test. Trial Tr. Vol. 6, Pages 120:23–121:1**.

After telephone discussions between Mr. Loganathan and Mr. Weissman,[13] TLE formally notified CAE that it would assume management and operation of the Parker and Aurora Centers on May 2, 2014.  *See* **TLE's Trial Exhibits 112, 115; Weissman Test. Trial Tr. Vol. 8, Pages 203:14–205:2, 205:17–22**.

Mr. Weissman testified that he never had to close a center within an hour's notice in his entire career except in cases of force *majeure*.  **Weissman Test. Trial Tr. Vol. 8, Page 205:3–7**. Mr. Weissman testified that he advised the Loganathans that they could not close the center and that TLE would step in and assume management.  **Weissman Test. Trial Tr. Vol. 8, Pages 205:23–206:8**.

Mr. Loganathan admitted he needed TLE's help to properly staff the center and wanted their help.  *See* **Loganathan Test. Trial Tr. Vol. 5, Pages 160:17–25, 168:8–9**.

The notice asserted that CAE had acknowledged and agreed to this course of action on May 1, 2014.  *See* **Weissman Test. Trial Tr. Vol. 8, Page 206:3–8; TLE's Trial Exhibit 113**.

### *TLE Returns to Manage Both Franchise Centers*

On or about May 2, 2014, TLE assumed management and operation of the Parker and

---

[13] The content of these conversations is disputed.

Aurora Centers. *See* **Campolo Test. Trial Tr. Vol. 4, Page 208:10–11**. The Loganathans were instructed not to enter either center, so as not to interfere with TLE's management and efforts to salvage the Centers. *See* **Loganathan Test. Trial Tr. Vol. 5, Page 170:18–23; Weissman Test. Trial Tr. Vol. 8, Pages 211:14–214:6; TLE's Trial Exhibit 115; Shafir Test. Trial Tr. Vol. 9, Page 65:2–8**.

After TLE assumed management of the centers, the Loganathans ceased all substantive communications with TLE and withdrew from owner-based responsibilities. Substantive responses from CAE and the Loganathans, from this point forward, were limited to responses from the Loganathans' counsel. *See* **Campolo Test. Trial Tr. Vol. 4, Pages 210:11–211:5; TLE's Trial Exhibits 118–119; Loganathan Test. Trial Tr. Vol. 6, Pages 121:7–14, 122:5–10**.

On or about May 2, 2014, TLE received formal notice from the state of Colorado that the Aurora Center was issued a probationary license for a six month period, running from April 14, 2014 to October 14, 2014, in part based upon a finding of child abuse or neglect that occurred in May of 2013, which was self-reported by TLE. There is no record evidence that the probation had any discernible impact on CAE's operation of the Aurora Center in the month of April (parents were not notified during that time), or that Aurora did not continue to operate normally. Probation was the least severe of adverse licensing actions. *See* **Wagoner Dep. at Page 109:20–24; Montenaro Test. Trial Tr. Vol. 7, Pages 115:25–117:12, 117:23–118:3**.

In fact, the probationary period was successfully completed and a full license was restored to the Aurora Center in November 2014. *See* **Campolo Test. Trial Tr. Vol. 4, Page 202:2–9; Montenaro Test. Trial Tr. Vol. 7, Page 117:10–15**.

In May of 2014, after TLE reassumed full-time management of the Parker Center, there were two site inspections of the Parker Center and DHS did not find any violations at that time.

*See* **Chase Dep. at Page 16:10–23**. Furthermore, the Parker Center achieved child-teacher ratio compliance in May of 2014 after TLE stepped in to manage the center. *See* **Chase Dep. at Page 58:1–23**. In sum, as of May 21, 2014, the Parker Center was brought into compliance, by TLE as manager, with all of the requirements that were set forth in the various reports of inspection. *See* **Chase Dep. at Page 62:3–7**.

TLE continued to communicate with CAE to resolve the urgent matters concerning the centers and sent a subsequent notice on May 12, 2014, which again put the Franchisee, CAE, on notice of its defaults under the various agreements, including that CAE had abandoned all responsibilities at the centers at CAE's sole election, and that CAE had not paid utility bills or prepared payroll. *See* **TLE's Trial Exhibit 122**.

On or about June 9, 2014, TLE sent yet another default notice, which outlined the various breaches committed by the CAE, including CAE's abandonment of the Centers, and the resulting assumption of primary management by TLE. The June 9, 2014 Default Notice included a demand for payment of all amounts due and owing under the various agreements. *See* **TLE's Trial Exhibit 125**.

On or about June 25, 2014, TLE sent another default notice to CAE, which again notified the Franchisee of the defaults under the agreements, as well as the failure to pay outstanding property taxes, which was CAE's obligation pursuant to the Management Agreement and the Assignment of Lease Agreements. *See* **TLE's Trial Exhibit 126**.

The Loganathans did not respond to TLE's multiple correspondences, and instead initiated the present suit. *See* **Campolo Test. Trial Tr. Vol. 4, Pages 210:11–211:5; TLE's Trial Exhibits 118–119; Loganathan Test. Trial Tr. Vol. 6, Pages 121:7–14, 122:5–10**.

The Parker Center suffered a very serious drop in student enrollment in the immediate weeks following the crisis at the Parker Center in April. **O'Byrne Test. Trial Tr. Vol. 6, Page**

**188:10–22; Montenaro Test. Trial Tr. Vol. 7, Pages 121:25–122:11, 19–25**.

Ultimately, TLE decided to mitigate its losses and close the Parker Center in an orderly fashion.  The center's operations were wound down and the Parker Center closed in or around February 2015.  **Weissman Test. Trial Tr. Vol. 8, Page 214:7–22; Shafir Test. Trial Tr. Vol. 9, Page 139:2–3**.

As of trial, the Aurora Center continued to operate under TLE management.  Enrollment has continued to increase and the center has apparently reached profitability.  *See* **O'Byrne Test. Trial Tr. Vol. 6, Pages 188:25–189:15**.

TLE never formally terminated the Franchise Agreements. The only person at TLE with the authority to terminate a franchise is Richard Weissman, CEO of TLE.  **Weissman Test. Trial Tr. Vol. 8, Pages 166:24–167:11**.  Mr. Weissman testified that he opted not to terminate the franchise in May 2014 because he believed it would have had an adverse effect on the EB-5 visa application for the Loganathans.  **Weissman Test. Trial Tr. Vol. 8, Page 167:1–11, 16–24**.

### *Critical Findings of Fact*

The Court makes the following findings of fact that are critical to the parties' claims:

1.      The Power of Attorney Agreement was intended to provide authority to TLE for TLE's interaction, on CAE's behalf, with third parties.  The Power of Attorney Agreement executed in this case empowered TLE to "act generally in relation to all matters of every kind in which Franchisor may be interested or concerned with respect to the operation and management of the [franchise]."  **CAE's Trial Exhibit 8**.  The wording of the scope of authority is therefore quite broad.  In recognition of the fact that this broad wording could be construed in a number of different ways, in a prior order the Court noted the following:

> It is possible, however, that a finder of fact could determine after reviewing evidence of intent that the scope of the power of attorney was intended to be limited to a small subset of TLE's actions in connection with the launch and

operation of the franchises.

DE 170.  At trial, TLE submitted substantial evidence that the purpose of the Power of Attorney Agreement (from TLE's perspective), which was executed in conjunction with the Management Agreement, was to allow TLE to interact with third parties, when managing the CAE franchises, when third parties required power of attorney authorization.  **Shafir Test. Trial Tr. Vol. 9, Pages 10–12**.  For example, TLE needed the Power of Attorney Agreement to interact with banks and state regulators.  By contrast, CAE submitted virtually no evidence on the issue of intent (from CAE's perspective) for the Power of Attorney Agreement.  Alternatively, to the extent CAE attempted to submit evidence of intent on this matter, the Court found such evidence to be unpersuasive.  The Court therefore finds that the Power of Attorney Agreement was executed for the purpose of TLE's authorization to interact with third parties (who required such authorization) and was not intended to serve as the authorization for TLE to engage in all of its responsibilities as manager (at such time as TLE unilaterally managed CAE's franchises).

2.     Based upon the testimony of Mr. Loganathan and Ms. Alaudeen, it was CAE's understanding that the co-management provision of the Management Agreement meant that TLE would provide regular, systemic, and in-person support to CAE for whatever problems arose during CAE's management.

3.     Based upon the testimony of Ms. Montenaro, Ms. O'Byrne, and Mr. Campolo, it was TLE's understanding that the co-management provision of the Management Agreement meant that while TLE would provide support and assistance, TLE was not obligated to provide help and support above and beyond what it would provide to any other franchisee.

4.     During TLE's management of CAE's franchises, TLE made a conscious effort to limit its use of CAE working capital.  TLE sought to keep staff near the minimum amount necessary (at wages that were far from outlandish) to operate the center while remaining in compliance with

state regulations; TLE established cost control budgets and attempted to enforce those budgets.

5.      TLE's decision to hire Ms. Giarratano was undertaken in good faith and, moreover, TLE's decision to hire Ms. Giarratano was based upon Ms. Giarratano's extensive experience and qualifications in the childcare industry. It is not for the Court to decide whether Ms. Giarratano was a good employee or a bad one.  There is no claim for negligent hiring. The Court has no doubt that Ms. Giarratano may be the right employee for some employers but the wrong one for others.

6.      The leases in this case were executed prior to execution of the Franchise Agreements and, as such, the terms of the leases (and the implicit property tax obligations) were therefore within the scope of items that should be reviewed by a prospective franchisee in the context of the franchisee's due diligence.

7.      The Loganathans communicated with franchise employees on prohibited matters on multiple occasions during the period of time that such communications were prohibited by the Management Agreement.

8.      The training *offered and available* to the Loganathans, by TLE, was extensive.  The testimony of Ms. Beers was persuasive because of her extensive knowledge and experience in training TLE franchisees.  The ITP training offered by TLE was substantial; numerous training programs were made available to the Loganathans through the TLE website and through TLE staff.  To the extent that the training of the Loganathans was truncated, this occurred at the direction of the Loganathans.   It is clear that the Loganathans were eager to assume the management of their franchises, due in no small part to their desire to stop paying TLE a management fee.  Accordingly, (i) any limitation of the Loganathans' training stemmed from the Loganathans' desire to assume management of their center as soon as possible, (ii) TLE altered its normal training structure as an accommodation for the Loganathans' desires, and (iii) had the

Loganathans sought additional training on matters not already documented and prepared on the TLE website, TLE would have provided it. To the extent the Loganathans' in-person training in September 2013 was limited, this was directly attributable to the Loganathans' unilateral decision to have Ms. Giarratano removed at a critical time. Nonetheless, despite the removal of Ms. Giarratano, a plethora of training resources existed for the Loganathans to use. Even so, the Loganathans did not fully use the training resources available to them. Finally, to the extent the Loganathans did not feel (or later come to believe) that they were adequately trained or prepared to operate their franchises, these concerns were not communicated to TLE; the Loganathans' alleged concern regarding their lack of training is contradicted by their consistent refusals to return any management responsibilities to TLE, even for a limited time.

9.      With respect to the quality of TLE's management of the CAE centers, the evidence on this issue is of the greatest contrast. If CAE is to be believed, TLE recklessly managed the franchisees, violating state regulations as a matter of course by virtue of inept hiring, all the while exhibiting an undercurrent of disdain and racism toward the Loganathans. If TLE is to be believed, the Loganathans caused the centers to rapidly descend into a state of decay due, essentially, to extremely poor management and poor people skills. The Court, in weighing the evidence on this matter, is guided by the available objective evidence. Two pieces of objective evidence are key. The first is that during TLE's operation of the CAE franchises, enrollment grew substantially. The second is that when CAE assumed managerial control of the Parker Center, there were no outstanding violations of state regulations, despite the fact that the Parker Center had recently been formally inspected.[14] These objective facts must also be considered in light of the fact that TLE's interests and CAE's interests were aligned. TLE made money when CAE made money. The more money CAE made, the more money TLE made. Finally, any

---

[14] The Aurora Center is another matter addressed separately.

evidence that arguably could be construed to indicate that TLE either understaffed the centers or purchased insufficient supplies can be attributed, at least in part, to the fact that TLE needed to frugally use the working capital that CAE had provided.  Had TLE paid CAE's employees an above-market wage, hired excess staff, or purchased too many supplies, the Court could well have found before it a claim related to TLE's wasteful expenditure of CAE's working capital. Taking all evidence into account and giving full consideration to the inherent difficulties associated with growing and starting a new business, the Court finds that during TLE's unilateral management of the Parker Center, TLE operated the center in good faith, with an earnest desire to improve and grow the center while maintaining legal compliance, while at the same time conserving CAE's working capital.

10.     Similarly, for the same reasons pertaining to the Parker Center, the Court finds that TLE operated the Aurora Center in good faith, with an earnest desire to improve and grow the center while maintaining legal compliance, while conserving CAE's working capital—with one important caveat.   It is clear that when TLE transitioned the Aurora Center to CAE, a probationary license was imminent and that this information was not conveyed to CAE.  While the Court does not find that TLE actively sought to deceive CAE on this issue,[15] TLE did fail to diligently convey this important information to CAE.  TLE feared the Loganathans' reaction (given the relationship between the Loganathans and TLE, such a fear was understandable); as a result, TLE appears not to have been particularly motivated to quickly apprise the Loganathans of the probationary license, at least until such time as the precise date and terms of the probationary license were known.  The Court finds no fault with TLE with respect to the conduct

---

[15] Evidence was admitted at trial that on at least a few occasions TLE did try to convey this information to the Loganathans and that the Loganathans were unavailable.  The Court found the testimony on this point to be credible. **O'Byrne Tst. Trial Transcript Vol. 6, Page 253:8–11**.  The Court also found the testimony of Ms. Montenaro to be credible that, to the extent any misinformation was communicated to the Loganathans on this matter, it was unintentional.  **Montenaro Tst. Trial Transcript Vol. 7, Pages 118–19**.

at the Aurora Center that gave rise to the probationary license.   The primary factor underpinning

the probationary license was a child injury that was addressed and resolved by TLE in an

appropriate manner.[16]

11.      There can be no causal connection between the events in April of 2014 at the Parker

Center (the April 2014 crisis) and TLE's unilateral management of the center in September of

2013.   Even if the Court were to accept CAE's premise that TLE's management of the Parker

Center was poor (and the Court does not), the span of time is too great.   The Loganathans were

the owners of the Parker Center.   The Loganathans managed the Parker Center for approximately

seven months.[17]   The conditions in April of 2014 at the Parker Center were dire.   The

Loganathans' attribution of one hundred percent of the blame for such conditions solely to TLE

is unreasonable:

> *Q:* You were never at fault for any of this, never any of your doing, always
> somebody else's fault; is that correct?
>
> *Ms. Alaudeen:* The fault is we trusted TLE corporate office too much, that is the
> fault. I am blamed because I trusted them, that is the only fault.
>
> . . .
>
> *Q:* Are you telling us everything that befell you at Parker, including the problems
> you had in April, are all the fault of somebody else, not you, and not your
> husband's management?
>
> *Ms. Alaudeen*: Due to corporate office mismanagement before I stepped into
> Parker, yes, TLE corporate office to be blamed.

**Alaudeen Test. Trial Tr. Vol. 2, Pages 142–143**.   The Court's finding is based upon the level of

control TLE exercised over the Parker Center, which was very little, in conjunction with the

---

[16] Furthermore, CAE's argument on this point repeatedly emphasizes the fact that the probation of the Aurora Center license was due to "willful and deliberate violations."   CAE's repeated emphasis on this fact is unpersuasive as it is the state of Colorado's position that essentially *every* violation, even an improperly discarded paper clip, is a willful and deliberate violation.  *See* **Wagoner Dep., Pages 107–08**.

[17] The Court notes that, at summary judgment, CAE took the position that they were essentially "managers in name only" and that the true managers of the Parker Center at all times was TLE.  This position is utterly without support in the record.

level of control CAE exercised over the Parker Center, which was very great, subsequent to September of 2013.

12.     Given the Court's finding that TLE managed the CAE franchises in good faith and that there is no causal nexus between the failure of the Parker Center in April of 2014 with TLE's management in September of 2013, it necessarily follows that CAE poorly managed the Parker Center.  The dire situation of the Parker Center in April of 2014 must be attributed to CAE and the Loganathans.  Compared to April of 2014, the state of the Parker Center in September of 2013 was excellent.  Something changed.  Logically, what changed was the management of the Parker Center from TLE to CAE.  This change had seven months of time to develop and manifest an impact on the Parker Center.  Essentially, what changed was the summation of the Loganathans' managerial decisions.  The Loganathans poorly managed the Parker Center.[18]

13.     The conditions at the Parker Center in the spring of 2014 represented a threat to public safety and public health.  A baby was abandoned in a crib during a fire drill.  A state inspector was forced to serve food to children.  A state inspector was forced to teach a classroom of children.  Police were summoned to the premises.  Background checks were not conducted on hired employees.  Teachers were not properly qualified.  Teacher-to-child ratios were not met.[19] There is even evidence that some employees were hired illegally and paid cash off-the-books. The Parker Center was so strongly out of compliance with state regulations (which are intended to protect children), that if the conditions at the Parker Center did not amount to a threat to public safety, then the Court is at a loss as to what conditions *would* constitute such a threat.  The

---

[18] The Court makes no finding as to the Loganathans' management of the Aurora Center because such a finding ultimately proves to be unnecessary and because the Loganathans' management of the Aurora Center was only for an abbreviated period of time.

[19] The Court also finds the testimony by TLE's witnesses that compare and contrast the recorded violations under TLE's management with the recorded violations under CAE's management to be persuasive.  More specifically, the recorded violations under CAE's management were far, far more severe than the violations recorded under TLE's management.

Court's decision on this matter is necessarily based upon the setting in which CAE operated—the business of CAE was the business of safely protecting and nurturing children—which is readily distinguishable, for example, from a business that merely sells retail products.

14.     As of May 1, 2015, the Loganathans intended to close, and essentially abandon, the Parker Center.[20]  Only three possibilities existed at that time: closure of the Parker Center by the state, merger of the Parker Center with the Aurora Center, and a takeover of the Center by TLE. Mr. Loganathan's e-mail, which stated that he proposed closing the center, when read in the context of the events leading up to the e-mail, equated to a clear intent to close and abandon the Parker Center.  The merger of the Parker Center student body with the Aurora Center student body, as proposed by Mr. Loganathan (he had no other plan), is completely uncalled for under the Franchise Agreements and, viewed in the totality of all events, would have amounted to a closure or abandonment of the Parker Center franchise.

15.     By the end of April 2014, a summary suspension of CAE's license, by the state of Colorado, was imminent, and a summary suspension was averted by TLE's assumption of management.  The Court's finding is based upon the testimony of Ms. Montenaro, Ms. Chase, and, most importantly, the testimony of Ms. Wagoner:

> And I do recall that I initiated a phone call to The Learning Center corporate office and spoke to somebody about getting some staff out there immediately or we would be seeking a summary suspension of their license.
>
> . . .
>
> As I recall, it was my expressing concerns that our staff was actually in the building. We were trying to send children home because of the severe shortage of staff. That our staff were stepping in and helping. And that they either got teachers -- new qualified staff placed in that building, I think I said within 20 or 30 minutes, or we would be seeking a summary suspension of that license.

**Wagoner Dep., Pages 115, 118–19**.

---

[20] Although the Court concluded essentially the opposite at summary judgment, the Court has now heard and weighed extensive evidence on this matter.

16.    TLE's assumption of management at the Parker Center had several positive effects for CAE and the Loganathans.   For example, TLE's assumption of management averted an imminent summary suspension of CAE's license and restored the Parker Center to full compliance with state regulations, something that CAE could not have accomplished on its own.

17.    When TLE assumed management of the CAE franchises in May of 2014, it did so with the understanding that CAE consented to its takeover of unilateral management.

18.    It was never the intention of CAE, or the Loganathans, for TLE to take over management in May of 2014 to the extent that, upon assuming management, the Loganathans would be excluded from further management or otherwise required to execute a new management agreement.

19.    CAE incurred no monetary damages as a result of TLE's delay in informing CAE of the pending probationary license at the Aurora Center.   The Court's finding is based upon the fact that the parents utilizing the Aurora Center were not notified of the probation (and the license was not fully received and solidified) until *after* TLE assumed management of both of CAE's centers.    Although TLE's delay in informing CAE of the probationary license had the hypothetical possibility of resulting in damages to the Aurora Center, events at the Parker Center pre-empted such a possibility.

20.    With respect to the quality of services and support that TLE offered and provided to CAE during the period of time that CAE managed its franchises, the Court finds that TLE provided, at a minimum, the same level of support for CAE that it provided to other franchises, and the support and assistance provided by TLE was rendered in good faith, was comprehensive, and was reflective of TLE's desire for the CAE franchises to succeed, which would have in turn caused TLE to succeed.   During the month of April in 2014, TLE provided assistance and support to CAE far beyond what it typically provides to its other franchises.

### III.    CONCLUSIONS OF LAW

At its core, this case is a breach of contract case.  The Court therefore first addresses the breach of contract claims raised by both parties before considering CAE's other claims.

#### A.  CAE's Breach of Contract Claims

CAE argues that TLE breached several agreements in this case.  Under Florida law, the elements of a breach of contract action are (1) a valid contract; (2) material breach; and (3) damages.  *Hodges v. Buzzeo,* 193 F. Supp. 2d 1279 (M.D. Fla. 2002) (citing *Abruzzo v. Haller,* 603 So. 2d 1338, 1340 (Fla. Dist. Ct. App. 1992)).  CAE argues that TLE breached the Franchise Agreements and the Management Agreement on several different points.  Each is addressed in turn.

CAE argues that TLE breached Section 7 of the Franchise Agreement through a "failure to train" CAE.  Section 7, however, does not obligate TLE to train franchisees to any specific level.[21]  Instead, Section 7 specifies that *franchisees* will not be able to assume operation of their franchise *before they complete a certain level of training*:

> 7.1    **Initial Training.**
>
> (a)    Before the opening of your Center, you must fully complete the training requirements listed in this Section before you will be permitted to use our Marks and System in the operation of your New Center.  Your completion of such training is a condition precedent to your being permitted to open or operate a Center.

**TLE's Trial Exhibit 3**.  Implicit in the wording of this section ("a condition precedent to your being *permitted*") is that TLE may waive training requirements, as it is within TLE's prerogative to grant a franchise to a partially trained franchisee if it chooses to do so.[22]  Subsequent paragraphs in Section 7 begin with the phrase "you [the franchisee] will be required" and thus

---

[21] The hypothetical scenario where TLE is not obligated to provide training, does not provide training, and also refuses to grant a franchise after receiving payment (due to a lack of training), is not before the Court.

[22] TLE's power to waive certain training requirements makes logical sense.  For example, TLE may have reserved this power to itself for such situations as when a newly formed franchise is owned by a franchisee who has already undergone training in the purchase of a previous franchise; it would make no sense for TLE to be required to provide the same training a second time.

Section 7 merely imposes obligations *on the franchisee* and does not impose obligations on the franchisor.  The Court therefore concludes that TLE did not breach Section 7 of the Agreement (with respect to the training of the Loganathans) because there is no relevant covenant in Section 7 for TLE to breach.  Alternatively, even if Section 7 could be construed to place an obligation on TLE to provide the training delineated in that section, any alterations in the Loganathans' training regime was a direct result of the Loganathans' request to manage their franchises as soon as possible and TLE's attempts to accommodate the Loganathans' request.[23]   Also alternatively, to the extent the Loganathans' training schedule was altered or truncated in September of 2013, this was due to the Loganathans' unilateral decision to remove Ms. Giarratano and their decision not to pursue every possible training opportunity available to them.  As a final matter, CAE also pressed the argument at trial that TLE breached a representation it made to CAE in its franchise disclosure documents pertaining to the number of hours it would train the Loganathans (as well as certain categories of training).  A misrepresentation claim is not before the Court and, as such, the Court cannot grant CAE any relief for a misrepresentation TLE is alleged to have made in the franchise disclosure documents.  Alternatively, even if some claim is cognizable based upon the types of training described in TLE's franchise disclosure documents, all such changes in training were attributable to the Loganathans—not TLE.  The Court, therefore, does not enter judgment in favor of CAE on these points.

CAE argues that TLE breached Section 9.1 of the Franchise Agreement through "a failure to provide support services."   A review of Section 9.1 shows, however, that this contention is without a convincing basis in the record:

---

[23] It is of no import that the Franchise Agreements were not amended to reflect any alterations to the Loganathans' training regime as the Court has found that all such alterations were exclusively attributable to the Loganathans' requests.

**9.1   Services Offered by Your Franchisor.**

**9.1.1   Consultation.** For no additional charge, we will make our personnel available to you for consultation on such matters as operations, advertising and promotion, and administration throughout the term of the franchise. We will provide continuing assistance to you in the development and operation of your Center by means of periodic visits by our field representative and by the maintenance of an office staff of trained personnel experts at our headquarters.

**9.1.2   Research and Development.** We will continue to research and develop products, curricula, and techniques for operating and promoting a Center. We agree that when any such developments are accepted by us for ongoing use in our own Centers, they will be made a part of our System and provided to you upon the same terms and conditions as those applicable to our other franchise owners. .

**9.1.3   Manual.** You must comply with the contents of the Manual at all times during the term and treat the Manual and the information contained therein as confidential. The Manual must be kept in a secure place at your Center. You shall not at any time copy, duplicate, record, or otherwise reproduce the Manual, in whole or in part, or otherwise make it available to any unauthorized person. The Manual shall at all times remain our sole property. You shall ensure that your copy of the Manual is kept current at all times, and in the event of any dispute as to the contents of the Manual, the terms of the master copy of the Manual maintained by us shall be controlling.

**TLE's Trial Exhibit 3**.  With respect to consultation services pursuant to Section 9.1.1, it is clear that TLE did provide consultation services to CAE.  These services were provided to CAE through TLE's website, through phone calls, through e-mails, and through on-site visits. Notably, on-site visits could have been more frequent had CAE been able to work, on a professional level, with the area manager chosen by TLE, Ms. Giarratano.  To the extent CAE was unsatisfied with the level of such services, the terms of Section 9.1.1 do not impose a specific requirement[24] that TLE failed to satisfy.  Alternatively, the services TLE provided to CAE were rendered in good faith and with the intention to see CAE succeed.  The mere fact that TLE required CAE to show independent initiative and personal responsibility is of no import when CAE functioned as the on-site owner of the franchises.  In light of these findings and the fact that there is no specific standard in Section 9.1.1 that TLE violated, the Court does not enter judgment in CAE's favor on these points.  Nor is there any persuasive evidence that TLE failed to provide research and development services or services pertaining to its manual of operations.

CAE's remaining arguments pertain to TLE's alleged breaches of the Management Agreement.

---

[24] To the extent CAE argues that the consultation services provided by TLE should have been augmented during the co-management period of the Management Agreement, this separate topic is addressed below.

CAE argues that TLE breached the Management Agreement through its failure to comply with state of Colorado regulations.  More specifically, CAE argues that TLE breached Section 2(b) of the Management Agreement ("Manager will obtain childcare licenses"), Section 4(a) of the Management Agreement ("Manager will contribute invaluable effort"), Section 4(b) of the Management Agreement (TLE offers its services in "good faith"), Section 2(a) of the Management Agreement (TLE is liable for actions of willful misconduct), and Section 6(e) of the Management Agreement ("Manager shall use reasonable efforts to manage the Centers so they operate profitably as soon as commercially practical").  These allegations go the heart of CAE's case against TLE—that TLE poorly managed the centers when TLE had unilateral control.  The Court squarely addressed this argument in its finding that TLE managed the CAE franchises in good faith, with an earnest desire to see that the centers succeed, and with an earnest intent to do so lawfully.[25]  As such, the Court cannot conclude that TLE failed to "contribute invaluable effort" or that TLE engaged in "willful misconduct."  The Court has found the opposite.  To the extent the franchises were poorly managed, this was the fault of CAE—not TLE.  Accordingly, the Court does not enter judgment in CAE's favor on these points.  Alternatively, CAE's claims are precluded by the terms of the Management Agreement.[26]

CAE argues that TLE breached Section 2(f) of the Management Agreement through a failure to keep CAE apprised of center operations.  Section 2(f) of the Management Agreement reads as follows:

---

[25] Moreover, when the Parker Center was transitioned to TLE there were no outstanding regulatory violations. Although the Aurora Center, at the time of transition, did have a pending probationary license, this is a point addressed separately, but the Court ultimately still finds that this point must be resolved in favor of TLE.

[26] See Section C, *infra*.

> (f)     Manager's authority to pay each Center's expenses is limited to day-to-
> day expenses, and all standard and typical payments that are required to perform Manager's
> role for operating the Centers.  Franchisee further agrees to work with Manager for the success
> of the Centers, but will use its best efforts not to interfere with Manager's management of the
> Centers.  Manager shall use reasonable efforts to update Franchisee on Center matters in a
> reasonable time so as to keep Franchisee apprised of Center operations.

**CAE's Trial Exhibit 8**.  As an initial matter, TLE argues that the provision at issue ("shall use reasonable efforts to update Franchisee on Center matters in a reasonable time so as to keep Franchisee apprised of Center operations") is unambiguously limited to requiring TLE to apprise CAE of center operations in the context of finances.  Given the context of this statement in Section 7(f), the Court agrees and, moreover, the Court finds that the evidence in this case clearly shows that TLE apprised CAE of all financial matters.  Even if the Court were to agree with CAE's interpretation, however, and construe this covenant to broadly include a duty to report to CAE on all matters of importance, the Court would still resolve this matter in favor of TLE.

The primary factual matter in contention on this point is the probationary license that was pending for the Aurora Center at the time CAE assumed managerial control.  It is undisputed that CAE was unaware of the pending probationary license at the time they assumed managerial control.  However, TLE did not actively seek to deceive CAE on the matter of the probationary license.  Instead, TLE failed to diligently convey this information because TLE feared the Loganathans' reaction and TLE wanted to know the precise date and contours of the probationary license before engaging the Loganathans in a discussion about the license.  Moreover, TLE did attempt to notify the Loganathans on a few occasions about the license, but the Loganathans were unavailable, and to the extent incorrect information was conveyed about the probationary license, this misinformation was unintentional.  In light of all of these findings, the Court concludes that TLE did not fail "to use reasonable efforts" in a "reasonable time" to apprise CAE—TLE was merely awaiting more information before engaging the Loganathans in

a discussion about the license.[27]

Even if the Court were to conclude, however, that TLE did breach Section 2(f) of the Management Agreement due to its failure to notify CAE of the impending probationary license, the Court still resolves this matter in favor of TLE.  The issue is damages.  The Aurora Center's parents were not officially notified of the probationary license until *after* TLE assumed unilateral management of the Aurora Center.  This means that damages did not have time to accrue to CAE. Alternatively, CAE's claims are precluded by a waiver CAE executed in the Management Agreement.[28]  The Court therefore does not enter judgment in CAE's favor as to these points.

CAE argues that TLE breached the Management Agreement by entering into lease assignments on CAE's behalf which resulted in high property tax bills.  The leases at issue in this case were executed prior to the Loganathans entering into the Franchise Agreement and, as a result, the leases and the underlying property tax obligations inherent in those leases were items that the Loganathans should have reviewed in their due diligence investigation.  *See* **Campolo Test. Trial Tr. Vol. 4, Page 138:12–139:4; Shafir Test. Trial Tr. Vol. 9, Page 37:5–15**.  The Loganathans had a high net worth and had utilized legal counsel in the past.  The Loganathans were fully capable, both in terms of experience and financial resources, of a due diligence investigation for the transaction in this case.  Notwithstanding their ability to do so, the Loganathans, for whatever reason, chose not to seek legal counsel and their due diligence investigation was less than thorough.  *See* **Alaudeen Test. Trial Tr. Vol. 2, Page 52:5–24; Loganathan Test. Trial Tr. Vol. 6, Page 14:12–25**.  For example, during his initial training program at TLE, Mr. Loganathan expressed confusion that he did not own his franchise

---

[27] All of the findings of the Court on this matter apply to other issues related to state inspections and licensing, and TLE's alleged failure to report such information.  The Court does not construe Section 2(f) so broadly as to require CAE to notify TLE of every single item noted by a state inspection and, moreover, a lack of damages precludes such claims.

[28] See Section C, *infra*.

buildings.  This belief, by Mr. Loganathan, is so incongruous with the structure of the transaction and the Franchise Agreements that it leads to the logical conclusion that the Loganathans did not fully read or understand the documents they executed.  Moreover, the Loganathans were aware at the time they signed the Franchise Agreements that TLE's affiliates were already under lease for the Parker and Aurora Centers.  ***See* Alaudeen Test. Trial Tr. Vol. 2, Page 48:11–14; Loganathan Test. Trial Tr. Vol. 6, Page 14:1–6**.  In any event, CAE assented to the underlying property tax obligations when they executed the Franchise Agreements; the property tax obligations were items they should have investigated in their due diligence. TLE cannot be held liable as a manager for failing to act in good faith or for failing to use reasonable efforts when TLE executed lease assignments on CAE's behalf because CAE had agreed for TLE to do so. Alternatively, CAE's claims are precluded by a waiver CAE executed in the Management Agreement.[29]  Accordingly, the Court does not enter judgment in CAE's favor on these points.

CAE argues that TLE breached Section 3 of the Management Agreement for "threatening to terminate the Management Agreement."  CAE's argument on this point lacks clarity. Although Section 3 of the Management Agreement does place restrictions on CAE's ability to terminate the Management Agreement, these restrictions are not imposed on TLE.  There is, therefore, no express provision in Section 3 that clearly prohibits TLE from terminating the Management Agreement.  CAE's argument on this point fails because there is no covenant in Section 3 that TLE is alleged to have breached, in the context of a threatened termination. Alternatively, even if such a covenant or restriction could be construed, the evidence provided by CAE on this point (which primarily consisted of comments by TLE that perhaps management should be vested solely in CAE at an earlier than agreed upon date), lacks the necessary

---

[29] See Section C, *infra*.

specificity and force to qualify as a *breach* of the Management Agreement.[30]  Also alternatively, to the extent CAE's argument on this point is premised upon TLE's assumption of management in April of 2014, these actions were undertaken in the context of CAE's breaches of the Franchise Agreement which, by virtue of a cross-default clause, entitled TLE to terminate the Management Agreement.  Accordingly, the Court does not enter judgment in CAE's favor as to this point.

CAE argues that TLE breached the Management Agreement through a failure to co-manage.  At trial, CAE placed great emphasis on TLE's alleged lack of support of the Loganathans during the "co-management" period of the Management Agreement.[31]  The co-management period appears to have resulted from a rather hastily drafted contractual provision in Section 3(d) of the Management Agreement:

> (d)   After Franchisee assumes full-time management of a Center, and subject to Section 3(e) below, Manager will co-manage with Franchisee for a period of six (6) months, and so long as each Center is improving and Franchisee is operating pursuant to the Franchise Agreements, the System and the Manuals, after expiration of the six (6) month period, this Agreement will no longer be applicable to that respective Center and Franchisee will assume full management and operations for that Center.  After the expiration of such period for both Centers, this Agreement will be terminated.  Upon termination, Franchisee will execute a General Release of Franchisor and its affiliates in the form attached hereto as Exhibit D.

**CAE's Trial Exhibit 8**.  The term "co-manage" is not defined in the agreement, nor is the term readily expounded upon.  As the Court is unable to utilize any part of the Management Agreement to explain the meaning of the co-management provision, the Court finds the term to be ambiguous.  *See Mount Vernon Fire Ins. Co. v. Editorial Am., S.A*, 374 So. 2d 1072, 1073 (Fla. Dist. Ct. App. 1979).  Because the term is ambiguous, the Court considers extrinsic

---

[30] Mr. Campolo testified that he merely wanted to "get [the Loganathans'] attention" so that the Loganathans would realize the seriousness of their actions, and the Court finds Mr. Campolo's testimony on this point, when viewed in the context of the relationship of the parties at that time, to be credible.  **Campolo Test. Trial Tr. Vol 4., 69:8– 70:16**.

[31] CAE also appears to press the argument that TLE's decision to transition management of the Aurora Center to the Loganathans prior to any additional training violated the co-management provision of the Management Agreement, as well as other provisions, but as discussed in the Court's findings of fact TLE's transition of the centers to the Loganathans was conducted in the context of the Loganathans' fervent desire to assume management of both of their franchises as soon as possible.  Accordingly, any ramifications associated with an early transition stem from the unilateral choices of the Loganathans.

evidence for the purposes of determining the intent of the parties at the time of contract.  *See Gulf Cities Gas Corp. v. Tangelo Park Serv. Co.*, 253 So. 2d 744, 748 (Fla. Dist. Ct. App. 1971).

Unfortunately, at the time of the execution of the Management Agreement, TLE had never utilized a co-management period before.  Instead, this entire provision appears to have been drafted in response to the Loganathans' request for assistance after their initial visa applications were denied, and as a result the Court has minimal extrinsic evidence to guide its decision.  The Loganathans testified extensively at trial regarding what they believed "co-management" meant.  It was their essential belief that the term meant that whenever the Loganathans encountered a problem, TLE would provide in-person assistance to help the Loganathans correct that problem, and that the Loganathans and TLE had a relationship that resembled that of a partnership.  The Court finds this interpretation of the term to be unreasonable and unpersuasive.

Problematically, TLE's interpretation of the co-management term and its corresponding evidence of intent shed little light on the Court's analysis.  Substantial evidence was admitted at trial that during the co-management period TLE treated CAE as it would any other franchisee, without any additional services or support.[32]  Testimony on the drafting of the provision was also unhelpful.  To the extent TLE makes the argument that the term did not require it to provide any additional support to CAE whatsoever, the Court finds this interpretation to be unreasonable as it would render the provision meaningless.  *See Moore v. State Farm Mut. Auto. Ins. Co.*, 916 So. 2d 871, 877 (Fla. Dist. Ct. App. 2005) (noting that courts will not interpret a contract in a manner that renders provisions meaningless if a reasonable interpretation is otherwise available).  The Court, therefore, turns its attention to the circumstances surrounding the parties at the time the Management Agreement was executed.  *See Clark v. Clark*, 79 So. 2d 426, 428 (Fla. 1955).

---

[32] TLE's other franchisees were not in "co-management" relationships.

One critical objective fact is that during the co-management period, TLE *was not entitled to a management fee*. **Weissman Test. Trial Tr. Vol. 8, Page 197:15–23**. The importance of this fact cannot be understated. Based upon this fact, it is unreasonable to conclude, as the Loganathans did, that TLE would provide in-person assistance (TLE's only corporate employee in the state of Colorado was banned from the Loganathans' presence) to the Loganathans, for any problems the Loganathans perceived, *for no additional compensation*.[33] Moreover, the Court concludes that the purported importance the Loganathans placed upon the co-management term was both unreasonable and unpersuasive in support of their contract construction argument. The co-management provision did not induce the Loganathans to purchase a franchise from TLE— the evidence clearly shows that the Loganathans' intention, from the very start, was that they would purchase and open a franchise center themselves without any co-management whatsoever. The genesis of the co-management provision was the fact that the Loganathans encountered visa troubles and, *as an accommodation to the Loganathans*, TLE agreed to manage the CAE centers until the Loganathans could comfortably enter the United States and train. The co-management provision is not what induced the Loganathans to enter into the Management Agreement; it was the Loganathans' immigration delays which ultimately induced the Management Agreement. When the co-management term is viewed in this context, together with the fact that TLE was not to be compensated during the co-management period, TLE's position that it need not provide any additional assistance (beyond what a franchisee would normally receive) is more tenable than it would otherwise facially seem.

Upon review of the aforementioned evidence, as well as the Management Agreement in

---

[33] Although it is true that, as a general matter, ambiguity is construed against the drafter, the thrust of CAE's position is to transform an ambiguous term into a kind of insurance policy for the ultimate failure of the CAE franchises. *See City of Homestead v. Johnson*, 760 So. 2d 80, 84 (2000). CAE's position is unpersuasive and, moreover, construing an ambiguous term against a drafter is intended, as a rule of construction, to be a method of last resort. *See Child v. Child*, 474 So. 2d 299 (Fla. Dist. Ct. App. 1985).

its entirety, the Court construes the meaning of the co-management provision.  During the co-management period *prior to April 2014*, TLE's position—that it need not provide any additional assistance to CAE that it would not otherwise provide for a normal franchisee—was correct.  The Court's conclusion is based upon the objective fact that TLE received no management fee during this period, together with the circumstances surrounding the execution of the Management Agreement.  TLE's co-management performance during this period of time was compatible with the terms of the Management Agreement. The Parker Center, although far from problem-free, did not appear to be in a dire situation and, from TLE's perspective, it was reasonable to conclude that many of the Loganathans' problems (which they now assert in perfect hindsight they needed help for) should have been resolved independently by the business owners on the ground.

However, once the Parker Center entered into a crisis situation in April of 2014, the co-management provision of the Management Agreement required something more.  During that period of time, TLE was required to provide substantial assistance to CAE to help CAE deal with an unusual and very serious situation.  And this is precisely what TLE did.  TLE, particularly during the end of April, provided a vast amount of support to CAE in an effort to help the franchise survive.  Although TLE ultimately terminated the Franchise Agreements after the April crisis, the evidence shows that TLE's termination was attributable to the manner in which the Loganathans navigated the April crisis and TLE's termination was pursuant to authorization in a completely separate agreement—the Franchise Agreement.  Accordingly, the Court concludes that TLE did not breach the co-management provision of the Management Agreement.  The Court, therefore, does not enter judgment in CAE's favor as to these points.

CAE's final arguments are that TLE breached the covenant of good faith and fair dealing under both the Management Agreement and Franchise Agreements and that the Franchise

Agreement and Management Agreement were improperly terminated by TLE's unauthorized seizure of the centers on May 2, 2015.  With respect to the covenant of good faith and fair dealing, the Court has addressed these claims in its finding that TLE *did* execute its duties in good faith.  TLE did not seek "to thwart [CAE's] reasonable expectations."  *See Ernie Haire Ford, Inc. v. Ford Motor. Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001).  Moreover, a claim based upon an implied covenant of good faith cannot be maintained in the absence of a breach of an express term of the contract, and may not otherwise contradict or vary the express terms of the contract.  *See Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So. 2d 787, 791-92 (Fla. Dist. Ct. App. 2005).  The implied covenant of good faith cannot be used to create a breach of contract on one party's part where there was no breach of any express term of the contract, and the Court has already concluded that TLE did not breach any term in the contractual agreements in this case.  *Id.*

In summary, the Court does not enter judgment in CAE's favor as to CAE's Count VII (Breach of Management Agreement), CAE's Count VIII (Breach of Covenant of Good Faith of Management Agreement), CAE's Count IX (Breach of the Franchise Agreement), and CAE's Count X (Breach of Covenant of Good Faith of the Franchise Agreement).  Judgment is entered in TLE's favor as to all of these counts, and CAE and the Loganathans (as Counter-claimants) shall take nothing.

### B.  TLE's Contract Claims

TLE argues that CAE breached the Franchise Agreement by virtue of the conditions of the Parker Center in the April 2014 crisis.  Pursuant to Section 11.2 of the Franchise Agreements, TLE was entitled to terminate a Franchise Agreement immediately and without an opportunity to cure under certain circumstances:

> **11.2   Termination Without Opportunity to Cure.**   You acknowledge and agree that strict compliance with many of the obligations agreed to by you in this Agreement is crucial to the success of the System and the Centers, and that any breach thereof would so jeopardize the well-being of the entire Franchise System or otherwise have such an adverse affect on the relationship between us, or be of such significance that you no longer will be able to effectively function as a franchise under this Agreement. Accordingly, you agree that if you commit any action described in Section 11.2 (a) through (n), you shall be in default hereunder, and we may, at our option, terminate this Agreement and all its rights granted hereunder and retain the Franchise Fee, SDSC and/or Site Coordination Fee, without affording you any opportunity to cure the default, effective immediately upon receipt of written notice by you.   The actions are:

**CAE's Trial Exhibit 5**.  One basis on which TLE could immediately terminate CAE's franchise was when the operations of the franchise posed a threat public health and safety:

> **(j)**   If we make a reasonable determination that the operation of your Center poses a threat to public health or safety;

**CAE's Trial Exhibit 5**.  The Court has found that the operations of the Parker Center, in April of 2014, *did* pose a threat to public health and public safety.   Accordingly, a similar determination by TLE, at that time, would have been reasonable.  TLE had another ground upon which it could immediately terminate the Franchise Agreement—if CAE ceased to operate the center:

> **(h)**   If you cease to operate your Center, unless: (i) operations are suspended for no more than sixty (60) days; and (ii) the suspension was caused by fire, earthquake, hurricane, condemnation, or act of God;

**CAE's Trial Exhibit 5**.  As of May 1, 2014, the day before TLE's assumption of managerial control, Mr. Loganathan exhibited a clear intent to abandon the Parker Center by virtue of his (only) plan to close the center and merge the students there into the Aurora Center.  Although it was Mr. Loganathan's testimony that he was only proposing such a merger and the merger would have been temporary, Mr. Loganathan's e-mail must be reviewed in context.  On the night of May 1, 2014, the closure of the Parker Center by the state of Colorado was imminent.  The center director for the Parker Center had quit.  There were no immediate prospects to replace the center director.  The staff at the Parker Center was exhibiting an extreme reluctance to come to work under the Loganathans' management.  The earliest anticipated date upon which a new center director could be hired was approximately two weeks away. The Court concludes that

TLE was entitled to view this statement, based upon the totality of facts, as an indication that the Loganathans were about to cease to operate their center. *See Burger King Corp. v. Barnes*, No. 95-1408-CIV, 1996 WL 529281 (S.D. Fla. Aug. 28, 1996); *In re Mid-America*, 159 B.R. 48, 54 (M.D. Fla. 1993).  Accordingly, TLE was entitled to terminate the Franchise Agreement for the Parker Center on the night of May 1, 2014.

However, TLE never formally terminated the Franchise Agreements.  TLE was not required to do so.  Even when, for example, center operations pose a threat to public health, TLE is not required to terminate a franchise agreement.  CAE never formally terminated the Franchise Agreements either.  Instead, CAE argues that TLE's seizure of the centers wrongfully terminated the Franchise Agreement.  Notably, TLE does possess the power to seize franchise centers, *but only in the context of a termination*.  The Management Agreement does not authorize, in any way, the seizure of a center.

Further complicating matters is the position of TLE that its seizure of the Parker Center on May 2, 2014 was authorized by the Loganathans.  It is the position of CAE that no such authorization ever occurred.  What is clear is that there was no meeting of the minds on this issue. The Court finds both parties' positions to be credible.  The Court is therefore left with the situation where both parties subjectively believed their actions were correct, with neither party clearly seeking to terminate the Franchise Agreement, but with both parties believing the other party had, through its actions, terminated the Franchise Agreement.

The Court concludes that on May 2, 2014, when TLE seized the Parker Center, all agreements between the parties were terminated, and that TLE was entitled to take this course of action.[34]  The Court's decision is based upon the alternatives available to TLE at that time.  If TLE had known that CAE had refused (or meant to refuse) to allow it to seize the centers, TLE

---

[34] It necessarily follows that the Court grants TLE's Count VIII for Declaratory Judgment.

would have exercised its power to terminate all relevant agreements. This is because the alternatives were, to TLE, unacceptable. TLE could not allow the state of Colorado to close the Parker Center down—this would have damaged the TLE brand. TLE refused to allow the Parker Center to close under Mr. Loganathan's merger plan—from TLE's perspective this too would have damaged the TLE brand. No other alternatives existed. TLE was entitled to terminate. In the absence of a meeting of the minds (with respect to TLE's seizure of the centers), the Court therefore concludes that TLE terminated the Franchise Agreements by virtue of Section 11.2 because the Parker Center represented a threat to public health and public safety and CAE's closure of the Parker Center was imminent.[35] Although it is true that CAE had not formally closed the center at the time of Mr. Loganathan's controversial e-mail, the Court concludes that Mr. Loganathan's e-mail, although styled as a proposal was, in fact, a clear intention to close. This is because Mr. Loganathan's e-mail, when read in context, was a concession that the Loganathans were too overwhelmed to continue operations at the Parker Center, and TLE was not required to undertake a futile act; if TLE had waited until the following morning to observe a formal closure, the damage to CAE—and to the TLE brand—would have already been done.[36] *See Waksman Enter., Inc. v. Oregon Props., Inc.*, 862 So. 2d 35, 43-44 (Fla. Dist. Ct. App. 2003). TLE could not prevent the closure of the Parker Center (had they waited for a formal closure) on a moment's notice—logistics were involved.

By virtue of a cross-default clause, CAE's breach of the Parker Franchise Agreement was equivalent to a breach of all other agreements, including the Aurora Franchise Agreement.

---

[35] The Court's decision is also based upon the fact that TLE's actions, the seizure of two centers, were only authorized under the termination provisions of the Franchise Agreement—which lends further support to the proposition that TLE's seizure was a result of the termination of the Franchise Agreements. Finally, TLE provided notice of the termination via its formal notice dated May 1, 2014 which, by its terms, was to take effect on May 2, 2015. *See* **TLE's Trial Exhibit 113**. The Notice informed CAE that it had (1) breached the Franchise Agreement, (2) failed to present any reasonable alternative to closure of the Parker Center, and (3) endangered the safety and well-being of the children and staff at the Parker Center. This was sufficient notice for TLE to invoke Section 11.2.

[36] At this time, CAE was also in breach of the Franchise Agreement on other grounds, however, termination on those grounds would have required notice and an opportunity to cure. *See* **CAE's Trial Exhibit 5**.

It necessarily follows that by essentially evicting CAE from the Parker Center and Aurora Center, by seizing the centers, by precluding the Loganathans from physically returning, and by terminating the Parker Franchise Agreement and the Aurora Franchise Agreement, that TLE's actions, although not styled as a termination, had the effect of immediate termination of the Management Agreement and all related agreements.  Therefore, on May 2, 2014 all agreements between the parties were terminated, by TLE, and TLE was authorized to do so.  *See* Section 11.2.3 of the Franchise Agreements (cross-default clause); Section 7 of the Management Agreement (permitting repossession of a center pursuant to the Franchise Agreement); Section 8 of the lease assignments (cross-default clause);[37] and generally the terms of the personal guarantees (attached to the Franchise Agreements).

Accordingly, the Court enters judgment in TLE's favor on all counterclaims: Count I (Breach of the Parker Franchise Agreement), Count II (Breach of the Guaranty of the Parker Franchise Agreement), Count III (Breach of the Assignment and Assumption of the Parker Lease Agreement), Count IV (Breach of the Aurora Franchise Agreement), Count V (Breach of the Guaranty of the Aurora Franchise Agreement), Count VI (Breach of the Assignment and Assumption of the Aurora Lease Agreement), and Count VII (Breach of the Management Agreement).

The Court's ruling on these claims is unremarkable.  The agreements in this case were drafted by TLE.  The Loganathans agreed to TLE's terms without seeking legal counsel and,

---

[37] Although the cross-default clause in the lease assignments only allows for repossession of the premises after a certain amount of notice, here CAE permitted TLE to possess the premises although this permission was based upon a misunderstanding.  One other point with respect to the lease assignments bears mentioning.  Although the remedies available to TLE under the cross-default provision would allow it to collect unpaid rent in the same manner as the owner of the property—and therefore are not facially compatible with a concrete amount of liquidated damages—the Court concludes that the liquidated damages provision in the Franchise Agreement encompasses the types of remedies contemplated in the lease assignments, and the uncertainty inherent in the utilization of such provisions.

unsurprisingly, the terms of the agreements favored TLE.[38]   These terms favored TLE by allocating the risk of a failed franchise.  Also unsurprisingly, the risk for a failed franchise was essentially placed entirely upon the Loganathans.  But with risk comes reward and, had the franchises been successful, the Loganathans—not TLE—stood to reap the most financial gain.  It is unfortunate that the CAE franchises were not more successful; it is unfortunate that the parties entered into business together when it would seem their respective personalities were so incompatible; it is unfortunate that the Loganathans and TLE could not find a way to work together as professionals; and it is unfortunate that the Loganathans could not, at a minimum, find a way to work with Ms. Giarratano until such time as they had received, as they perceived it, adequate training.  In light of the damages in this case, it is also unfortunate the parties could not reach a mutually agreeable settlement resolution.  The Court appreciates the gravity of its decision in light of the time and energy the Loganathans invested into their businesses, in light of the struggles they have endured, and in light of the earnestness with which they have pressed their claims.   Nonetheless, the Court is bound to apply the law in this case, which the Loganathans consented to on September 19, 2011, when they executed the Franchise Agreements.

### C.  CAE's Remaining Claims

CAE's Contract Rescission Claim.   The elements of a cause of action for rescission of contract are: (1) the character or relationship of the parties; (2) the making of a contract; (3) the existence of fraud, mutual mistake, false representation, impossibility of performance, or other ground for rescission or cancellation; (4) the party seeking rescission had rescinded the contract and notified the other party to the contract of such rescission; (5) if the moving party has received

---

[38] The Court does not mean to imply TLE's terms were unusual for this type of transaction; the Court expresses no opinion on this subject.

benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible; and (6) the moving party has no adequate remedy at law. *Bland v. Freightliner LLC*, 206 F. Supp. 2d 1202, 1206 (M.D. Fla. 2002) (interpreting Florida law).

Here, the Court has found that with respect to the contracts in this case, TLE is without fault; TLE did not breach the agreements in this case; CAE did.  Accordingly, CAE is not entitled to judgment on this count.  *See Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policeman*, 50 F.3d 908, 916 (11th Cir. 1995).  Alternatively, the evidence in this case clearly established that, even if there was a breach and harm to CAE, CAE possessed an adequate remedy at law, and the availability of legal damages serves as an alternative basis to deny CAE judgment on this count.  Accordingly, the Court does not grant judgment in CAE's or the Loganathans' favor (as Counter-claimants) as to Count III and Counterclaim III.  Instead, judgment is entered in TLE's favor, and CAE and the Loganathans (as Counter-claimants) shall take nothing.

CAE's FDUTPA claim.  A "claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Tracfone Wireless, Inc. v. GSM Group, Inc.*, 555 F. Supp. 2d 1331 (S.D. Fla. 2008) (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006)).  At the summary judgment stage, the Court permitted this claim to proceed only to the extent it was premised upon TLE's actions undertaken during its management of the CAE franchises.  The Court has addressed this claim above by finding that TLE's actions in connection with the management of the CAE franchises were undertaken in good faith.  The Court concludes, therefore, that TLE has not engaged in any deceptive or unfair practice.  Moreover, the only point raised by CAE that may come close to a deceptive or unfair practice is the matter concerning TLE's failure to inform CAE of the pending probationary license at the Aurora Center.  Yet, the Court has found that TLE did not actively seek to deceive CAE on this matter.  Alternatively, even if it were assumed that TLE actively deceived CAE on this point, the Court

found that such deception did not result in any damages to CAE; in addition, evidence of causation

on such damages is lacking—there was simply no time for any damages to materialize.  Proof of

actual damages is necessary to sustain a FDUTPA claim. *Dorestin v. Hollywood Imports, Inc.*,

45 So. 3d 819 (Fla. Dist. Ct. App. 2010); *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist.

Ct. App. 1984).   Accordingly, CAE is not entitled to judgment on Count IV.  Instead, judgment is

entered in TLE's favor and CAE shall take nothing.

> CAE's Power of Attorney Claim.   In Count VI of the Amended Complaint and

Counterclaim, CAE asserted a claim for violation of Florida's Power of Attorney Statute.  Fla. Stat.

§ 709.2114.  This statute states in pertinent part that:

> (1) An agent is a fiduciary.  Notwithstanding the provisions in the power of attorney, an
> agent who has accepted appointment:
>> (a) must act only within the scope of authority granted in the power of attorney.  In
>> exercising that authority, the agent:
>>> 1.    Must not act contrary to the principal's reasonable expectations
>>> actually known by the agent;
>>> 2.    Must act in good faith;
>>> 3.    May not act in a manner that is contrary to the principal's best
>>> interest, except as provided in paragraph 2(d) and s. 709.2202.

Further, this section states in pertinent part that:

> (2) Except as otherwise provided in the power of attorney, an agent who has accepted
> appointment shall:
>> (a) Act loyally for the sole benefit of the principal;
>> (b) Act so as not to create a conflict of interest that impairs the agent's ability to
>> act impartially in the principal's best interest;
>> (c) Act with the care, competence, and diligence ordinarily exercised by agents in
>> similar circumstances.

*See id.*

Violations of this act flow from violations of the underlying agreement (*i.e.*, acting

outside of the limited authority granted by the agreement or failure to exhibit due care in

discharging those limited obligations).  *See id.*  Most significantly, the statute affords some

protection for an agent who has not breached a specific fiduciary duty in that, absent a breach, an

agent may not be held liable for the principal's economic loss.  *See* § 709.2114(5).  In other words, where the agent has acted in good faith and for the benefit of the principal, but the principal has nonetheless suffered a loss in value of property, the agent should not be held liable simply because he held control over that property.

Although the bounds of the fiduciary relationship are not expressly addressed therein, courts have refused to extend a general fiduciary duty under the statute and, instead, strictly limit it to the bounds of the contractual agreement.  *See Bldg. Educ. Corp. v. Ocean Bank*, 982 So. 2d 37, 41 (Fla. 3rd Dist. Ct. App. 2008) (finding that a fiduciary duty to act for the benefit of another is limited to matters within the scope of the fiduciary relationship); *see also Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002) (defining a fiduciary duty as "a duty to act for or to give advice for the benefit of another upon matters within the scope of that relation").

As the Loganathans could not legally enter the United States prior to the opening of the Parker and Aurora Centers, the parties entered into a Management Agreement in order for TLE to manage the centers on behalf of CAE.  TLE argues that in conjunction with this agreement, it was necessary for the parties to enter into a Power of Attorney Agreement so that TLE, as Manager, could perform certain discrete duties in connection with the Management Agreement.  Specifically Section 2 of the Management Agreement states:

2.      Center Operations

(a)      As of the Effective Date, Manager shall assume authority over the management and operations of the Centers.  Franchisee hereby grants absolute power of attorney, as shown on Exhibit B attached hereto, appointing Manager as its attorney-in-fact to act in its place and stead on all matters pertaining to the Centers; provided, however, that Manager and its affiliates shall not assume or otherwise incur any liability in regard to its management of the Centers, and Franchisee does hereby agree to release and hold harmless Manager and its affiliates from any liability arising from its management of the Centers, except for any liability resulting from the willful misconduct of Manager.

**CAE's Trial Exhibit 8**.  TLE further argues that the Powers of Attorney in this case were intended

to be utilized by TLE only for certain limited purposes under the provisions of the Management

Agreement to further TLE's actions as Manager.  More specifically, the Powers of Attorney could

be used to:

1)      Obtain childcare licenses for the Centers (*See* Section 2(b) of the Management
        Agreement);

2)      Open segregated bank accounts for each Center and not co-mingle the funds of the
        Centers' respective bank accounts (*See* Section 2(b) of the Management
        Agreement);

3)      Collect tuition and file tax returns (*See* Section 2(b) of the Management Agreement);
        and

4)      Manage and pay bills, payroll and federal and state taxes as required (*See* Section
        2(b) of the Management Agreement).

*See* **Shafir Test. Trial Tr., Page 11:12–12:1, 13:11–16:6, 15–25, 17:1–3**.

In response, CAE argues that the scope of the Power of Attorney, "on all matters pertaining

to the Centers," was so broad that essentially *every* function of management, by TLE, was subject to

fiduciary duties.  Upon review of the Management Agreement and Power of Attorney, the Court

concludes that TLE's position is both logical and reasonable. However, CAE's position, which is

grounded in the plain wording of the text, is sufficiently reasonable that the Court concludes that the

scope of the Power of Attorney is ambiguous.  The Court therefore considers extrinsic evidence of

intent as well as evidence of the circumstances surrounding the execution of the Management

Agreement.  *See Gulf Cities Gas Corp. v. Tangelo Park Serv. Co.*, 253 So. 2d 744, 748 (Fla. Dist.

Ct. App. 1971).

The totality of evidence clearly weighs in favor of TLE's interpretation of the Power of

Attorney Agreement.  CAE's evidence of intent on this matter was both limited and unpersuasive.

The Court therefore concludes that the scope of the Power of Attorney was limited to the certain

discrete functions delineated by Mr. Shafir.  With respect to TLE's performance of those functions,

the evidence at trial showed that TLE complied with and performed successfully each one of these enumerated duties.  CAE did not present any competent evidence (1) that TLE failed to perform these specific duties under the Management Agreement, (2) that TLE failed to act in good faith when completing these duties, (3) that TLE acted contrary to CAE's reasonable expectations which were actually known to TLE when completing these duties, or (4) that TLE acted contrary to CAE's best interests in carrying out these specific duties.  TLE also presented uncontroverted evidence that TLE uses a similar power of attorney with all of its management agreements and that its use is limited to "ministerial" acts involving certain limited third party transactions, such as obtaining licenses for the centers, and opening bank accounts in the name of the franchisee.  *See* ***Campolo Test. Trial Tr. Vol. 4, Page 139:10–140:6; TLE's Trial Exhibit 5; Weissman Test. Trial Tr. Vol. 8, Page 194:20–196:8; Shafir Test. Trial Tr., Page 11:12–12:1, 13:11–16:6, 15–25, 17:1–3***.  Furthermore, CAE failed to present any evidence that TLE mismanaged the funds in the segregated bank accounts or that TLE failed to manage and pay the bills, payroll or applicable taxes, as required under the Management Agreement.  Pursuant to the statute, TLE was required to act in accordance with CAE's "reasonable" expectations that were actually known to TLE.  TLE acted in accordance with those reasonable expectations actually known to it, which are set forth in the Management Agreement.  As such, this Court finds that CAE is not entitled to any relief under its claim related to the Florida Power of Attorney statute. Alternatively, even if the scope of the Power of Attorney is construed to encompass all of TLE's duties as Manager, the Court concludes that TLE acted as Manager in good faith, in accordance with all *reasonable* expectations known to it, in a manner that was not contrary to CAE's interest.  The Court therefore does not enter judgment in CAE's favor as to Count VI. Instead, judgment is entered in TLE's favor and CAE shall take nothing.

<u>All of CAE's claims under the Management Agreement.</u>  As a final matter, the Court makes one conclusion in the alternative for the majority of CAE's claims premised upon the Management Agreement.  The Management Agreement contains express disclaimers and limitations of TLE's duties as Manager, including without limitation the following:

- That Manager and its affiliates shall not assume or otherwise incur any liability in regard to its management of the Centers, and that Franchisee does hereby agree to release and hold harmless Manager and its affiliates from any liability arising from its management of the Centers, except for any liability resulting from the willful misconduct of Manager. *See* Section 2(a) of the Management Agreement;

- Franchisee agrees and represents that each understands that there are no express or implied representations by Manager with respect to the Centers' operations, and Franchisee further agrees that the performance by Manager hereunder will not be used by Franchisee as a basis for any claim, suit or other cause of action, or otherwise as a claim against Manager or its affiliates under the Franchise Agreements or any related documents.  Franchisee further acknowledges that Manager's agreement to assume the management of the Centers does not constitute a guarantee, assurance or warranty, express or implied, of the successful operation or profitability of the Centers.  *See* Section 6(e) of the Management Agreement;

- Franchisee specifically acknowledges, agrees and represents that no representations or promises of any kind have been made to induce them to sign this agreement.  Franchisee further acknowledges, agrees, and represents that neither Manager nor any of Manager's affiliates have guaranteed that the center will succeed or has provided any sales or income projections of any kind.  Franchisee agrees that if the above is not true, they are obligated to notify the Manager in writing, of any violation of this Section.  Most importantly, Franchisee acknowledges, agrees and understands that Manager has entered into this Agreement based solely on the representations made by Franchisee hereunder and is merely a good faith attempt by Manager to improve the Center in the interests of the Center's children and the brand name.  *See* Section 5 of the Management Agreement.

CAE takes the position that the waivers and disclaimers under the Management Agreement amount to a promise not to sue for a failure to produce a profit.  This interpretation of the waivers in the Management Agreement is unreasonable.  The terms of the waiver are unambiguous; the most appropriate reading of the waivers and disclaimers in the Management Agreement is that CAE promised not to litigate claims that were based upon TLE's **performance** under the Management

Agreement, *unless TLE's deficient performance arose from willful misconduct*. TLE did not engage

in any willful misconduct.  Accordingly, the Court concludes that CAE may not bring any claim

that is premised upon TLE's performance under the Management Agreement.  More specifically,

any claim that is based upon the specific methods or procedures that TLE used (or the discretion it

exercised) to manage the centers is precluded under the Management Agreement.  These waivers do

not preclude, for example, arguments unrelated to TLE's day-to-day operations of the centers, such

as CAE's argument over TLE's co-management obligations under the Management Agreement.

The Court therefore concludes, in the alternative, that judgment cannot be entered in CAE's favor

for each of CAE's Management Agreement claims premised on the grounds specified above.

## D.      Damages

The Franchise Agreements contain two provisions relevant to the issue of damages.  The

first is section 11.4.1(d) which reads as follows:

> (d)      You must promptly pay all sums owing to us and our Affiliates.  In the event of
> termination for any default of yours, such sums will include all damages (including future royalty fees
> that otherwise likely would have been paid from the termination date through the end of the initial term
> but for the early termination of the Agreement), costs, and expenses, including reasonable attorneys' fees,
> incurred by us as a result of the default, which obligation shall give rise to and remain, until paid in full, a
> lien in favor of us against any and all of the personal property, furnishings, equipment, signs, fixtures, and
> inventory owned by you as well as on the Center premises.  You hereby appoint us as your attorney in
> fact, with full power and authority to execute on your behalf such documents as are necessary to obtain
> and perfect such lien.  Future royalty fees due will be calculated as the present value of the average
> monthly royalty fees that you were obligated to pay during the 12-month period immediately preceding
> the month that the Franchise Agreement is terminated, multiplied by the number of months remaining in
> the initial term at the date of termination;

**CAE's Trial Exhibit 5**.  The second is Section 11.5, a liquidated damages provision, which

reads as follows:

> **11.5      Liquidated Damages.**  In the event we terminate this Agreement pursuant to Section 11.1, 11.2,
> or you improperly terminate this Agreement through your act or omission, it is acknowledged that
> estimating the damages suffered us will be difficult.  Our expenses include the costs of possibly taking
> back the Center, staffing, possible renovations, re-equipping, increased advertising, lost Royalty income,
> as well as damage to our reputation and the Marks.  The parties therefore agree that as liquidated damages,
> we will be entitled to recover, without actual proof of loss, the sum calculated in accordance with the
> following formula: six percent (6%) of the single highest monthly Gross Revenues from the previous
> thirty-six (36) month period before the termination, multiplied by twelve (12) and the result multiplied by
>
> the number of remaining years under this Agreement had it not been terminated and that number being
> reduced to net present value using a 6% discount rate plus default rate of two (2x) times that value.  You
> agree that this formula is a reasonable estimate of damages and not a penalty.  This formula is stipulated to
> be acceptable to all parties and to be used by any court of competent jurisdiction in calculating the award
> of damages to us for termination of this Agreement.

**CAE's Trial Exhibit 5**.  As an initial matter, it is self-evident that applying both damages provisions to CAE would result in a double recovery for TLE and, notably, TLE does not take the position[39] that it is entitled to damages under both clauses.  Upon review of these damages clauses, the Court finds that TLE is entitled to liquidated damages under Section 11.5 but is not entitled to damages under Section 11.4.1(d).  The Court's decision is based upon the appropriate nature of liquidated damages in this case.[40]

For example, the liquidated damages provision was expressly included in the Franchise Agreement because of the inherent difficulty in estimating damages that resulted from "taking back the Center . . . lost Royalty income, as well as damage to our reputation and the Marks" as well as the difficulty in calculating actual damages under Section 11.4.1(d).  The difficulty in estimating damages under the facts of this case warrants an application of liquidated damages.  TLE was required to incur expenses related to seizing the centers, staffing the centers, and repairing the damage done to its brand.  These expenses are difficult to quantify, particularly expenses related to the damage CAE's actions caused to the TLE brand.  Furthermore, TLE became responsible for lease payments[41] which eventually necessitated a very large settlement with the Parker Center property owner when the Parker Center was closed.  Although the lease assignments provided TLE with the authority to sue CAE for missed lease payments in the same manner as the landlord of the property could, the inherent uncertainty in such a provision promotes the utility of a liquidated damages clause.  Moreover, the damages provision in the lease assignment (even if TLE wanted to use it) was complicated by CAE's withdrawal from all

---

[39] Although at trial TLE's position was less clear, TLE takes the position in its proposed findings of fact and conclusions of law that the liquidated damages provision is an alternative, not cumulative, remedy.

[40] The Court's decision is also based upon a reading of Section 11.4 in its entirety.  A fair reading of this section implies that the franchisee will continue to (or theoretically could) operate a business, in some form, after termination and that TLE would not, for example, seize the business.

[41] Although TLE also became responsible for lease payments at the Aurora Center, and although the Court concludes that such payments were the obligations of TLE as an owner subsequent to May 2, 2014, the Court's analysis is different for the Parker Center because of the center's essential insolvency.

owner-based responsibilities and the accompanying uncertainty as to whether CAE remained as a franchisee. The net result of CAE's actions, with respect to damages, was confusion.

This confusion further reinforces the appropriate nature of liquidated damages in this case. CAE's insistence that it was no longer a franchisee, combined with TLE's insistence that CAE *was* still a franchisee, resulted in a cacophony of financial discord. TLE was forced, lest its brand be damaged, into assuming ownership-based responsibilities of the CAE franchises. Problematically, TLE assumed these responsibilities with the understanding that it would be entitled, in the interim, to a management fee since it was not (as it understood it) the owner of the CAE franchises. Accompanying this confusion was the instant litigation. Finally, the liquidated damages provision encompasses the royalty payments TLE had anticipated receiving in the future, which are now impossible to collect.

CAE argues that it would be inequitable to apply the liquidated damages provision in this case. *See Coleman v. B.R. Chamberlain & Sons, Inc.*, 766 So. 2d 427, 429 (Fla. Dist. Ct. App. 2000) (liquidated damages may not be disproportionate to the harm); *Hutchison v. Thompkins*, 259 So. 2d 129 (Fla. 1972) (a trial court may, through equitable powers, reduce a liquidated sum if it appears unconscionable in light of the circumstances). CAE points out that the Aurora Center has become profitable and that TLE may now reap the associated fiscal rewards into the future—which is far greater than, for example, future expected royalty payments. CAE also points out that a settlement was reached between TLE and the Parker Center landlord and as a result there will be no future damages associated with lease payments at that center. With respect to the Parker Center, the Court finds these arguments to be unpersuasive. *See Secrist v. Nat'l Serv. Indus., Inc.*, 395 So. 2d 1280, 1283 (Fla. Dist. Ct. App. 1981) ("The fact that the liquidated damages may be excessive at the time of the breach does not lead to the conclusion that the liquidated damages clause is a penalty and therefore not enforceable."). With respect to

the Aurora Center, CAE's arguments have merit.

### 1. The Parker Center

Ultimately, the awkwardness and confusion in this case are primarily derived from the actions of CAE and the Loganathans. The Management Agreement was offered as an accommodation to the Loganathans' immigration situation—which had the effect of substantial confusion and litigation in this case. The Loganathans' training and assumption of management were both accelerated as an accommodation to the Loganathans—which had the effect of substantial confusion and litigation in this case. The April 2014 crisis was also attributable to the Loganathans. Finally, and perhaps most importantly, the withdrawal of CAE from all ownership responsibilities—notwithstanding TLE's clear desire to keep CAE as a franchisee—had the result of very great confusion and uncertainty in this case, particularly with respect to TLE's damages. For these reasons, to the extent the Court weighs the equities associated with liquidated damages at the Parker Center, the Court concludes that such an analysis favors TLE.

Moreover, CAE's arguments do not address the uncertainty that existed at the time of contract, nor do they address the harm that flowed from CAE's breach. CAE agreed that the liquidated damages provision was not a penalty at the time the Franchise Agreements were executed, and the Court concurs. The liquidated damages under the provision are variable and have the potential for large fluctuations depending upon such factors as a center's gross revenues and the amount of time the center has been in operation. The central harm that flowed from CAE's breach was the loss of royalty income for TLE. The liquidated damages provision is tailored to that breach: it uses the revenues of the center, applies a percentage, and extrapolates the damages into the remainder of the franchise term—which is what TLE bargained for. To the extent these damages are augmented beyond lost royalty payments, this stems from the fact that TLE was anticipated to (and did) incur damages beyond its lost royalty payments that were

similarly difficult to calculate.  For example, TLE incurred damages to its brand and damages pertaining to future lease obligations.  For the appropriateness of including these types of damages in the liquidated damages calculation, the Court need only look to what ultimately occurred at the Parker Center.  The itemized amount of lost royalties at the Parker Center was proffered by TLE to be $438,851.  *See* **TLE's Trial Exhibit 256C**.  When TLE's $300,000 settlement payment to the Parker Center landlord is added to this amount, together with CAE's missed lease payments, the summation approximates the liquidated damages calculation, to say nothing of the other damages TLE incurred in relation to the Parker Center.  Moreover, the disparity between the apparent outcomes of the Parker and Aurora Centers highlights the uncertainty and difficulty in estimating these types of damages at the time of contract.

In summary, the Court concludes that the liquidated damages clause is enforceable for the Parker Center because the damages that stemmed from CAE's material breach were not readily ascertainable when the contract was formed and the sum stipulated to is not so grossly disproportionate that it cannot be reasonably expected to flow from the breach.  *See Goldblatt v. C.P. Motion, Inc.*, 77 So. 3d 798, 800 (Fla. Dist. Ct. App. 2011); *Humana Med. Plan, Inc. v. Jacobson*, 614 So. 2d 520, 522 (Fla. Dist. Ct. 1992).  Applying the liquidated damages formula to the Parker Center results in the following calculation:

> Six percent (6%) of the highest monthly gross revenues from the previous thirty-six month period ($71,537), which computes to $4,292.00 (rounded to the nearest dollar);
>
> multiplied by 12, which computes to $51,504.00;
>
> multiplied by the number of years remaining under the Parker Franchise Agreement (13.36), which computes to $688,093;
>
> discounted to present value (using a 6% discount rate), which computes to $464,303;
>
> multiplied by two, which computes to **$928,606**.

*See* **Shafir Test. Trial Tr., Pages 93:19–97:11; TLE's Trial Exhibit 256B**.

2.   **The Aurora Center**

With respect to the Aurora Center, the Court concludes that, like the Parker Center, the damages that stemmed from CAE's breach were not readily ascertainable at the time of contract. Unlike the Parker Center, however, the Court concludes that the liquidated damages provision *is* grossly disproportionate to the Aurora Center breach.  This is because TLE could not terminate the Aurora Center Franchise Agreement for precisely the same reason as it could terminate the Parker Center Franchise Agreement.  The Parker Franchise Agreement was terminated by TLE for, essentially, the gross mismanagement of the center by CAE.  By contrast, the Aurora Franchise Agreement was terminated by TLE pursuant to a cross-default clause.  While the cross-default clause certainly entitled TLE to such termination, it does not necessarily follow that TLE was damaged at the Aurora Center in the same manner that TLE was damaged at the Parker Center.

Unlike the Parker Center, the Aurora Center was managed almost exclusively by TLE.  In the entire lifespan of the Aurora Center, CAE was only responsible for its management for a single month.  The damages at the Parker Center, which were so difficult to estimate, are not present at the Aurora Center.  CAE did not have enough time at the Aurora Center to cause damage to the TLE brand.  Indeed, the Court finds that there is no persuasive evidence that CAE was responsible for any notable amount of mismanagement or direct damages at the Aurora Center during their brief tenure as managers.

Furthermore, although TLE submitted evidence of damages at the Aurora Center in the form of expenses it has incurred (such as working capital), those expenses were incurred *after* TLE seized the Aurora Center.  TLE owned the Aurora Center at the time of seizure:  May 2, 2014.  Accordingly, TLE incurred those expenses as an owner, not as a manager, and has therefore suffered no damages in this regard.  As such, only one notable category of damages

remains—TLE's lost royalty revenue at the Aurora Center.[42]  Although lost royalty revenue at the Aurora Center would facially qualify for a liquidated damages allotment, the liquidated damages calculation is disproportionate to the harm.  The amount of lost royalty revenue at the Aurora Center is proffered by TLE to be $479,448.  **TLE's Trial Exhibit 256C**.  By contrast, the Aurora liquidated damages calculation would exceed one million dollars.  This is disproportionate and, as such, the liquidated damages provision is not enforceable as to the Aurora Center.  *See Coleman v. B.R. Chamberlain & Sons, Inc.*, 766 So. 2d 427, 429 (Fla. Dist. Ct. App. 2000).

Alternatively, the Court concludes that it would be inequitable to apply the liquidated damages provision to the Aurora Center.  *See Hutchison v. Thompkins*, 259 So. 2d 129 (Fla. 1972); *Beatty v. Flannery*, 49 So. 2d 81, 82 (1950).  The evidence before the Court is that the Aurora Center has reached the point of profitability and the Court finds that the Aurora Center is anticipated to now produce, if it has not already, a profit.  This profit would easily be anticipated to exceed the amount of revenue TLE would receive from CAE in the form of royalty payments.  Moreover, TLE now owns a viable center that could be sold to another investor, together with all of the site improvements that were constructed with CAE funds.   An award of liquidated damages for the Aurora Center would amount to a windfall to TLE.  Although TLE was entitled to seize the Aurora Center by virtue of the Parker Center default, the basis for liquidated damages—or any damages at all—is not imputed from the Parker Center to the Aurora Center.  In summary, (i) TLE's expenses at the Aurora Center were expenses it incurred as an owner, albeit as an unknown owner, (ii) TLE's lost future revenues and expenses related to seizing the Aurora Center are greatly exceeded by the income stream (and improvements) it now possesses,

---

[42] Although other viable damages existed, such as expenses relating to seizing the Aurora Center on May 2, 2014, these damages are insufficient under the Court's analysis for the Aurora Center (to cause the liquidated damages provision to no longer be disproportionate) for the same reasons anticipated royalty revenues are insufficient.

and (iii) the factual circumstances and corresponding equitable considerations are vastly different between the Aurora Center and the Parker Center.  The Court therefore concludes that TLE is not entitled to damages in connection with the Aurora Center.

For all of the foregoing reasons, TLE is entitled to judgment in the amount of **$928,606**. Final judgment will be entered in a separate order.  The Clerk of the Court is directed to **CLOSE THIS CASE**.

**DONE AND ORDERED** in Chambers, Fort Pierce, Florida, this 31st day of July, 2015.

Robin L. Rosenberg
United States District Judge

Copies furnished to all counsel of record.